IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 1:24-cv-22142-DPG

**FANNY B. MILLSTEIN and
MARTIN KLEINBART,**

**Plaintiffs,**

**v.**

**WELLS FARGO BANK, N.A.,**

**Defendant.**

_____/

### FIRST AMENDED COMPLAINT

Plaintiffs Fanny B. Millstein and Martin Kleinbart, on behalf of themselves and all others similarly situated (herein referred to as the "Plaintiffs"), hereby sue Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), and state as follows:

### Introduction

1.      This civil action seeks damages against Wells Fargo for aiding and abetting a massive Ponzi scheme (the "Scheme") resulting in the loss of over $300 million by more than 1,000 investor victims (the "Class"), including Plaintiffs, most of whom were elderly and lost substantial life savings.

2.      From 2011 until 2021, Wells Fargo possessed actual knowledge of the Scheme and substantially assisted the Scheme's perpetrators Marshal Seeman ("Seeman"), Eric Holtz ("Holtz"), and Brian Schwartz ("Schwartz") (collectively, the "Scheme Operators").

3.      The Scheme was conducted by the Scheme Operators through a multitude of entities controlled by them, including National Senior Insurance, Inc. d/b/a Seeman Holtz

("NSI"), the Para Longevity Companies ("PLCs"),[1] and the Centurion Companies,[2] that used Wells Fargo as their primary bank.

      4.     The basic framework of the Scheme consisted of NSI and its agents soliciting and selling to Plaintiffs and the Class promissory notes ("Notes") that were offered by the PLCs and secured by collateral in the form of certain life insurance policies issued to third parties, commonly known throughout the insurance industry as "Stranger-Originated Life Insurance" ("STOLI") and "life settlements." The Scheme Operators promised investors in the Notes that the proceeds from the death benefits of STOLIs would be used to fund the interest payments due to those investors and eventually return their principal.

      5.     However, as Wells Fargo knew, instead of properly using new investor money to fund premiums for new STOLI policies, the Scheme Operators took a substantial portion of those newly invested funds to pay existing investors, and further looted significant sums through improper, exorbitant, or fictitious fees and expenses. Wells Fargo also knew and observed that many of the same STOLIs that were represented to Plaintiffs and the Class to serve as collateral for their Notes were instead fraudulently pledged as security or transferred to other lenders through

---

[1] The PLCs consist of the following entities: (1) Para Longevity Investments, LLC; (2) Integrity Longevity Investments, LLC; (3) Para Longevity 2012, LLC; (4) Para Longevity 2012-5, LLC; (5) Emerald Assets, LLC; (6) Seeman Holtz Global, LLC; (7) Para Longevity 2014, LLC; (8) Emerald Assets 2014, LLC; (9) Paraveda Investments V, Inc.; (10) Paraveda Investments, LLC; (11) Emerald Assets 2015, LLC; (12) Emerald Assets 2016, LLC; (13) Alloy Elements Assets, LLC; (14) Para Longevity 2019-7, LLC; (15) Advent Assets, LLC; (16) Paraveda Premium Financing 2009-2, LLC; (17) Paraveda Premium Financing 2009-3, LLC; (18) Para INT 2019, LLC; (19) Para Longevity Global V, LLC; (20) Para Longevity 2014-5, LLC; (21) Centurion ISG Services, LLC; (22) Para Longevity 2015-5, LLC; (23) Para Longevity 2015-3, LLC; (24) Para Longevity 2016-3, LLC; (25) Para Longevity 2016-5, LLC; (26) Integrity Assets, LLC; (27) SH Global, LLC N/K/A Para Longevity V, LLC; (28) Integrity Assets 2016, LLC; (29) Para Longevity 2018-5, LLC; (30) Para Longevity 2018-3, LLC; (31) Emerald Assets 2018, LLC; (32) Para Longevity 2019-6, LLC; (33) Para Longevity 2019-3, LLC; (34) Para Longevity 2019-5, LLC; (35) Para Longevity VI, LLC; (36) Grace Holdings Financial, LLC; (37) Alloy Assets, LLC; and (38) Centurion ISG Finance Group, LLC.

[2] The "Centurion Companies" are entities that were created by Seeman, Holtz, and/or Schwartz to own or service the STOLIs purchased with funds converted from PLCs, which includes CENTURION INSURANCE SERVICES GROUP, LLC, an Ohio limited liability company, CENTURION ISG Holdings, LLC, a Delaware limited liability company, CENTURION ISG Holdings II, LLC, a Delaware limited liability company, CENTURION ISG (Europe) Limited, a foreign entity, CENTURION FUNDING SPV I LLC, a Delaware limited liability company, CENTURION FUNDING SPV II LLC, a Delaware limited liability company.

the Centurion Companies.  But rather than reporting or taking any action to stop this ongoing and ever-expanding fraud, Wells Fargo instead chose to substantially assist and profit from it.

6.      During that 2011 through 2021 period, Wells Fargo had both an insiders' and top-level view of the Scheme. From these dual perspectives, the hallmarks of the Ponzi scheme were obvious and known to Wells Fargo.

7.      From its insider roles as trustee of, and securities intermediary for, certain STOLIs, the collateral that was supposed to back the investors' Notes, Wells Fargo knew of, and substantially assisted in, the fraudulent representations and material omissions of fact crafted by the Scheme Operators to Plaintiffs and the Class.  As further described below, Wells Fargo knew that the Scheme Operators, by and through the PLCs they controlled, communicated to Plaintiffs and the Class that the underlying STOLIs for the Notes were held by a collateral agent to protect those life settlement assets.  In reality, as Wells Fargo knew, no collateral agent held those assets, and investors in the Notes were misled regarding the profitability of the PLCs that issued the Notes, the existence of sufficient STOLIs and other assets securing their investments, and the perfection of security interests in those assets.

8.      From its bird's eye vantage point as the primary depository bank used by the Scheme Operators for the intake and outflow of investment funds to and from Plaintiffs and the Class, Wells Fargo knew of and substantially assisted in the frequent transfers of those funds for improper purposes, which included round-trip, in-and-out transactions of new investor money to pay existing investors as well as the pilfering of those funds by the Scheme Operators.

9.      Moreover, Wells Fargo must have known that (a) the Notes were not properly registered as securities, (b) nor were the Notes qualified for exemption from registration under the applicable state securities statutes, (c) nor were NSI or its agents who recommended and sold the

Notes properly licensed to do so.

10.     Plaintiffs and most of the Class members have lost their entire investment.  For many of them, their investments in the Notes represented their life's savings, and they now have been left with no income to sustain them in retirement other than Social Security benefits.

11.     In 2021, the Florida Office of Financial Regulations ("OFR") uncovered the Scheme and commenced legal action against its perpetrators. Thereafter, by order dated May 12, 2023 of the Florida Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Civil Division in *State of Florida, Office of Financial Regulation v. National Senior Insurance, Inc. d/b/a Seeman Holtz, et al.,* Case No. 502021CA008718XXXXMB (the "OFR Action"), Daniel J. Stermer ("Stermer") was appointed receiver of NSI and certain of the PLCs and other related entities (the "Receivership Entities").

12.      Based on a forensic review of the Receivership Entities' books and records, Stermer determined that the PLCs and other Receivership Entities had been substantially damaged not only by the acts of the primary perpetrators of the Scheme, but by secondary acts and material omissions of Wells Fargo that aided and abetted the Scheme. As a direct and proximate consequence of Wells Fargo's knowing and substantial assistance of the Scheme, the PLCs and other Receivership Entities had: (a) their assets stolen; (b) the STOLIs they purchased pledged and ultimately foreclosed on by third parties; and (c) their bank accounts pilfered by the Scheme Operators.

13.     Stermer further discovered that from 2011 until 2021, Wells Fargo provided substantial assistance and services in furtherance of the Scheme, including, *inter alia*, as the trustee ("Trustee") of irrevocable life insurance trusts ("ILITs") that owned the STOLI policies, as securities intermediary ("Securities Intermediary") for STOLIs, as well as the bank that opened

4

and maintained dozens of bank accounts for the PLCs and other entities affiliated with the Scheme ("Depository Bank"). Thus, as Receiver for the Receivership Entities, on May 9, 2024, Stermer sued Wells Fargo for aiding and abetting the Scheme by initiating a supplemental proceeding in the OFR Action before the same Florida state court.

14.     Wells Fargo's goal was to maximize assets held, account- and transfer-related revenue, and compensation, and in chasing that goal, Wells Fargo and its employees substantially assisted the Scheme's fraud, as well as the misuse and misappropriation of assets by enabling the Scheme to continue operating. Wells Fargo, as the primary Depository Bank used in the Scheme, as well as in its roles as Trustee and Securities Intermediary, effectuated the transactions that enabled the Scheme to reach catastrophic levels. Without Wells Fargo's substantial assistance in facilitating the Scheme, it would have stalled, leaving the PLCs and other Receivership Entities with significant funds that could have been used for legitimate, profit-generating investments or simply held to later return to capital investors. But with Wells Fargo's assistance, the Scheme went uninterrupted until the OFR intervened.

15.     Now, the PLCs and other Receivership Entities face a significant, nine-figure liability to Plaintiffs and the Class that would not have been possible but for the actions and omissions of Wells Fargo. And, as Stermer has disclosed in various court filings and communications to Plaintiffs and the Class, the PLCs and other Receivership Entities have little to no means to compensate Plaintiffs and the Class for their losses directly and proximately caused by the Scheme.

16.     The Scheme raised more than $400 million in capital since 2011 through the sale of the Notes, and there are currently more than $300 million in outstanding Notes held by more than 1,000 current investors, many holding more than one Note.

17.     The Notes belonging to Plaintiffs and the Class have matured, including specifically the following for Ms. Millstein:

| Noteholder | Issuer | Matured |
|---|---|---|
| Gerald J. Millstein and Fanny B. Millstein | Para Longevity 2015-3 ("PL 2015-3") | Jan. 28, 2019 |
| Fanny B. Millstein | Para Longevity 2016-3 ("PL 2016-3") | Jan. 13, 2020 |

18.     The Notes for Mr. Kleinbart have also matured:

| Issuer | Issue Date | Face Value | Maturity |
|---|---|---|---|
| Para Longevity 2018-5, LLC | Sept. 14, 2017 | $100,000 | Sept. 14,2022 |
| Para Longevity 2018-5, LLC | Oct. 23, 2018 | $100,000 | Oct. 23, 2023 |
| Para Longevity 2018-5, LLC | Feb. 8, 2019 | $100,000 | Feb. 8, 2024 |
| Para Longevity 2018-5, LLC | Feb. 26, 2019 | $112,920 | Feb. 26, 2024 |
| Grace Holdings Financial, LLC | Sept. 12, 2019 | $158,000 | Sept. 12,2021 |

19.     Even though the Notes have fully matured, the PLCs and other Receivership Entities do not possess any significant underlying assets to pay back the monies owed to Plaintiffs and the Class.

20.     Due to Wells Fargo's actual knowledge of and substantial assistance in the Scheme as described herein, it is liable to Plaintiffs and the Class for all the outstanding monies due and owing to them for their respective Notes.

## Parties

21.     Plaintiff Martin Kleinbart is 82 years old and *sui juris*. Plaintiff Martin Kleinbart is a citizen of the State of Florida residing in Miami-Dade County, Florida.

22.     Plaintiff Fanny B. Millstein is 79 years old and *sui juris*.  Plaintiff Fanny B. Millstein is a citizen of the State of Florida residing in Broward County, Florida

23.     Defendant Wells Fargo is a nationally chartered bank, headquartered in Sioux Falls,

South Dakota, and with its principal place of business in San Francisco, California. Wells Fargo is one of the largest banks in the United States, providing banking products and services to businesses, customers, and institutions in all 50 states and boasting $17.892 billion in net income for 2023.

24.    Non-party Marshall Seeman is a resident of Florida. Seeman was a principal of the Receivership Entities and Seeman Holtz Property & Casualty, LLC ("SHPC"), and acted as their chief executive officer.

25.    Non-party Eric Holtz was a resident of Florida.[3] Holtz was a principal of the Receivership Entities and SHPC, who acted as the head of marketing and sales, as well as the chief of the PLCs' financial advisory practice.

26.    Non-party Brian Schwartz was a resident of Florida.[4] Schwartz was a principal of the Receivership Entities and SHPC, who acted as the head of finance and accounting.

<u>**Jurisdiction and Venue**</u>

27.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (codified at 28 U.S.C. §§ 1332(d)(2)).  At least one member of the Class is a citizen of a different state than the Defendant, there are more than one hundred members of the Class, and the aggregate amount in controversy exceeds five-million dollars ($5,000,000).

28.    This Court has specific personal jurisdiction over Wells Fargo because Plaintiffs' claims arise out of Wells Fargo's activity and unlawful conduct in Florida and in this District, including the conduct by which Plaintiffs were damaged.  Accordingly, the Defendant is subject to Florida's long arm jurisdiction under Fla. Stat. § 48.193. This Court has general personal jurisdiction over Wells Fargo because Wells Fargo is a nationally chartered bank that continuously

---

[3] Holtz committed suicide on June 11, 2021.
[4] Schwartz committed suicide on April 12, 2023.

and systematically operates, conducts, engages in, and carries on business in Florida and maintains numerous branches in Florida.

29.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Wells Fargo transacts business, engaged in misconduct, and/or may be found in this District. Venue is also proper here because at all times relevant hereto, Plaintiffs resided in the Southern District of Florida, and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

30.     All conditions precedent to this action have occurred, been performed, or have been waived.

31.     Venue is proper in this Division because this is a related case to *Millstein v. Holtz*, No. 21-cv-61179 (S.D. Fla. 2021), which was presided over by Judge Ruiz and involves the same Scheme, Scheme Operators, nucleus of operative facts, and Plaintiff Milstein.

<u>**General Allegations**</u>

**I.      The Underlying Scheme.**

32.     Seeman and Holtz created and ran one of the largest insurance conglomerates in South Florida, having two main divisions: NSI and SHPC.  NSI sold life insurance, annuities, structured settlements, and other insurance-related products, and held itself out as a wealth manager.  SHPC sold property and casualty insurance products and grew rapidly through the acquisitions of smaller property and casualty insurance companies.

33.     Seeman and Holtz also created the PLCs to solicit funds from investors through the sale of Notes purportedly to fund the purchase and payment of premiums for STOLIs.

34.     Each of the Notes sold to Plaintiffs and the Class contained substantially similar material terms.  Each investor's Note from a PLC required the PLC to pay interest to the investor

8

over a certain period of time. Upon maturity of the Notes, the PLC agreed to return to the investors the original principal amount invested. The investment period on the Notes ranged from between 4 to 60 months, with the average being slightly more than 30 months.

35.     Plaintiffs and the Class were lured to invest in the Notes issued by PLCs with promises of returns with average annual interest rates that ranged from approximately 7.25% to 18%.

36.     The Notes are securities as defined by Fla. Stat. § 517.021(22). The Notes were neither exempt from registration with OFR pursuant to Fla. Stat. § 517.051; nor offered and sold in transactions that were exempt from registration with OFR pursuant to Fla. Stat. § 517.061; nor federal covered securities, as defined by Fla. Stat. § 517.021(10). At all material times, the Notes were not registered with the OFR.

37.     Each PLC solicited funds through a private placement memorandum ("PPM") in connection with each of the Note offerings that described the purported investment opportunity, risk of loss, and other material matters.  The PPMs acknowledged that the Notes were securities subject to state and federal securities laws and indicated that only "accredited investors" were eligible to purchase the securities. However, hundreds of the investors in the Class were unaccredited investors; many never filled out an accredited investor form, or only partially filled out an accredited investor form.

38.     By 2013, the PLCs had raised approximately $58 million in funds primarily from individual investors, and by 2019 that number had ballooned to more than $400 million.

39.     Despite assurances otherwise, the STOLIs which purportedly secured the Notes were not owned or held by the respective PLC that issued the Notes.

40.     Rather than purchase STOLIs, the Scheme Operators used newly-invested money

in the Notes issued by the PLCs to: (a) pay interest and redemptions to investors who had invested in other PLCs; (b) fund the purchase and retained ownership of STOLIs by other non-PLC companies controlled by the Scheme Operators, which did not collateralize the Notes; and (c) pay improper, exorbitant, and fictitious fees and expenses, including to NSI to pay its agents' commissions for assisting in the sale of Notes to investors.

41.     Other than through the proceeds from the sales of Notes to investors, the PLCs did not have other sources of revenue to maintain the STOLIs they purportedly purchased, let alone make interest payments or fund redemptions to Plaintiffs and the Class.

42.     The Scheme Operators also diverted money from legitimate business operations (*i.e.*, from NSI and SHPC assets and revenues) to pay premiums on STOLIs, or to pay interest to investors in the PLCs to perpetuate the Scheme. Instead of paying Plaintiffs and the Class from the funds generated by the death benefits of the STOLIs securing their PLC Notes, those investors were routinely paid from the revenues generated by the legitimate business operations of other related companies such as NSI and SHPC.

43.     NSI and SHPC were also both banking clients of Wells Fargo.

**II.     Wells Fargo's Role in the Scheme.**

44.     From at least 2009 until the OFR uncovered the Scheme in 2021, Wells Fargo provided substantial assistance and services in furtherance of the Scheme, including through its roles as Trustee, Securities Intermediary, and Depository Bank.

45.     Based on these roles and their attendant obligations, Wells Fargo knew the PLCs were supposed to use the money invested by Plaintiffs and the Class to purchase and pay the premiums of the STOLIs that collateralized the PLC Notes, the proceeds from the death benefits of which would be used to make interest payments due on the Notes and eventually return their

principal.

46.     As Trustee, Securities Intermediary, Depository Bank, and credit card issuer,[5] Wells Fargo monitored the activities of the PLCs and knew the PLCs were being used to perpetrate the Scheme.  Wells Fargo knew that the PLCs were formed to purchase and pay premiums to maintain STOLIs using the funds they raised from investors. Yet, Wells Fargo watched as the funds raised by the PLCs were repeatedly diverted and used to pay interest and principal to investors holding Notes in earlier PLCs, transferred among the PLCs themselves to then be diverted for improper purposes, and transferred to other entities created by the Scheme Operators – the Centurion Companies – without consideration. Wells Fargo also knew the same life insurance policies that the PLCs pledged to back the Notes were additionally pledged as collateral for loans to the Centurion Companies from unrelated third party lenders.

47.     By recklessly pursuing its objectives to maximize assets held, and to generate account- and transfer-related revenue and compensation, Wells Fargo and its employees substantially assisted the Scheme's fraud, as well as the misuse and misappropriation of assets by allowing the Scheme to continue operating and enabling the Ponzi Scheme to reach catastrophic levels.

48.     Without Wells Fargo's substantial assistance in facilitating the Scheme, it would have stopped, leaving the PLCs and other Receivership Entities and affiliates with significant funds and assets that could have been used for legitimate, profit-generating investments or simply held to later return to investors.

---

[5] Wells Fargo issued a credit card to one of the PLCs, Integrity Longevity Investment, LLC, which was used by Seeman for extensive personal use, including charges for thousands of dollars in gambling debts to FanDuel, despite being a company which should have purchased life insurance policies.  Moreover, the Wells Fargo credit card balances were often paid by other PLCs or NSI.

49.     But with Wells Fargo's assistance, the Scheme went uninterrupted until the OFR intervened and Stermer was appointed Receiver to take control of the Receivership Entities.

A.  **Wells Fargo's Knowledge and Substantial Assistance as Trustee for the ILITs.**

50.     As early as 2009, Wells Fargo served as the Trustee for the ILITs that owned certain life settlement policies funded by the Centurion Companies in order to build a lucrative banking relationship with them.

51.     When the ILITs' structure was proposed to Wells Fargo by the Centurion Companies, Wells Fargo's outside counsel remarked that, "[i]n short, the ILIT that has been proposed is unlike any ILIT that I believe Wells Fargo has agreed to serve as Trustee under…It is rife with discretion and fiduciary provisions akin to the type of document a personal trust trustee would agree to serve under."  As Wells Fargo's outside counsel explained about the Centurion Companies' proposed ILIT structure, "[t]he Trust Agreement would require a fair amount of editing to make it consistent with the type of Trust Agreement under which we typically see Wells Fargo serve in premium finance transactions."

52.     Of course, the reason the ILITs' structure was so unusual was that the STOLIs being purchased by the Centurion Companies were ostensibly held for its investors and not the named insureds.  The STOLI investment scheme proposed by the Centurion Companies to Wells Fargo is strictly prohibited by most insurance companies.  To prevent this, the insurance companies cause their life settlement policies to contain provisions that explicitly prohibit a STOLI relationship between the insured and beneficiary.  As the life settlement policies explain, insurance companies "strongly oppose[] arrangements designed to obtain life insurance for the benefit of a third party that lacks an insurable interest in the insured."  To prevent STOLIs from occurring, insurance companies prohibit an applicant from applying for a life settlement policy in the following

circumstances:

- If, at the time of sale, a plan exists to directly or indirectly sell, assign, settle, or otherwise transfer the policy (or the rights to its death benefits) or an ownership or beneficial interest in an entity that will own the policy, to a life settlement company or third party;

- Where the producer and/or applicant knows, or has reason to know, that the true source of funds (e.g., premium financing, third party funding) for premium payments of a policy have not been disclosed to the Company.[6]

The STOLI exemplar policies quoted above are typical in life settlement policies.

53.    To reinforce the significance of the STOLI policies, insurance companies require the insured when applying for a life settlement policy to "affirmatively represent that I have read the Company's policy on STOLI arrangements set forth above, that I have not engaged in any prohibited conduct described above in connection with this application, and that I will abide by the policy on STOLI arrangements."   Similarly, STOLI applications routinely ask, "Will the Insured… or Owner… receive any compensation as a result of the issuance of this policy, other than the benefits provided by this policy?  In answering this question, I am including any direct or indirect payment to a family member, beneficiary, business partner, charity or other entity receiving compensation on behalf of the Insured…or Owner…."[7] These STOLI policies are commonplace and routinely used by insurance companies to prevent STOLI-related investment schemes like the one the Centurion Companies proposed to Wells Fargo.

54.    Wells Fargo agreed to serve as the Trustee over the ILITs and assist the Centurion Companies in implementing the Scheme. The ILIT structure proposed by the Centurion

---

[6] Plaintiffs' counsel does not have the complete application and life settlement policy files for the life settlement policies held by the ILITs and many of the application pages it does have for the ILITs' life settlement policies are illegible. The exemplar STOLI policies cited come from the application of Jessica Blythe, one of the life settlement policies procured by the Centurion Companies for which Wells Fargo served as the Securities Intermediary.

[7] These exemplar STOLI policies come from the application of Dominick Conte, one of the life settlement policies procured by the Centurion Companies for which Wells Fargo served as the Securities Intermediary.

Companies was "unlike any ILIT" for which Wells Fargo had agreed to serve as Trustee because it was designed by the Scheme Operators to prevent the insurance companies from discovering that the Centurion Companies were making third-party investments in STOLIs in violation of the insurance companies' STOLI provisions.

55.     Upon information and belief, the life settlement policies held in the ILITs for which Wells Fargo served as Trustee contained STOLI provisions similar to those exemplars quoted above. Because Wells Fargo served as the Trustee it would have received the life settlement applications and policies, including all of their terms and conditions, and would have been aware of the STOLI provisions through its role as Trustee.  And, Wells Fargo would have also known that the Centurion Companies were directly violating the STOLI provisions contained in the life settlement policies through Wells Fargo's work as the Trustee over the ILITS.

56.     Despite knowing that the Centurion Companies were violating the insurance companies' STOLI policies through their purchase of the STOLIs, Wells Fargo actively participated in the Scheme and assisted the Scheme Operators.

57.     Wells Fargo's participation was essential to the Scheme's success and enabled it. Wells Fargo helped the Centurion Companies actively conceal from the insurance companies: (1) the source of funds used to purchase the STOLIs; (2) the identity of the true beneficiaries under the STOLIs by creating trusts in the name of the insureds for which it served as the Trustee with the Centurion Companies as the beneficiaries of those trusts; and (3) that the insureds taking out the STOLIs were being compensated for the purchase of the policy.  Each of these separate and distinct acts violated the insurance companies' STOLI policies and had they been discovered by the insurance companies would have ended the Scheme.

58.     For example, the Centurion Companies purchased a life settlement policy from

TransAmericaOccidental Life Insurance Company ("TransAmerica") for James S. Yakovakis in the amount of $8,500,000 ("Yakovakis Policy"). Wells Fargo served as the Trustee of the ILIT that held the Yakovakis Policy. Wells Fargo helped disguise the STOLI violations by creating a trust as the beneficiary of the Yakovakis Policy. That trust was named the Yakovakis 2010 Trust for which Wells Fargo served as the Trustee and the Centurion Companies were the beneficiaries. Wells Fargo knew that Mr. Yakovakis was not actually purchasing the Yakovakis Policy but that the Centurion Companies were actually paying for it because Wells Fargo received the Insured's Cooperation Agreement, the Irrevocable Life Insurance Policy Relinquishment and Loan Satisfaction Agreement, and the Premium Finance Loan Agreement. Those three documents, which Wells Fargo received through its work as Trustee of the ILIT and was required by its fiduciary duties to read and be familiar with, explained that: (1) Mr. Yakovakis transferred ownership of the Yakovakis Policy to the Centurion Companies; (2) the Yakovakis Policy premiums were being made by funds provided by the Centurion Companies; and (3) the Centurion Companies paid Mr. Yakovakis $5,000 to purchase the Yakovakis Policy. As demonstrated by the exemplar STOLI policies cited above, each of these was an independent STOLI violation of which Wells Fargo had actual knowledge and which Wells Fargo actively concealed, allowing the Scheme to flourish.

59.     Specifically, the Irrevocable Life Insurance Policy Relinquishment and Loan Satisfaction Agreement stated Mr. Yakovakis "is the borrower under a loan…made by the Lender…to purchase and to pay subsequent premiums on the" Yakovakis Policy. And, that pursuant to this agreement, Mr. Yakovakis "desires to transfer, convey and assign absolutely all of [his] rights, titles, interests, claim, cash values, dividends, options, riders, benefits, privileges and ownership in the" Yakovakis Policy to the Centurion Companies. In the Cooperation Agreement,

Mr. Yakovakis received a $5,000 "Cooperation Fee" from the Centurion Companies for purchasing the Yakovakis Policy. These "Cooperation Fee[s]" were essential to the Scheme because they compensated the insured for taking out the policy without which there would have been no Scheme. Furthermore, and in direct violation of the STOLI policies, all of these agreements revealed that the true owner of the Yakovakis Policy was the Centurion Companies. Despite knowing that this violated the terms of the STOLIs, Wells Fargo not only served as the Trustee of the ILITs but actively conspired with the Centurion Companies to mislead the insurance companies into selling the STOLIs, ensuring the continuation of the Scheme.

60.     Wells Fargo also understood the money the Centurion Companies used to purchase the STOLIs and pay their premiums came from Class members. Wells Fargo, from its communications with Seeman and its new account materials, knew that certain of the Centurion Companies operated as a "fund that buys life policies." And, Wells Fargo knew that those Centurion Companies acting as a "fund" received their money from Class members who regularly sent in their checks to Wells Fargo to be deposited into the Wells Fargo Centurion Companies' bank accounts with the fund identified on the memo line for deposit. Wells Fargo also knew that the Centurion Companies used those Class member funds to, among other things, purchase and pay the premiums on the various life settlement policies that constituted the Scheme. The import of this is that Wells Fargo knew and understood that the STOLIs the Centurion Companies purchased were for the benefit of the Class members.

61.     Despite knowing the Class members were paying the premiums through the Centurion Companies for the STOLIs and had first priority lien rights in them, Wells Fargo assisted the Centurion Companies in assigning those same STOLIs to other investors, namely DZ Bank AG Deutsche Zentral-Gennossenschaftsbank ("DZ Bank") and Teleios LS Holdings V DE, LLC

("Teleios"), the assignment of which would ultimately have catastrophic consequences for the Class. The reason Wells Fargo assisted the Centurion Companies with the assignment was because without it the Scheme would collapse, exposing Wells Fargo to significant liability. The assignment would allow Wells Fargo to limit its liability by resigning as Trustee and to transition to the more lucrative role of Securities Intermediary, thereby increasing its fees by a multiple of 10 on the Centurion Companies' accounts.

62.     In April 2012, the Centurion Companies recognized the Scheme was going to collapse and decided that the only way to prevent that collapse was to assign the STOLIs to other lenders as collateral for loans to shore up the Scheme. First, the Centurion Companies wrote Wells Fargo and provided it with "executed copies of the Loan Purchase Agreements [it] has entered into with Life Share Financial, LLC and Madison One Associates, LLC in respect of the premium finance loans made by Life Share Financial, LLC to each of the [ILITs] and secured against the life insurance policies [held by the ILITs]." As the letter explained, "I have appointed Centurion Insurance Services Group, LLC to act as my company's servicing agent in respect [to] the above referenced life insurance policies…" With the new loan purchase agreements in place with the new lending companies, the Centurion Companies wrote Wells Fargo in July 2012 asking it to resign as Trustee of the ILITs and appoint new trustees for them. Specifically, the Centurion Companies informed Wells Fargo that they needed Wells Fargo to resign immediately because the "life settlement policies held by the [ILITs] are to form part of a larger portfolio which is the subject of an imminent transaction and the absence of executed change forms on these three policies presents a disproportionately larger issue for us."

63.     Wells Fargo's outside counsel, who copied Wells Fargo's senior banking leadership on her response, summed up the problem best with what the Centurion Companies were asking

for:

> We are confused as to how Centurion has the authority to include these policies in a portfolio that is being sold. Wells Fargo is not aware of any default having been declared with respect to the loans, nor is it aware of the policies having been foreclosed upon as part of the default or any other event that would give rise to Centurion's having the authority to unilaterally direct the trustee, on behalf of the trusts, to transfer these policies.  As such, Wells Fargo is not in a position to take instruction from Centurion with respect to the execution change form transferring the policies out of the trusts.  The direction would need to come from the protector of each trust, countersigned by the Lender. Given the lack of direction from the protectors with respect to the transfer of these policies, Wells Fargo is not in a position to execute these change forms.

64.     In response to Wells Fargo's outside counsel's email, the Centurion Companies responded, again copying Wells Fargo's senior banking leadership, and explained:

> Centurion is within a group of associated companies that includes the Lender.  *The loans are currently in default.  As an alternative to formal foreclosure action, the Lender is prepared to acquire the Policies.*  To that end the Lender will require the Change Forms to be executed as quickly as possible.  For a number of reasons, it is very important that the Cohen and Walters Policies are assigned as quickly as possible without the potential delays at the carrier level that can occur when there is a change of trustee.

65.     Like it had when it ignored outside counsel's advice about the structure of the ILITs, Wells Fargo's senior banking leadership again ignored outside counsel's advice about the Trustee resignation forms and pushed forward with the resignation papers in order to limit its liability by resigning as Trustee over the ILITs and to secure the more lucrative fees as the Securities Intermediary.  At this critical juncture, Wells Fargo, as the Trustee for the ILITs that held the STOLIs and whose premiums were funded by the Class members, knew that the STOLIs were "in default" and facing a "formal foreclosure action."  Despite being the Trustee of those ILITs and knowing that the premiums were being paid by the Class members who had priority lien rights, Wells Fargo took no action to stop what was now an obvious Ponzi scheme but instead doubled down and helped the Centurion Companies and Scheme Operators further the Scheme by assigning

the STOLIs owned by the Class members to Telios and DZ Bank.

66.     In June 2013, the Centurion Companies wrote Wells Fargo's senior executives omitting Wells Fargo's outside counsel and requested that Wells Fargo, as Trustee of the ILITs, execute the resignation forms and make them "effective as of August 10, 2012 [since] they are not being notarized.  *Moreover, this would seem to be in the bank's interest from a liability perspective.*"  The Centurion Companies went on to explain, "[t]he only date-sensitive aspect is to that whoever executes on behalf of the bank must have been authorized to do so as of August 10, 2012."  Finally, the Centurion Companies explained that this was advantageous to Wells Fargo because the Centurion Companies agreed to indemnify Wells Fargo as soon as the documents had been executed by the bank.  Privately, the Centurion Companies' executives acknowledged how broad the release Wells Fargo wanted in exchange for the Trustee resignation forms by commenting that "the release of Wells under section 10 is very comprehensive…."

67.     In an effort to limit its liability and to secure the more lucrative Securities Intermediary fees, Wells Fargo did exactly what the Centurion Companies demanded.  Specifically, a Wells Fargo Vice President informed the Centurion Companies that Wells Fargo "will not object to the documents being made effective as of August 10, 2012."  That is, Wells Fargo was willing to backdate the Trustee resignation forms by nearly a year, obtaining even more liability protection.  And, in exchange for a broader liability release for its role as Trustee of the ILITs from the Centurion Companies, Wells Fargo's senior management informed the Centurion Companies that in order to expedite this process as requested, "Wells is willing to move forward without the more involved resignation/appointment process (where all interested parties sign-off)."  In late June 2013, Wells Fargo backdated the ILIT Trustee resignation forms and other requested documents to August 10, 2012, and provided them to the Centurion Companies, which allowed the Centurion

Companies to begin to assign the Class members' STOLIs to Telios and DZ Bank, setting them up for their eventual seizure by those lenders to the detriment of the Class members.

68.     However, on July 3, 2013, TransAmerica informed Wells Fargo that it was "unable to process" the change of Beneficiary Designation, Transfer of Ownership, and Release of Assignment for the Yakovakis Policy for a number of reasons.  One of those reasons related to a possible STOLI violation.   Specifically, TransAmerica wanted "additional clarification with regards to the assignment release.  The Release of Assignment we received was dated June 10, 2010, when the above policy had been in force for only two months, however, the release did not get submitted to us until now." Of course, the reason Wells Fargo did not submit the Release of Assignment in 2010 was because it would have revealed to TransAmerica that the funds used to purchase the Yakovakis Policy and make its premium payments came from a third-party life settlement company, Life Share Financial, LLC, in direct violation of the Yakovakis Policy's STOLI provisions.[8]  Had Wells Fargo submitted the Release of Assignment back in 2010, it would have revealed that this was a stranger-originated life insurance policy and it would have threatened the viability of the Scheme because it would have allowed TransAmerica to unwind or cancel the STOLI sale.

69.     In addition to the trouble with TransAmerica over the Yakovakis Policy, the Centurion Companies also had trouble with the insurance companies for the other ILITs as they too rejected the change of beneficiary designations, transfer of ownership, and change in trustee forms.  In late August 2013, the Centurion Companies asked Wells Fargo to speak directly with the insurance companies to get them to accept the paperwork and transfer the ownership for the

---

[8] TransAmerica's response is additional evidence there were STOLI provisions in the Yakovakis Policy, otherwise this would not have been an issue for TransAmerica in processing the forms provided by Wells Fargo and the Centurion Companies.

other STOLIs.  Wells Fargo's senior management agreed and spoke with each of the insurance companies that had written the STOLI policies and communicated those issues back to the Centurion Companies.  After Wells Fargo's involvement, the insurance companies processed the paperwork for each of the ILITs, effectively ending Wells Fargo's role as Trustee over them and paving the way for the Centurion Companies' assignment of the Class' STOLIs to Telios and DZ Bank.

B. **Wells Fargo's Knowledge and Substantial Assistance as Securities Intermediary.**

70.     After Wells Fargo resigned as the Trustee of the ILITs, it was involved in negotiating its role as the Securities Intermediary for the Class' life settlement policies that were being assigned by the Centurion Companies to other lending entities, namely DZ Bank and Teleios.

71.     Wells Fargo's duties and obligations as the Securities Intermediary were set forth in the Securities Account Control and Custodian Agreements ("Securities Account Agreements") it entered into with DZ Bank, Teleios, and certain of the Centurion Companies.  Both Securities Account Agreements represented that there were no "liens" or "security interests" in the life settlement policies and that Teleios and DZ Bank were granted a "first priority lien on and security interests in" all of the life settlement policies.  However, as Wells Fargo was aware through its work as Trustee over the ILITs, the Class members had a first priority lien in the life settlement policies that the Centurion Companies were now giving a first priority lien to DZ Bank and Teleios.  In fact, every life settlement policy that Wells Fargo had served as the Trustee of was transferred to DZ Bank and Teleios and identified in the Securities Account Agreements.  Wells Fargo knew this representation was false but went along with it anyway to ensure the Scheme continued instead of collapsing.

72.     Wells Fargo's deception, however, did not end there.   Wells Fargo falsely represented in the Securities Account Agreements that, "the Securities Intermediary on the date hereof has no actual knowledge of any claim to, or security interest in the Pledged Accounts or in any 'financial asset'… credited hereto and does not have actual knowledge of any claim that any person other than the Agent has been given 'control' of a Pledged Account or any such financial asset."  However, contrary to Wells Fargo's assertion to Teleios and DZ Bank, it **did** have actual knowledge that the Class members had a claim to, and a security interest in, the life settlement policies that were now being pledged and assigned to Teleios and DZ Bank.

73.     Wells Fargo was not only willing to deceive Teleios and DZ Bank in order to help the Centurion Companies further the Scheme, it also took an active role in the Scheme under the Securities Intermediary Agreements. Specifically, Wells Fargo contractually agreed to make the premium payments for the life settlement policies on behalf of the Centurion Companies thereby further concealing the STOLI violations and preventing the insurance companies from knowing that the premium payments came from a life settlement funding company, which would have alerted the insurance companies to the STOLI violations and resulted in the cancellation of the life settlement policies.  And, knowing that its conduct was unlawful, Wells Fargo sought to inoculate itself under the Securities Intermediary Agreements by limiting its liability to fraud, willful misconduct, and gross negligence.   Wells Fargo's assistance was necessary and critical in perpetrating and sustaining the Scheme.

74.     Indeed, as Securities Intermediary, Wells Fargo knew the Centurion Companies' business practices were "not normal."

75.     On September 24, 2018, Paul Fritz, Assistant Vice President, Wells Fargo Corporate Trust Services, Longevity Group, emailed the Centurion Companies that their repeated

failure to pay policy premiums led to Wells Fargo's receiving "consistent grace notices" "causing a strain at times to keep up with so many policies week to week. **This is not normal for accounts we administer** as most times policies are kept out of grace and grace notices are not frequent occurrences. Can you provide me with the expectations on your side in keeping policies in active status. Is the expectation that you will pay the minimal amount and pay grace amounts very near the end of the grace period? **That appears to be the history for this account**."

76.     Rather than investigate the clear and ongoing red flags and determine how the Centurion Companies could fund the policy premiums when Wells Fargo knew it was not receiving income from death benefits from the life insurance policies, Wells Fargo simply stated: "I would like to confirm though if this is going to be continued procedure on your side or not." Wells Fargo continued to serve as Securities Intermediary despite these known red flags.

### C.  Wells Fargo's Knowledge and Substantial Assistance as Depository Bank.

77.     Wells Fargo knew, based on its Know Your Customer ("KYC") inquiries and the extensive list of services provided to essential aspects of the PLCs' operations, that the PLCs were supposed to use investor money to purchase and pay the premiums on life insurance policies, the proceeds from the death benefits of which would be used to pay back the investors their interest and eventually return their principal. Despite having this actual knowledge, Wells Fargo substantially assisted the Scheme that caused catastrophic financial losses to Plaintiffs and the Class.

###     1.     Wells Fargo's Duties to Know its Customers and the Nature of Their Business and Transactions.

78.     Wells Fargo is obligated by law to "know its customers" – in this case the PLCs – and maintain a customer due diligence program to predict the type of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a

means of identifying unusual or suspicious transactions for each customer.

79.     Wells Fargo's abject failures enabled the intricate web of transfers which assisted the Scheme Operators in stealing money and misusing funds of the legitimate Receivership Entities, *i.e.*, NSI and SHPC, and by and among the PLCs, to defraud them.

80.     Wells Fargo was obligated to identify its customers, report indications of suspicious activity, and assign a "customer risk rating."

81.     Reasonable due diligence also requires Wells Fargo to know what business its customer is in, its sources of revenue, and to understand the types of transactions a customer should, and actually does, make.

82.     When monitoring its customers' accounts, Wells Fargo is obligated to comply with the Bank Secrecy Act (BSA), including regulations broadening its anti-money laundering (AML) provisions.

83.     Wells Fargo and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia, or "red flags," set forth in the FFIEC BSA/AML Examination Manual.

84.     Relevant here to the Receivership Entities' banking activities the FFIEC BSA/AML Examination Manual lists the following:

(1) repetitive or unusual fund transfer activity;

(2) fund transfers sent or received from the same person to or from different accounts;

(3) transactions inconsistent with the account holder's business;

(4) transfers of funds among related accounts;

(5) depositing of funds into several accounts that are later consolidated into a single master account;

(6) large fund transfers sent in round dollar amounts;

(7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities;

(8) multiple high-value payments or transfers between shell companies without a legitimate business purpose;

(9) payments unconnected to legitimate contracts or revenue sources;

(10) fund transfers containing limited content or related party information;

(11) transacting businesses sharing the same address;

(12) an unusually large number of persons or entities receiving fund transfers from one company;

(13) loans secured by pledge assets held by third parties unrelated to the borrower;

(14) loans secured by deposits or other readily marketable assets, such as securities, particularly when owned by apparently unrelated third parties;

(15) borrower defaults on a cash-secured loan or any loan that is secured by assets which are readily convertible into currency;

(16) loans are made for, or are paid on behalf of, a third party with no reasonable explanation;

(17) the size and frequency of currency deposits increases rapidly with no corresponding increase in non-currency deposits;

(18) a customer borrows against the cash surrender value of permanent life insurance policies, particularly when payments are made to apparently unrelated third parties;

(19) policies are purchased that allow for the transfer of beneficial ownership interests without the knowledge and consent of the insurance issuer. This would include secondhand

endowment and bearer insurance policies;

(20) a customer is known to purchase several insurance products and uses the proceeds from an early policy surrender to purchase other financial assets;

(21) a customer uses multiple currency equivalent (e.g., cashier's checks and money orders) from different banks and money services businesses to make insurance policy or annuity payments;

(22) payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number; and

(23) suspicious movements of funds from one bank to another, then funds are moved back to the first bank.

85.     The FFIEC Manual identifies "lending activities" and "nondeposit account services"— including nondeposit investment products — as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency.

86.     The FFIEC Manual requires heightened due diligence by Wells Fargo, including determining the purpose of the account, ascertaining the source and funds of wealth, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining explanations for account activity.

87.     To comply with FFIEC guidance and AML regulations, Wells Fargo maintains systems to monitor accounts and account activity for improper activity.

88.     This system includes review, monitoring, and evaluation of transactions, the transacting parties, the parties' identity, and account patterns.

89.     Wells Fargo is further expected to consult external sources, such as the internet,

commercial databases, and direct inquiries to evaluate the nature of suspicious transactions and the identities of the parties to the transactions.

90.     Wells Fargo collects and maintains information about its customers and their banking behavior to, among other things, detect and prevent money laundering and fraud and to protect itself from liability to third parties and reputational injury.

91.     For this purpose, Wells Fargo maintains procedures to determine the identity of each customer, 31 C.F.R. §§ 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R. § 1020.220(a)(2).

92.     When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

93.     The information that Wells Fargo collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

94.     Based on this information, as well as external resources like internet search engines and public and commercial record databases, upon information and belief, Wells Fargo creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When Wells Fargo learns that customer information has materially changed, upon information and belief its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating.

95.     One of the ways in which a bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account

activity.

96.    Wells Fargo also maintains internal controls to ensure ongoing compliance with federal AML laws and regulations.

97.    These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel.

98.    The controls also include customer due diligence programs to prevent and detect money laundering.

99.    Through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers.

100.    Likewise, Wells Fargo can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account.

101.    These datapoints are then used to identify unusual and suspicious transactions.

102.    From 2011 to 2017, federal agencies fined and imposed other disciplinary measures on Wells Fargo for its compliance failings, including its AML oversight.

103.    In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its systems. Following an audit, the bank adopted a risk-management framework and made other substantive changes, including realigning over 5,000 employees.

104.    The bank also devoted substantial resources to developing and implementing surveillance technology, including artificial intelligence software, designed to enhance Wells Fargo's account-transaction monitoring system.

105.    Wells Fargo's deficient BSA and AML program also resulted in a Consent Order (the "2015 Consent Order") by the U.S. Office of the Comptroller of the Currency in *In re Wells*

*Fargo*, No. AA-EC-201-79 (Nov. 19, 2015).

106.    The 2015 Consent Order was based on findings of "deficiencies in an internal control pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance covering the Wholesale Banking Group line of business."

107.    The OCC found that Wells Fargo's BSA/AML customer risk assessment practices were ineffective, its customer due diligence practices were unsatisfactory, and its monitoring and oversight practices were inadequate.

108.    The 2015 Consent Order required, among other things, the establishment of a compliance committee, a comprehensive BSA/AML action plan, a comprehensive risk assessment of customer relationships, and development of appropriate customer due diligence and enhanced due diligence policies, procedures, and processes.

109.    By 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws.

110.    And following termination of the 2015 Consent Order in January 2021 (and another consent order relating to improper retail sales practices), Wells Fargo issued statements addressing its AML-related procedures and infrastructure.

111.    Specifically, it confirmed that it "undertook significant work to remedy the deficiencies that gave rise to the consent order and to enhance its BSA/AML compliance program" and suggested that it had built "the right risk and control infrastructure."

112.    Thus, by the time the PLCs opened bank accounts, and Centurion Companies opened their security intermediary accounts, and used them to process and siphon hundreds of millions of dollars, and pledge the STOLIs to both Notes holders and lenders such as DZ and Teleios, Wells Fargo's system of internal controls, including its company-wide compliance

awareness protocols, risk management framework, and monitoring technology portfolio, provided Wells Fargo with the tools to readily detect the Scheme.

113.    In addition to its internal processes and software, Wells Fargo requires that its employees comply and be familiar with banking regulations and AML-related matters.

114.    Wells Fargo incorporates these concepts into job descriptions and performance evaluations.

115.    Wells Fargo also provides AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, to allow them to detect money laundering and fraud.

116.    Supervising personnel then oversee the day-to-day issues and implementation of the Wells Fargo's compliance structure at its individual branches.

117.    Wells Fargo's alleged commitment to compliance is also reflected in its Code of Ethics and Business Conduct, which requires employees to "complete all customer due diligence requirements[,] be alert to—and report—suspicious activity," and sets the policy of "completing all required . . . Compliance training on a timely basis."

118.    Wells Fargo bankers are trained to ask at least 20 fact-finding questions when opening new accounts.

119.    These questions include the use of the account and the customer's long-term intentions for the account.

120.    New accounts that are fewer than 60 days old are also subject to greater scrutiny and limitations, including mandatory review by additional personnel.

121.    Similarly, a banker processing an outgoing wire transfer is trained to ask the customer questions designed to detect possible money laundering, including the purpose of the

transaction, and the nature of the relationship between the parties.

122.    Wire transfers between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction.

123.    A manager who approves outgoing wires often conducts a secondary review to confirm that the checklist questions were adequately addressed.

124.    Wire transfers above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization.

125.    A similar process is employed for checks.

126.    Before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, payee, and depositor.

127.    When these efforts detect unusual activity, employees examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or service the account.

128.    Many branch-level employees also regularly review Balance Fluctuation Reports.

129.    These reports highlight substantial balance fluctuations and list the account activity in certain accounts.

130.    Wells Fargo employees must also complete Currency Transaction Reports on any cash transactions exceeding $10,000.

131.    To complement these human efforts, Wells Fargo uses its advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and data analytics software platform.

132.    Actimize markets its product as "entity-centric," and capable of revealing hidden

connections and relationships between transacting parties across multiple accounts and transactions.

133.    Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior.

134.    When the software identifies activity warranting further review or escalation, it alerts bank personnel.

> **2.    Wells Fargo's Improprieties in Opening and Maintaining Accounts in Furtherance of the Scheme.**

135.    Dozens of PLCs opened and maintained bank accounts at Wells Fargo (collectively, the "Accounts") through which the fraudulent scheme was enabled. Between August 2011 and 2018, Wells Fargo opened and served as the primary bank for 58 bank accounts of the Centurion Companies, PLCs, and other Receivership Entities and affiliates.

136.    Wells Fargo had a long-term business relationship with the Scheme Operators and the entities they controlled.  Wells Fargo also relaxed its KYC policies when dealing with them.

137.    Wells Fargo's relationship managers pre-filled account application forms on Seeman's behalf and forwarded them to Seeman for his execution, instead of making Seeman prepare the forms himself and explain the purpose of the account, the nature of the business of the company opening the account, the expected transactions, and the sources of revenue.

138.    Seeman repeatedly and routinely provided inconsistent answers regarding the beneficial owners of the PLCs. Seeman provided incomplete and cryptic answers regarding the nature of the PLCs' businesses. Seeman never provided answers regarding the sources of revenues of the PLCs.

139.    For example, in response to an email from a Wells Fargo business associate on

October 1, 2015, requesting Seeman to explain the nature of business and business description for a long list of PLCs, Seeman described each of those PLCs as "fund that buys life policies" and the Centurion Companies as "services payment son [sic] life insurance policies," and NSI as "Life and health insurance agency."

140.    Wells Fargo should have identified these disclosures as a red flag, for both the PLCs and the Centurion Companies. Wells Fargo, through its roles as Trustee and Securities Intermediary, knew that the Centurion Companies were the companies which were represented as the STOLI owners.

141.    Wells Fargo also knew that the money raised through the PLCs were not used to "buy(s) life polices." Wells Fargo had the unique vantage point to see the vast number of transactions to/from the PLCs' accounts, transfers to the Centurion Companies, and the legion of other misuses of the PLCs' bank accounts – despite the five-word KYC disclosure from Seeman about the nature of the PLCs' businesses, with each a "fund that buys life policies."

142.    Wells Fargo knew that the PLCs and the Centurion Companies had no legitimate contracts, invoices, or other exchange of goods or services to justify the transfers between them. It knew this because of its relationship as their bank, as well as its companion roles as Trustee and Securities Intermediary.

143.    Wells Fargo opened the following Accounts for the PLCs with the listed information for "Industry" and "Description of Business:"

| Entity Name | Bank Account # | Account App Date | Industry | Description of Business |
|---|---|---|---|---|
| Para Longevity 2014-5, LLC | x9032 | 11/07/13 | Real Estate, Rental and Leasing | [Left Blank] |
| Centurion ISG Services, LLC | x3271 | 06/27/14 | Finance and Insurance | Portfolio Servicing Management |
| Para Longevity 2015-3, LLC | x7405 | 02/11/15 | Finance and Insurance | Investment Finance |
| Para Longevity 2015-5, LLC | x3160 | 02/11/15 | Finance and Insurance | Investment Finance |
| Para Longevity 2016-3, LLC | x9354 | 01/07/16 | Finance and Insurance | Property Casualty |
| Para Longevity 2016-5, LLC | x9370 | 01/07/16 | Finance and Insurance | Property Casualty Insurance |
| Integrity Assets 2016, LLC | x9878 | 04/28/16 | Finance and Insurance | Casualty Insurance |
| Integrity Assets, LLC | x9886 | 04/28/16 | Finance and Insurance | Casualty Insurance |
| SH Global, LLC N/K/A Para Longevity V, LLC | x9894 | 04/28/16 | Finance and Insurance | Casualty Insurance |
| Emerald Assets 2018, LLC | x7000 | 06/22/17 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2018-3, LLC | x6994 | 06/22/17 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2018-5, LLC | x7018 | 06/22/17 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2019-5, LLC | x6271 | 10/25/18 | Finance and Insurance | Investment Finance |
| Para Longevity 2019-3, LLC | x8049 | 10/25/18 | Finance and Insurance | Investment Finance |
| Para Longevity VI, LLC | x0122 | 02/20/19 | Finance and Insurance | Property and Casualty |

| Entity Name | Bank Account # | Account App Date | Industry | Description of Business |
|---|---|---|---|---|
| Para Longevity Investments, LLC | x0129 | 08/12/11 | Real Estate, Rental and Leasing | [Left Blank] |
| Integrity Longevity Investments, LLC | x0145 | 08/22/11 | Real Estate, Rental and Leasing | [Left Blank] |
| Para Longevity 2012, LLC | x1870 | 07/11/12 | Real Estate, Rental and Leasing | [Left Blank] |
| Para Longevity 2012-5, LLC | x8999 | 08/07/12 | Real Estate, Rental and Leasing | r/e |
| Emerald Assets, LLC | x6745 | 03/18/13 | Finance and Insurance | [Left Blank] |
| Seeman Holtz Global, LLC | x7788 | 10/25/13 | Professional, Scientific, and Technical Svcs | [Left Blank] |
| Para Longevity 2014, LLC | x8786 | 11/07/13 | Real Estate, Rental and Leasing | [Left Blank] |
| Emerald Assets 2014, LLC | x9151 | 02/27/14 | Finance and Insurance | [Left Blank] |
| Paraveda Investments V, Inc | x9409 | 02/27/14 | Finance and Insurance | [Left Blank] |
| Emerald Assets 2015, LLC | x2387 | 04/03/15 | Finance and Insurance | Investment Advisors |
| Emerald Assets 2016, LLC | x9362 | 01/07/16 | Finance and Insurance | Property and Casualty Insurance |
| Alloy Element Assets, LLC | x6198 | 08/01/18 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2019-7, LLC | x3937 | 10/25/18 | Finance and Insurance | Investment Finance |
| Emerald Assets 2019, LLC | x2052 | 10/25/18 | Finance and Insurance | Insurance |

144.   Wells Fargo's bankers ignored their due diligence obligations and KYC regulations. For example, Wells Fargo's typical account opening procedures were often not followed.  On October 21, 2015, Maryin Vargas, Business Associate, Business Banking, Wells Fargo explained to Seeman:

> Good afternoon Mr. Seeman,
>
> We will reach out to you before end of day to day. I am sure we can assist **but new procedures require us to get the new account applications signed in person** so we are looking into this.
>
> Thank you,
>
> Sincerely,
>
> Maryin Vargas
>
> **Business Associate**
>
> Business Banking | 200 S. Biscayne Blvd | Miami, Fl 33131  |

[Phone and email information intentionally omitted.]

145.   Upon information and belief, Wells Fargo did not require Seeman to open the accounts in person and instead authorized the accounts to be opened by email.

146.   For example, on November 7, 2013, the account opening applications for several PLC Accounts at Wells Fargo, Para Longevity 2014, LLC (account x8786) and Para Longevity 2014-5, LLC (account x9032), were pre-filled with an incorrect industry description ("Real Estate, Rental and Leasing"), no business description, and were sent to Seeman only *after* the bank

account had already been opened. On November 7, 2013, the Wells Fargo banker acknowledged the bank's violation by email: "Please note the accounts have been opened. However, I need the attached documents signed and return to my attention as soon as possible to avoid a compliance violation." No further inquiry or investigation into the purposes for the accounts are evident from the account opening documentation produced by Wells Fargo.

147.     Instead of requiring Seeman or Holtz to complete his own account opening applications and certificates of beneficial ownership forms before opening bank accounts for the various PLCs, Wells Fargo bankers would open the bank accounts, then pre-fill these forms and send them to Seeman and Holtz for execution.

148.     On February 9, 2015, Wells Fargo emailed to Seeman the Account Application and Authorization for Information forms that were entirely blank for Para Longevity 2015-3, LLC (account x7405) and for Para Longevity 2015-5, LLC (account x3160). Seeman signed the blank forms and returned them to Wells Fargo on February 11, 2015 and Wells Fargo opened the accounts later that same day. The account applications produced by Wells Fargo in response to a subpoena from the Receiver also show the Para Longevity 2015-3, LLC (account x7405) and Para Longevity 2015-5, LLC (account x3160) Account Application and Authorization for Information forms were, upon information and belief, completed by Wells Fargo, not Seeman (as Seeman returned the executed blank forms to Wells Fargo), with a generic industry description ("Finance and Insurance"), and a limited, rote business description ("investment finance").

149.     Most of the accounts opened for the PLCs at Wells Fargo were opened in a similar manner and had similar material discrepancies, including, but not limited to, incorrect business description of "Property Casualty," "Property Casualty Insurance," and "Casualty Insurance," and incorrect or incomplete beneficial ownership statements.

150.     However, Wells Fargo knew that the PLCs were created to fund the purchase of life insurance policies and had nothing to do with real estate or property and casualty insurance.

151.     Wells Fargo's failure to follow basic due diligence practices and comply with the applicable KYC regulations created incorrect and incomplete client profiles which aided Seeman and Holtz in obfuscating the Scheme.

152.     Wells Fargo also maintained the following bank accounts for the Centurion Companies:

| Entity Name | Bank Account # | Account App Date |
|---|---|---|
| Centurion ISG Holdings II, LLC | x6248 | 08/27/18 |
| Centurion Funding SPV II LLC | x6230 | 08/27/18 |
| Centurion Funding SPV II LLC | x9800 | 12/14/18 |
| Centurion Funding SPV II LLC | x9801 | 12/14/18 |
| Centurion Funding SPV II LLC | x9802 | 12/14/18 |
| Centurion Funding SPV II LLC | x9803 | 12/14/18 |
| Centurion Funding SPV II LLC | x9804 | 12/14/18 |
| Centurion Funding SPV II LLC | x9805 | 12/14/18 |
| Centurion ISG (Europe) Limited | x8701 | 02/12/14 |
| Centurion ISG (Europe) Limited | x8700 | 02/12/14 |
| Centurion Funding SPV I LLC | x6203 | 08/22/14 |
| Centurion Funding SPV I LLC | x6202 | 08/22/14 |
| Centurion Funding SPV I LLC | x6201 | 08/22/14 |
| Centurion Funding SPV I LLC | x6200 | 08/22/14 |

153.     Wells Fargo knew that the Centurion Companies, as opposed to any of the PLCs, actually owned the STOLIs purchased using the funds raised by the PLCs because Wells Fargo served as Trustee of and Securities Intermediary for certain STOLIs.

154.     Wells Fargo also knew that Centurion SPV I and Centurion SPV II collectively borrowed almost $40,000,000 using STOLIs as collateral because Wells Fargo entered into Security Procedure Agreements with both DZ Bank and Teleios, which granted DZ Bank and Teleios certain rights to direct Wells Fargo regarding the distribution of assets held in the securities intermediary account.

36

155.     Yet, Wells Fargo did nothing to stop the Scheme from continuing to raise hundreds of millions of dollars from the sales of Notes while at the same time hypothecating the STOLIs to lenders such as DZ Bank and Teleios.  Only Wells Fargo and the Scheme Operators were in the position to see the entirety of the Ponzi scheme.

> ### 3.     Wells Fargo's Complicity in Knowingly Assisting Obvious Fraudulent Account Transactions.

156.     There were numerous Account transactions apparent to Wells Fargo that showed the Scheme Operators were directing funds from investors of Notes from newer PLCs to pay investors of Notes from older PLCs.

157.     For example, on January 31, 2019, Para Longevity 2018-5, LLC, deposited $100,000 from **Investor 1** into its Wells Fargo bank account ending x7018.  On February 1, 2019, Para Longevity 2018-5, LLC, transferred $100,000 from its Wells Fargo bank account ending x7018 to Para Longevity 2012-5, LLC's Wells Fargo bank account ending x8999.  On February 11, 2019, Para Longevity 2012-5, LLC's Wells Fargo bank account cleared a check payable to **Investor 2** for $100,024.

158.     Other examples of later investors' funds being used to pay earlier investors' interest or principal payments (in different PLCs) include:

> a. On May 9, 2016, Para Longevity 2016-5, LLC, deposited $50,000 from **Investor 3** into its Wells Fargo bank account ending x9370.  On May 9, 2016, Para Longevity 2016-5, LLC, transferred $50,000 from its Wells Fargo bank account ending x9370 to Para Longevity 2012, LLC's Wells Fargo bank account ending x1870.  On May 10, 2016, Para Longevity 2012, LLC's Wells Fargo bank account cleared a check payable to **Investor 4** for $50,000.
>
> b. On July 28, 2015, Para Longevity 2015-3, LLC, received $129,304.17 from

**Investor 5** into its Wells Fargo bank account ending x7405. On July 28, 2015, Para Longevity 2015-3, LLC, transferred $80,000 from its Wells Fargo bank account ending x7405 to Emerald Assets 2014, LLC's Wells Fargo bank account ending x9151. On July 28, 2015, Emerald Assets 2014, LLC, issued a wire transfer from its Wells Fargo bank account ending x9151 to **Investor 6** for $94,315.26.

c. On August 11, 2015, Para Longevity 2015-3, LLC, received $137,646.25 from **Investor 7** into its Wells Fargo bank account ending x7405. On August 11, 2015, Para Longevity 2015-3, LLC, transferred $82,243 from its Wells Fargo bank account ending x7405 to Paraveda Investments V, Inc.'s Wells Fargo bank account ending x9409. On August 11, 2015, Paraveda Investments V, Inc., issued a wire transfer from its Wells Fargo bank account ending x9409 to **Investor 8** for $72,843.67.

d. On April 28, 2015, Para Longevity 2015-5, LLC, received $400,000 from **Investor 9** into its Wells Fargo bank account ending x3160. On April 28, 2015, Para Longevity 2015-5, LLC transferred $131,264 from its Wells Fargo bank account ending x3160 to Paraveda Investments V, Inc.'s Wells Fargo bank account ending x9409. On April 28, 2015, Paraveda Investments V, Inc., issued a wire transfer from its Wells Fargo bank account ending x9409 to **Investor 10** for $129,385.42.

159. The intended purpose of the PLCs was to purchase and pay the premiums of life settlement policies each was to acquire.

160. The premiums on life settlement policies were supposed to be paid by investor

funds.  However, without income from maturing policies, the PLCs could not meet the growing liquidity demands of both investor interest payments and premium payments.

        **4.     Other Specific Examples of Wells Fargo's Actions and Material Omissions in Knowing Furtherance of the Scheme.**

161.    The following are just some examples of the litany of improper activities and transactions, identified as "red flags" in the FFIEC BSA/AML Examination Manual, that occurred in the Accounts, which Wells Fargo must have known but did nothing about and/or substantially assisted in furtherance of the Scheme:

- repetitive or unusual fund transfer activity;

  a.  Here, there were at least 5,100 transfers between the PLCs and the same U.S. Bank account for one of the Centurion Companies, CISG.

- fund transfers sent or received from the same person to or from different accounts;

  b.  Here, there were at least 5,100 transfers between the PLCs and the same U.S. Bank account for one of the Centurion Companies, CISG.

  c.  For example, on July 26, 2016, Para Longevity 2016-5, LLC, deposited $110,000 from **Investor 11** into its Wells Fargo bank account ending x9370. On July 27, 2016, Para Longevity 2016-5, LLC, transferred $100,000 from its Wells Fargo bank account ending x9370 to CISG's U.S. Bank account ending x3068.  On July 27, 2016, CISG transferred $100,000 from its U.S. Bank account ending x3068 to Integrity Longevity Investments, LLC's Wells Fargo bank account ending x0145.  On July 29, 2016, a check cleared Integrity Longevity Investments, LLC's Wells Fargo bank account ending x0145 for $100,722.28 to **Investor 12**.

- transactions inconsistent with the account holder's business;

d.  Here, transfers among the PLCs were not related to the limited description of the PLCs' businesses i.e., a "fund that buys life policies."  None of the PLCs actually directly purchased life policies.

e.  Further, over $50,000,000 through over 400 transfers of funds from new PLCs to old PLCs and their investors also had no legitimate business purpose and were not related to the "account holder's business."

- transfers of funds among related accounts;

f.  Here, more than $24,000,000 was transferred by and between the Receivership Entities' accounts at Wells Fargo.  The Receivership Entities maintained fifteen (15) bank accounts at Wells Fargo through which at least $414,000,000 was moved through their accounts through deposits and withdrawals.  And among the PLCs, the Centurion Companies and their affiliates, more than $378,000,000 in intercompany transfers were processed between their Wells Fargo bank accounts during the operation of the Scheme.

- depositing of funds into several accounts that are later consolidated into a single master account;

g.  Here, on multiple occasions cash was transferred into one of the PLCs' account and then out to CISG and other non-Para Longevity Companies nearly simultaneously.

h.  As one example, on May 15, 2017, Para Longevity 2016-5, LLC received the following transfers into its Wells Fargo bank account ending x9370:

i.  $280,000 from Para Longevity 2014, LLC's Wells Fargo bank account ending x8786,

ii.   $200,000 from Para Longevity 2014, LLC's Wells Fargo bank account ending x8786,

iii.   $55,000 from Para Longevity Investments, LLC's Wells Fargo bank account ending x0129, and

iv.   $30,000 from Para Longevity 2012-5, LLC's Wells Fargo bank account ending x8999.

i.   Also on May 15, 2017, Para Longevity 2016-5, LLC, made the following intercompany transfers from its Wells Fargo bank account ending x9370:

v.   $379,520.60 was transferred to CISG's U.S. bank account ending x3068 in five separate transactions.

vi.   $36,500 was transferred to Para Longevity VI Holdings, LLC's Wells Fargo bank account ending x1912.

j.   On May 16, 2017 Para Longevity 2016-5, LLC, made the following intercompany transfers from its Wells Fargo bank account ending x9370:

vii.   $112,845.45 was transferred to CISG's U.S. Bank account ending x3068 in four separate transactions.

viii.   $20,000 was transferred to Para Longevity VI Holdings, LLC's Wells Fargo bank account ending x1912.

k.   The net effect of the intercompany transfers made within Para Longevity 2016-5, LLC's Wells Fargo bank account ending x9370 on May 15 and 16, 2017, was an increase in its ledger balance by $16,133.95 for no identified business purpose.

• large fund transfers sent in round dollar amounts;

l.  Round dollar transactions in the amounts of $50,000, $100,000, $200,000, etc., occurred with extensive frequency from the PLCs' accounts.

• payments unconnected to legitimate contracts or revenue sources;

m.  There were at least 5,100 transfers between the PLCs and the same U.S. Bank account for one of the Centurion Companies, CISG, without consideration or other contractual or legitimate business purpose for the PLCs.

n.  By way of further example, on June 26, 2018, Seeman emailed Beatriz Dezayas at Wells Fargo to initiate a wire transfer from Emerald Assets 2018, LLC's Wells Fargo account to CISG's account at U.S. Bank for $57,971.92 in reference to pay a policy premium for a life insurance policy in the name of Vittorio Gerardi.  The **very same** life insurance policy was also pledged to Teleios and was controlled by Wells Fargo which served as Securities Intermediary.

• transacting businesses sharing the same address;

o.  Many of the PLCs and the Centurion Companies shared the same business address at 301 East Yamato Rd., Boca Raton, Florida.

• an unusually large number of persons or entities receiving fund transfers from one company;

p.  There were at least 5,100 transfers between the PLCs and the same U.S. Bank account for one of the Centurion Companies, CISG.

• loans secured by pledge assets held by third parties unrelated to the borrower;

q.  The Notes sold to the Class members were supposed to be secured by the purchase of life settlement policies, which Wells Fargo knew were pledged to

DZ Bank and Teleios by the Centurion Companies.

- loan secured by deposits or other readily marketable assets, such as securities, particularly when owned by apparently unrelated third parties;

    r.  The Notes sold to investors were supposed to be secured by the purchase of STOLIs, which Wells Fargo knew were pledged to DZ Bank and Teleios by the Centurion Companies.  The PLCs, which were supposed to have purchased the STOLIs, were unrelated to the Centurion Companies.  For example, Para Longevity 2015-3, LLC, was owned 50/50 by Valentino Global Holdings and Altrai Global, LLC, two single member LLCs that are owned by Seeman and Holtz, respectively.  Centurion Funding SPV I, LLC, is a wholly owned subsidiary of JEMS LLC.  JEMS LLC is owned 50/50 by Centurion ISG Holdings LLC and Lotus Life Management, which is owned by unrelated third parties.  When Paul Fritz, Assistant Vice President, Wells Fargo Corporate Trust Services, Longevity Group, inquired on September 13, 2017:

> "The wholesale CCD standards require us to obtain, the ENTIRE ownership chain down to 25%. We needed  to ensure that there is no other entity behind the two at 50% that indirectly have 25% or greater ownership of  Centurion Funding SPV I LLC. For example, if they had someone that owns them at 100% then indirectly, that entity would have greater than 25% of our CIP customer, if that makes sense. In short, who owns Centurion ISG Holdings, LLC and Lotus Life Management, LLC, if they can confirm that there is no other entities that own greater than 25% then we are good to go."

In short, Wells Fargo knew of its obligations to know the ownership of the Centurion Companies, in which the value of the life insurance policies was held, were 50% owned by unrelated third parties, and ignored the red flags or failed in its further investigation, if any.

- borrower defaults on a cash-secured loan or any loan that is secured by assets which are readily convertible into currency;

    s.  Wells Fargo as Securities Intermediary knew that in December 2017, DZ Bank had foreclosed on the assets in the securities intermediary account x6200 for Centurion SPV I and yet, months later, agreed to serve as Securities Intermediary for Centurion SPV II, which assets were also later foreclosed on.

- loans are made for, or are paid on behalf of, a third party with no reasonable explanation;

    t.  Examples of this red flag include payments by Para Longevity 2016-3, Para Longevity 2016-5, Para Longevity 2018-3, Para Longevity 2018-5, and SH Global n/k/a Para Longevity V, LLC, to Pelican Capital Management LLC in aggregate total of $1,294,000 for debts owed by the Centurion Companies without any basis or reasonable purpose.

- payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number;

    u.  There were at least 120 transfers among the PLCs with accounts at Wells Fargo annotated as "mistake" or "mistaken."

    v.  Further, over $50,000,000 through over 400 transfers of funds from new PLCs to old PLCs and their investors also had no legitimate business purpose.

- suspicious movements of funds from one bank to another, then funds are moved back to the first bank.

    w.  There were at least 5,100 transfers between the PLCs and the same U.S. Bank account for one of the Centurion Companies, CISG, without consideration or other contractual or legitimate business purpose for the PLCs.  Through these

round-trip transactions, prior investors in the Scheme were paid with money obtained by new investors in the Scheme, often within a day or a few days of the transfers into the later-formed PLCs' Wells Fargo accounts, with the funds then being transferred to the Centurion Companies' main account at U.S. Bank and then back to the earlier PLCs' Wells Fargo accounts, and then paid to the earlier Note holder investor in classic Ponzi fashion.

x.   For example, on June 21, 2016, SH Global LLC N/KA Para Longevity V, LLC, received $474,868.50 from **Investor 13** in its Wells Fargo bank account ending x9894.  On June 22, 2016, SH Global LLC N/KA Para Longevity V, LLC, wired $200,000 from its Wells Fargo bank account ending x9894 to CISG's U.S. Bank account ending x3068.  On June 22, 2016, CISG wired $200,000 from its U.S. Bank account ending x9894 to Integrity Longevity Investments, LLC's Wells Fargo bank account ending x0145.  On June 22, 2016, Integrity Longevity Investments, LLC, wired $211,283.33 from its Wells Fargo bank account ending x0145 to **Investor 14**.

162.   Other indicia of the Scheme's continuous fraudulent activities were also apparent to Wells Fargo and must have been flagged for compliance alerts to be investigated.  For instance, checks issued by the PLCs were routinely flagged for insufficient funds.  Incredibly, the bank accounts at Wells Fargo were overdrawn no less than ***1,400 times*** during the period those accounts were open which generated overdraft notifications from Wells Fargo.

**PLAINTIFFS KLEINBART'S AND MILLSTEIN'S INVESTMENT IN THE NOTES**

163.   In furtherance of the Scheme, NSI and its agents solicited and sold the Notes to Plaintiffs and the Class members.  These included specifically the following Notes sold to

Plaintiff Millstein:

| Noteholder | Issuer | Issue Date | Face Value | Maturity |
|---|---|---|---|---|
| **Gerald J. Millstein and Fanny B. Millstein** | PL 2015-3 | Jan. 28, 2016 | $125,000.00 | Jan. 28, 2019 |
| **Fanny B. Millstein** | PL 2016-3 | Jan. 13, 2017 | $101,037.10 | Jan. 13, 2020 |

164.    NSI and its agents also solicited and sold the following Notes to Plaintiff Kleinbart:

| Issuer | Issue Date | Face Value | Maturity |
|---|---|---|---|
| **Para Longevity 2018-5, LLC** | Sept. 14, 2017 | $100,000 | Sept. 14,2022 |
| **Para Longevity 2018-5, LLC** | Oct. 23, 2018 | $100,000 | Oct. 23, 2023 |
| **Para Longevity 2018-5, LLC** | Feb. 8, 2019 | $100,000 | Feb. 8, 2024 |
| **Para Longevity 2018-5, LLC** | Feb. 26, 2019 | $112,920 | Feb. 26, 2024 |
| **Grace Holdings Financial, LLC** | Sept. 12, 2019 | $158,000 | Sept. 12,2021 |

165.    The material terms of the transaction documents for the Notes were nearly identical, aside from identifying different amounts invested, the duration of the Notes, and the dates of issuance and maturity.

166.    In each instance, NSI and its agents, from offices in Florida, solicited Plaintiffs and the Class members to invest in the Notes on behalf of the PLCs and made these solicitations from within Florida.

167.    Plaintiffs and the Class members returned each of the completed Note Purchase Agreements to NSI in Florida, and NSI, in turn, transmitted the completed Note Purchase Agreements to the respective PLCs in Florida.

168.    The Notes belonging to Plaintiffs and the Class have matured.  Even though the Notes have fully matured, the PLCs and other Receivership Entities do not possess any significant underlying assets to pay back the monies owed to Plaintiffs and the Class.

169.    Due to Wells Fargo's actual knowledge of and substantial assistance in the Scheme it is liable to Plaintiffs and the Class for all the outstanding monies due and owing to them for their respective Notes.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action against Defendant pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all other persons similarly situated.  The Class which the Plaintiffs seeks to represent is comprised of the following:

> All persons who, during the applicable limitations period, purchased interests or invested in life settlements offered by the PLCs.  Excluded from the Class are (a) Wells Fargo and its principals, officers, directors, and employees, (b) the Scheme Operators and their spouses, employees, heirs, and assigns, and (c) any governmental entity.

## NUMEROSITY

171.    The Class consists of more than 1,000 individuals and entities who sent funds to Defendant to be held in trust and to be used to purchase fractional interests in life insurance policies.  The Class is so numerous and geographically dispersed that joinder of all of its members is impracticable.

172.    The names and addresses of all Class members can be identified in the business records maintained by Defendant, PLCs, and the Centurion Companies.  The precise number of Class members will only be obtained through discovery but the numbers are clearly more than can be consolidated in one complaint, and it is impractical for each to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

## COMMONALITY

173.    There are questions of law and fact that are common to the claims of Plaintiffs and the entire Class.  These common questions predominate over any questions that are particular to

any individual Class member.  Among such common questions of law and fact are the following:

a. Whether the Scheme Operators defrauded investors;

b. Whether Defendant knew that the Scheme was defrauding investors;

c. Whether Defendant's ignorance of "red flags" and failure to conduct due diligence substantially assisted the Scheme;

d. Whether Defendant's varied roles as Trustee, Securities Intermediary, and Depository Bank enabled the Scheme;

e. Whether Defendant had knowledge of the Scheme;

f. Whether the Scheme Operators defrauded and breached their fiduciary duties owed to Plaintiffs and the Class by, *inter alia*, using the PLCs to sell unregistered securities to largely unaccredited investors; using the funds solicited through the PLCs for transactions other than their expressed and intended purposes, *i.e.*, to purchase STOLIs; misappropriating the funds solicited through the PLCs and transferring them without consideration to SHPC and the Centurion Companies; transferring the funds solicited through the PLCs to the Centurion Companies who purchased STOLIs without granting the PLCs any interest in or entitlement to the death benefits; using new funds solicited through the PLCs to pay old investors in the PLCs creating a Ponzi scheme; allowing the STOLIs that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on STOLIs; overleveraging of the STOLIs to create an appearance of profitability from the value of STOLIs, which did not exist; granting third parties a preferred secured position on the life settlement policies that were purportedly securing the Notes sold to investors in the PLCs; and facilitating the use of NSI's assets to fund the Scheme.

g.  Whether Defendant aided and abetted the Scheme Operators' fraud and breaches of their fiduciary duties owed to Plaintiffs and the Class;

h.  Whether Defendant knowingly and substantially assisted the Scheme Operators in their fraud and breaching their fiduciary duties to Plaintiffs and the Class by, *inter alia*, facilitating the transfers of funds solicited through the PLCs for transactions other than their expressed and intended purposes, *i.e.*, to purchase STOLIs; facilitating the misappropriation of funds solicited through the PLCs and transferring them without consideration from the Centurion Companies and prior investors in other PLCs; transferring the funds solicited through the PLCs to the Centurion Companies which purchased STOLIs without granting the PLCs any interest in or entitlement to the death benefits; facilitating the transfers of new funds solicited through the PLCs to pay old investors in the PLCs, creating a Ponzi scheme; allowing the STOLIs that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on STOLIs; overleveraging of the STOLIs to create an appearance of profitability from the value of STOLIs, which did not exist; knowingly allowing third parties to take a preferred secured position in the STOLIs that were purportedly securing the Notes sold to investors in the PLCs; allowing the Centurion Companies' accounts and assets to be used in a manner that bore no reasonable resemblance to how such securities intermediary accounts are properly used; facilitating, accommodating, and not impeding or stopping the Scheme Operators' movement of funds and assets, as described above, despite knowing the duties owed by them and the nature of the assets and funds they were handling; and facilitating the use of NSI's assets to fund the Scheme;

i.      Whether Defendant owed Plaintiffs and the Class a duty of reasonable care applicable to banks and financial institutions;

j.      Whether Defendant breached its duty of reasonable care applicable to banks and financial institutions by, *inter alia*, failing to know its customer through account opening documents and due diligence; failing to implement adequate account monitoring programs and guidelines; allowing, facilitating, and executing the commingling of monies across the PLCs' accounts; failing to inform any of the investors of the Scheme Operators' misconduct; failing to report the Scheme Operators' misconduct to law enforcement and/or regulatory agencies; failing to freeze or close the PLCs' accounts upon discovering the Scheme Operators' misconduct; allowing and facilitating the Scheme Operators' theft from the PLCs' bank accounts; and aiding and abetting the Scheme Operators' breaches their fiduciary duties, fraud, and conversion of assets;

k.      Whether Defendant was negligent in substantially assisting the Scheme;

l.      Whether Defendant was unjustly enriched by its misconduct; and,

m.      The amount of damages members of the Class sustained as a result of Defendant's wrongful conduct, and the proper measure of such damage.

## TYPICALITY

174.    Plaintiffs' claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct.  Each Class member has sustained damage as a result of Defendant's wrongful conduct in the same manner as Plaintiffs – that is, each Class member invested funds in life settlements, through uniform offering materials, and was damaged as a result of the same conduct alleged herein.

## ADEQUACY OF REPRESENTATION

175.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

176.    To prosecute this case, Plaintiffs have chosen the law firms of Buckner + Miles, P.A., Sallah Astarita & Cox LLC, and The Silver Law Group.  These firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

## <u>LEGAL CLAIMS</u>

### COUNT I:
### <u>AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES</u>

177.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 169 above, as if fully set forth herein.

178.    Seeman, Holtz, and Schwartz, *i.e.*, the Scheme Operators, through the PLCs controlled by them, owed fiduciary duties to Plaintiffs and the members of the Class. The Scheme Operators owed a duty of loyalty, care, and utmost good faith and fair dealings to the PLCs and were required to exercise their reasonable and prudent business judgment in the best interests of the PLCs.

179.    The Scheme Operators breached their fiduciary duties to Plaintiffs and the Class members, by, *inter alia*:

        a.   using the PLCs to sell unregistered securities to largely unaccredited investors;

        b.  using the funds solicited through the PLCs for transactions other than their

expressed and intended purposes, *i.e.*, to purchase STOLIs;

c.   misappropriating the funds solicited through the PLCs and transferring them without consideration to SHPC and the Centurion Companies;

d.   transferring the funds solicited through the PLCs to the Centurion Companies who purchased STOLIs without granting the PLCs any interest in or entitlement to the death benefits;

e.   using new funds solicited through the PLCs to pay old investors in the PLCs, creating a Ponzi scheme, and subjecting the PLCs to civil and criminal liability.

f.   allowing STOLIs that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on those STOLIs;

g.   overleveraging of the STOLIs to create an appearance of profitability from the value of STOLIS, which did not exist;

h.   granting third parties a preferred secured position in the STOLIs that were purportedly securing the Notes sold to Plaintiffs and the Class members in the PLCs; and

i.   facilitating the use of NSI's assets to fund the Scheme.

180.   Instead of using the PLCs' funds for their intended investment purpose, the Scheme Operators ran a Ponzi scheme with those funds resulting in substantial damage to Plaintiffs and the members of the Class.

181.   Wells Fargo knew that the Scheme Operators were breaching their fiduciary duties to Plaintiffs and the Class members, and knew that it was substantially assisting those breaches of fiduciary duties.

182.    Wells Fargo was the primary bank for the PLCs. Wells Fargo knew that the PLCs transferred large sums of money by and between their accounts without any legitimate business purpose.

183.    Wells Fargo knew the PLCs were created for the purpose of raising funds to purchase STOLIs, however, the funds were improperly transferred to the Centurion Companies who purchased STOLIs without granting the PLCs any interest in the death benefits of those policies. In turn, the Centurion Companies borrowed against the same STOLIs, and Wells Fargo, acting as the Securities Intermediary, agreed to grant the lenders an interest in the death benefits in the event of a default, which default occurred and caused the foreclosure upon the STOLIs.

184.    Through its active monitoring of the PLCs' accounts and its roles as Trustee and Security Intermediary over the primary STOLI assets of the Scheme, Wells Fargo knew that the STOLI assets were not being used for their intended purpose, that the STOLI assets were overleveraged, and that the STOLIs could not possibly secure the millions of dollars in Notes sold to Plaintiffs and the Class members by the PLCs.

185.    Wells Fargo nonetheless knowingly and substantially assisted the Scheme Operators in breaching their fiduciary duties to Plaintiffs and members of the Class, by, *inter alia*:

    a.   facilitating the transfers of funds solicited through the PLCs for transactions other than their expressed and intended purposes, *i.e.*, to purchase STOLIs;

    b.   facilitating the misappropriation of funds solicited through the PLCs and transferring them without consideration to the Centurion Companies and prior investors in other PLCs;

    c.   transferring the funds solicited through the PLCs to the Centurion Companies which purchased STOLIs without granting the PLCs any interest in or entitlement

to the death benefits;

d.  facilitating the transfers of new funds solicited through the PLCs to pay old investors in the PLCs, creating a Ponzi scheme; and allowing the STOLIs that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on STOLIs;

e.  overleveraging of the STOLIs to create an appearance of profitability from the value of STOLIs, which did not exist;

f.  knowingly allowing third parties to take a preferred secured position on the STOLIs that were purportedly securing the Notes sold to investors in the PLCs;

g.   allowing the Centurion Companies' accounts and assets to be used in a manner that bore no reasonable resemblance to how such securities intermediary accounts are properly used;

h.  facilitating the Scheme Operators' movement of funds and assets, as described above, despite knowing the duties owed by them and the nature of the assets and funds they were handling;

i.  facilitating the use of NSI's assets to fund the Scheme.

186.    Wells Fargo substantially benefited from assisting the Scheme Operators. Wells Fargo, through its banking relationships with the Scheme Operators and the entities controlled by them, earned income from fees and from its possession of deposits.

187.    As a direct and proximate cause of the Scheme Operators' breaches of their fiduciary duties to the Plaintiffs and the members of the Class and Wells Fargo's knowing and substantial assistance thereof, the Plaintiffs and the Class members suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals and entities, demands judgment in their favor and against Wells Fargo for (a) actual compensatory, consequential and incidental damages in an amount to be proven at trial; (b) such civil penalties as allowed by law; (c) pre- and post-judgment interest as allowed by law; and (d) such other and further relief as the Court may deem just and proper.

**COUNT II:**
**AIDING AND ABETTING FRAUD**

188.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 169 above, as if fully set forth herein.

189.     Seeman, Holtz and Schwartz -- *i.e.*, the Scheme Operators -- defrauded Plaintiffs and the members of the Class by, *inter alia*:

    a.   using the PLCs to sell unregistered securities to largely unaccredited investors;

    b.   using the funds solicited through the PLCs for transactions other than their expressed and intended purposes, *i.e.*, to purchase STOLIs;

    c.   misappropriating the funds solicited through the PLCs and transferring them without consideration to SHPC and the Centurion Companies;

    d.   transferring the funds solicited through the PLCs to the Centurion Companies who purchased STOLIs without granting the PLCs any interest in or entitlement to the death benefits;

    e.   knowing that new funds solicited through the PLCs were used to pay old investors in the PLCs, creating a Ponzi scheme, and subjecting the PLCs to civil and criminal liability;

    f.   allowing STOLIs that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on

STOLIs;

g.  overleveraging of STOLIs to create an appearance of profitability from the value of STOLIs, which did not exist;

h.  granting third parties a preferred secured position in the STOLIs that were purportedly securing the Notes sold to investors in the PLCs; and

i.  using NSI's assets to fund the Scheme.

190.  Instead of using the PLCs' funds for their intended investment purpose, the Scheme Operators ran a Ponzi scheme with those funds resulting in substantial damage to Plaintiffs and members of the Class.

191.  Wells Fargo knew that the Scheme Operators were defrauding Plaintiffs and the Class members.

192.  Wells Fargo was the primary bank for the PLCs. Wells Fargo knew that the PLCs transferred large sums of money by and between their accounts without any legitimate business purpose.

193.  Wells Fargo knew that the PLCs were created for the purpose of raising funds to purchase STOLIs, however, the funds were improperly transferred to the Centurion Companies which purchased the life policies without granting the PLCs any interest in the death benefits of those policies. In turn, the Centurion Companies borrowed against the life settlement policies, and Wells Fargo, acting as the Securities Intermediary, agreed to grant the lenders an interest in the death benefits in the event of a default, which default occurred and caused the foreclosure upon the STOLIs.

194.  Through its active monitoring of the PLCs' accounts and its role as a Security Intermediary over the primary assets of the Scheme, Wells Fargo knew that the assets were not

being used for their intended purpose, that the assets were overleveraged, and that the assets could not possibly secure the millions of dollars in Notes sold to Plaintiffs and the Class by the PLCs.

195.   Wells Fargo nonetheless knowingly and substantially assisted the fraud committed and Ponzi scheme perpetrated by, *inter alia*:

    a.  facilitating the transfers of funds solicited through the PLCs for transactions other than their expressed and intended purposes, *i.e.*, to purchase STOLIs;

    b.   facilitating the misappropriation of funds solicited through the PLCs and transferring them without consideration to the Centurion Companies and prior investors in other PLCs;

    c.  transferring the funds solicited through the PLCs to the Centurion Companies which purchased STOLIs without granting the PLCs any interest in or entitlement to the death benefits;

    d.  facilitating the transfers of new funds solicited through the PLCs to pay old investors in the PLCs, creating a Ponzi scheme; and allowing the STOLIs that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on STOLIs;

    e.  overleveraging of the STOLIs to create an appearance of profitability from the value of STOLIs, which did not exist;

    f.  knowingly allowing third parties to take a preferred secured position in the STOLIs that were purportedly securing the Notes sold to investors in the PLCs;

    g.  allowing the Centurion Companies' accounts and assets to be used in a manner that bore no reasonable resemblance to how such securities intermediary accounts are properly used;

    h.   facilitating the Scheme Operators' movement of funds and assets, as described above, despite knowing the duties owed by them and the nature of the assets and funds they were handling; and

    i.   facilitating the use of NSI's assets to fund the Scheme.

196.   Wells Fargo substantially benefited from assisting the Scheme Operators. Wells Fargo, through its banking relationships with the Scheme Operators and the entities controlled by them, earned income from fees and from its possession of deposits.

197.   Instead of being used for investment purposed or otherwise held for the benefit of the PLCs, the PLCs' funds were misappropriated, and the STOLIs securing the Notes held by Plaintiffs and members of the Class were overleveraged and lost to third-party creditors.

198.   The PLCs lost their money and their assets and now face significant liability from Plaintiffs and the members of the Class who are due return of their principal by the PLCs for their Notes.

199.   As a direct and proximate cause of the massive fraud and Wells Fargo's assistance thereof, Plaintiffs and the members of the Class have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals and entities, demands judgment in their favor and against Wells Fargo for (a) actual compensatory, consequential and incidental damages in an amount to be proven at trial; (b) such civil penalties as allowed by law; (c) pre- and post-judgment interest as allowed by law; and (d) such other and further relief as the Court may deem just and proper.

## COUNT III:
## UNJUST ENRICHMENT

200.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 169

above, as if fully set forth herein.

201.    Wells Fargo provided banking services to the PLCs through various bank accounts. Those bank accounts were used to carry out the Ponzi scheme.

202.    The funds held in the PLCs' bank accounts conferred benefits upon Wells Fargo in the form of deposits from which Wells Fargo generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees. Wells Fargo knowingly and voluntarily accepted, and retained, the deposits and those benefits.

203.    Because Wells Fargo aided and abetted the fraud and breaches of fiduciary duties by the Scheme Operators and the entities they controlled, it would be inequitable for Wells Fargo to retain the benefits it generated from PLCs' bank accounts, which otherwise would contained those funds that are due and owing to Plaintiffs and the members of the Class.

204.    As a result, Wells Fargo must disgorge its gains from its conduct.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals and entities, demands judgment in their favor and against Wells Fargo for the return of income and fees retained by Wells Fargo; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### Jury Trial Demanded

Plaintiffs hereby demand trial by jury for all issues so triable.

Respectfully submitted,

Dated: June 6, 2024

BUCKNER + MILES
2020 Salzedo Street, Ste. 302
Coral Gables, Florida 33134
Tel.: (305) 964-8003
Fax: (786) 523-0585

SILVER LAW GROUP
11780 W. Sample Road
Coral Springs, FL 33065
Tel.: (954) 755-4799
Fax: (954) 755-4684

/s/Seth Miles             
**Seth Miles, Esq.**
Fla. Bar No. 385530
seth@bucknermiles.com
**David M. Buckner, Esq.**
Fla. Bar No. 60550
Email: david@bucknermiles.com
**Brett E. von Borke, Esq.**
Fla. Bar No. 0044802
Email: vonborke@bucknermiles.com


SALLAH ASTARITA & COX, LLC
One Boca Place
2255 Glades Rd., Ste. 300E
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020

**James D. Sallah, Esq.**
Fla. Bar No. 0092584
Email: jds@sallahlaw.com
**Joshua A Katz, Esq.**
Fla. Bar No. 0848301
Email: jak@sallahlaw.com

*Counsel for Plaintiffs and the Class*

**Scott L. Silver, Esq.**
Fla. bar No. 095631
Email: ssilver@silverlaw.com
**Ryan A. Schwamm, Esq.**
Fla. Bar No. 1019116
Email: rschwamm@silverlaw.com
**Peter M. Spett, Esq., Of Counsel**
Fla. Bar No. 0088840
Email: pspett@silverlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 6, 2024, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

/s/ Seth Miles
Seth Miles, Esq., FBN 385530
seth@bucknermiles.com