**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**


**Case Number: 1:24-cv-22142-DPG**

**FANNY B. MILLSTEIN and
MARTIN KLEINBART,**

        **Plaintiffs,**

**v.**

**WELLS FARGO BANK, N.A.,**

        **Defendant.**
_____

**<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT WELLS FARGO BANK, N.A.'S MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT AND INCORPORATED
MEMORANDUM OF LAW</u>**

Wells Fargo Bank, N.A. ("Wells Fargo") urges this Court to overlook nearly 60 pages of well-pled allegations in the Amended Complaint meticulously detailing how Wells Fargo aided and abetted a Ponzi scheme (the "Scheme") orchestrated by Marshall Seeman, Eric Holtz, Brian Schwartz, and their companies. D.E. 3. Contrary to these allegations, Wells Fargo misleadingly claims it only provided "routine banking services" to the perpetrators. D.E. 25 at 1. This argument is a blatant attempt to mischaracterize its actions and evade accountability for its misconduct. The Complaint alleges Wells Fargo not only knew of the Scheme, but also played an active role in its operation.

Wells Fargo's Motion to Dismiss ("Motion") argues Plaintiffs' claims are "based solely on allegations of atypical transactions and red flags" failing to show Wells Fargo's actual involvement or knowledge of the Scheme. D.E. 25 at 1-2. However, even a cursory review of the Complaint reveals otherwise. Plaintiffs allege Wells Fargo knowingly assisted the perpetrators by designing irrevocable life insurance trusts to circumvent prohibitions on stranger-originated life insurance policies ("STOLIs"), which served as the backbone of the Scheme. D.E. 3 ¶¶50-69. When the Scheme was on the brink of financial collapse in 2012, Wells Fargo actively helped the perpetrators deceive lenders into providing over $40 million in loans, allowing the fraud to continue for another decade. *Id.* ¶¶60-76. And, Wells Fargo permitted the use of its accounts in ways that blatantly violated its own policies and federal anti-money laundering laws. *Id.* ¶¶77-162.

Wells Fargo's actions were far from "routine," and Plaintiffs' allegations sufficiently state valid causes of action. Therefore, Wells Fargo's Motion should be denied.

## I.      ABBREVIATED FACTUAL BACKGROUND

This case arises out of a Ponzi Scheme operating from 2009 to 2021 resulting in more than $300 million in losses from over 1,000 elderly investors ("Class"). D.E. 3 ¶1. The Scheme involved

the sale of promissory notes ("Notes") to the Class offered by entities controlled by National Senior Insurance ("NSI"), the Para Longevity Companies ("PLCs"), and the Centurion Companies and managed by Marshal Seeman ("Seeman"), Eric Holtz ("Holtz"), and Brian Schwartz ("Schwartz") (collectively, "Scheme Operators"). *Id.* ¶¶2-3. The Scheme consisted of NSI selling the Class Notes secured by life insurance policies issued to third parties (the STOLIs). *Id.* ¶4. The Scheme Operators used Wells Fargo as the Scheme's primary bank. With Wells Fargo's assistance, knowledge, and participation, the Scheme operated for 12 years, generating substantial illicit profits. *Id.* ¶4. All throughout, Wells Fargo had both an insiders' and top-level view of the Scheme. *Id.* ¶6.  The hallmarks of a Ponzi were obvious and known to Wells Fargo and the bank played a critical role in maintaining the Scheme. *Id.* ¶¶32-162.

## A.    WELLS FARGO AIDED THE SCHEME AS THE TRUSTEE OF THE ILITS.

To obtain the Scheme Operators' business, Wells Fargo created irrevocable life insurance trusts ("ILITs") that its outside counsel explained were "unlike any ILIT…Wells Fargo has agreed to serve as Trustee under…" *Id.* ¶51. That structure was unusual because it was designed to allow the Scheme Operators to evade the insurance companies' STOLI prohibitions that "strongly oppose[] arrangements designed to obtain life insurance for the benefit of a third party that lacks an insurable interest in the insured." *Id.* ¶¶52, 54. The STOLI policies prohibit: (1) the assignment or sale of the STOLI to a life settlement company; (2) a third party paying for the STOLI's premiums; and (3) paying the insured for procuring the STOLI.  *Id.* ¶¶52-53.

As Trustee, Wells Fargo received the STOLI applications and knew the Scheme Operators and insureds made misrepresentations in them. *Id.* ¶¶55-59. Wells Fargo's ILIT structure allowed the Scheme Operators to evade the STOLI provisions by concealing from the insurance companies: (1) the source of funds used to purchase the STOLIs; (2) that the Scheme Operators were the actual

STOLI beneficiaries; and (3) that the insureds were paid to purchase the STOLIs. *Id.* ¶57.  For example, as Trustee of the ILIT for the Yakovakis Policy, Wells Fargo knew Mr. Yakovakis transferred ownership of the STOLI to the Scheme Operators, the Scheme Operators paid the STOLI premiums, and Mr. Yakovakis was paid $5,000 to procure the STOLI. *Id.* ¶58. Each of these was an independent STOLI violation Wells Fargo had actual knowledge of and concealed, not only for the Yakovakis Policy, but for all the STOLIs for which it served as Trustee. *Id.* ¶¶58-59. Without Wells Fargo's assistance, the Scheme Operators would not have been able to purchase the STOLIs, which served as the foundation of the Scheme. *Id.* ¶68.

## B.   WELLS FARGO AIDED THE SCHEME AS THE SECURITIES INTERMEDIARY.

Wells Fargo knew the money the Scheme Operators used to purchase the STOLIs and pay their premiums came from the Class' purchase of Notes. *Id.* ¶60. In the account opening materials provided by Seeman, Wells Fargo knew the Centurion Companies operated as a "fund that buys life policies" and received money from the Class, who sent checks to Wells Fargo for deposit in the Scheme Operators' accounts with the fund noted on the memo line. *Id.* Wells Fargo understood the Scheme Operators used the Class' funds to purchase and pay the premiums on the STOLIs that constituted the Scheme. *Id.* Wells Fargo also knew the Scheme Operators failed to pay the premiums on the STOLIs because Wells Fargo received "consistent grace notices" that "cause[ed] a strain [on Wells Fargo] to keep up with so many policies week to week." *Id.* ¶75.

Wells Fargo knew the Scheme was in financial trouble based on its receipt of the grace notices. *Id.* ¶¶62, 75. In April 2012, the Scheme Operators told Wells Fargo it had to resign as Trustee and assign the STOLIs to lenders ("Lenders") to allow the Scheme Operators to borrow against them. *Id.* ¶62.  As the Scheme Operators explained, the "loans are in default" and facing a "formal foreclosure action." *Id.* ¶64.  Wells Fargo did not merely know the Scheme was struggling

financially.  Rather, despite knowing the STOLIs collateralized the Class' Notes, Wells Fargo took no action to stop what was now an obvious Ponzi scheme and instead helped the Scheme Operators assign the STOLIs to the Lenders. *Id.* ¶65.

First, Wells Fargo resigned as Trustee to facilitate the STOLI assignments and allowed the Scheme Operators to backdate the resignation forms by nearly a year. *Id.* ¶67. Wells Fargo proceeded without the usual resignation process requiring all parties' approval. *Id.* These actions enabled the Scheme Operators to assign the STOLIs to the Lenders, but the insurance companies initially rejected the assignments due to potential STOLI violations. *Id.* ¶¶68-69. When approval was denied, the Scheme Operators requested Wells Fargo's intervention after which the insurance companies accepted the STOLI assignments without further issue. *Id.*¶69.

Wells Fargo played a critical role in the transfer of the STOLIs. *Id.* ¶¶70-73. In the Securities Account Agreements ("SAAs"), Wells Fargo stated there were no "liens" on the STOLIs and the Lenders had a "first priority lien on and security interests in" them. *Id.* ¶71. Wells Fargo also stated in the SAAs it had "no actual knowledge of any claim to, or security interest in the" STOLIs. *Id.* ¶72. These statements were false. Wells Fargo knew the Class had a security interest in the STOLIs because they collateralized the Notes. *Id.* Wells Fargo also knew Centurion SPV I and II borrowed $40 million using the STOLIs as collateral because it entered into the SAAs with the Lenders. *Id.*¶154. Wells Fargo's actions prevented the Scheme from collapsing in 2012. *Id.*

**C.    WELLS FARGO AIDED THE SCHEME AS THE DEPOSITORY BANK.**

The Scheme Operators maintained accounts at Wells Fargo that enabled the Scheme. *Id.* ¶135. Between 2011-2018, Wells Fargo opened 58 accounts for them and the Receivership Entities. *Id.* Wells Fargo knowingly violated its own Know Your Customer ("KYC") policies by sending pre-filled applications, opening accounts without required paperwork, and providing blank forms

for signatures. *Id.* ¶¶146, 148. Wells Fargo acknowledged these compliance violations, stating, "I need the attached documents signed and returned...to avoid a compliance violation." *Id.* ¶146.

The few times Wells Fargo required Seeman to complete new account opening documents, he provided inconsistent information about the PLCs' beneficial owners and business nature, which were red flags Wells Fargo ignored. *Id.* ¶¶138, 140. By overlooking these, Wells Fargo enabled thousands of questionable transactions involving the PLCs' accounts, including transfers to the Centurion Companies. *Id.* ¶141. As Trustee, Securities Intermediary, and depository bank, Wells Fargo knew there were no legitimate contracts or goods/services to justify these transfers. *Id.* ¶142. Failing to follow due diligence procedures and KYC regulations, Wells Fargo created inaccurate client profiles with knowledge of the entities' true profiles, facilitating the Scheme. *Id.* ¶151.

Wells Fargo knowingly ignored obvious Ponzi-like activity in the Scheme Operators' accounts, allowing the use of new investor funds to pay older investors. *Id.* ¶¶156-158. For instance, on January 31, 2019, Para Longevity 2018-5 deposited $100,000 from Class member 1 into a Wells Fargo account. *Id.* ¶157. The next day, this amount was transferred to Para Longevity 2012-5's account. *Id.* And, on February 11, 2019, Para Longevity 2012-5's Wells Fargo account cleared a check payable to Class member 2 for $100,024. *Id.* This classic Ponzi scheme activity, using new investor funds to pay off old investors, was routine in the PLCs' Wells Fargo accounts, despite their stated purpose of purchasing STOLIs and paying their premiums. *Id.* ¶159.

Wells Fargo ignored other red flag activity that violated the FFIEC BSA/AML rules requiring closure of the Scheme Operators' deposit accounts. *Id.* ¶161. Violations included but were not limited to: (1) 5,100 round trip transfers from the PLCs' Wells Fargo accounts to a Centurion Company's U.S. Bank account suggesting money laundering (*id.* ¶161(a)); (2) $50

million in transfers from new PLCs' to old PLCs' accounts, with payouts to Class members unrelated to business operations, but consistent with Ponzi scheme activity (*id.* ¶¶61(d)-(e)); (3) over $378 million in unjustified intercompany transfers between the PLCs' and Centurion Companies' accounts (*id.* ¶161(f)); (4) using PLCs' accounts to pay STOLI premiums for STOLIs already pledged to the Lenders (*id.* ¶¶161(m)-(n)); (5) securing the Class' Notes with STOLIs known to be pledged to the Lenders (*id.* ¶161(q)); (6) loans made for or paid on behalf of a third party with no reasonable explanation including $1.2 million in payments from multiple PLCs' Wells Fargo accounts to Pelican Capital Management for debts owed by the Centurion Companies (*id.* ¶161(t)); and (7) payments to and from the company that have no stated purpose, do not reference goods or services, or identify only a contract or invoice number, including more than 120 transfers among the PLCs' Wells Fargo accounts annotated "mistake." *Id.* ¶¶161(u)-(v).

## II.  ARGUMENT

### A.  MOTION TO DISMISS STANDARD

"In considering a motion to dismiss, the Court must accept the allegations in a complaint as true and construe them in a light most favorable to the plaintiffs." *Gevaerts v. TD Bank, N.A.*, 56 F. Supp. 3d 1335, 1337 (S.D. Fla. 2014). "At the pleading stage, the Complaint need only contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 1337-38. "All that is required is that there are 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

Moreover, Fed. R. Civ. P. 9(b) requires only that "circumstances constituting fraud" be pled with particularity. Wells Fargo does not, because it cannot, argue Plaintiffs failed to sufficiently allege the Scheme Operators' underlying fraud. Instead, it vaguely and erroneously implies the remaining elements of Plaintiffs' aiding and abetting claims are subject to Rule 9(b)'s heightened

pleading standard because they generally "involve" fraud.  D.E. 25 at 6.  It is well settled Rule 9(b) "does not require Plaintiffs to plead with particularity the other elements of aiding and abetting fraud…." *Hobbs v. BH Cars, Inc.*, 2004 WL 1242838, at *4 n.9 (S.D. Fla. June 4, 2004).[1] Rather, the rule provides "knowledge and other conditions of a person's mind *may be alleged generally*." Fed. R. Civ. P.9(b). This includes a defendant's knowledge of the underlying fraud in claims for aiding and abetting those torts. *Hobbs*, 2004 WL 1242838, at *4 n.9; *Cabot*, 2016 WL 8739579, at *4. Regardless, Plaintiffs' well-pled allegations satisfy either pleading standard and establish Wells Fargo had actual knowledge of, and directly participated in, the Scheme.

**B.**     **COUNTS I AND II STATE CLAIMS FOR AIDING AND ABETTING LIABILITY.**

A bank is liable to a noncustomer for its customer's misappropriation of funds if the bank knows or should have known a fiduciary relationship exists between the customer and noncustomer and has actual knowledge of the misappropriation. *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094-95 (11th Cir. 2017). To state a claim for aiding and abetting, Plaintiffs must allege: (1) an underlying violation by the primary wrongdoer; (2) knowledge of the underlying violation by the aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor. *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. Appx. 988, 993 (11th Cir. 2014). Here, Plaintiffs' allegations satisfy all three elements.[2]

**1.**     **Plaintiffs Allege Wells Fargo had Actual Knowledge of the Scheme.**

"A defendant has knowledge of an underlying fraud if it has a general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. 4th DCA 2020) (reversing dismissal of aiding and abetting claims against bank) (citing *Woods v.*

---

[1] S*ee Cabot E. Broward 2 LLC v. Cabot*, 2016 WL 8739579, at *4 (S.D. Fla. Oct. 25, 2016) (rejecting argument that claims of aiding and abetting fraud "are subject to the heightened pleading requirements of Rule 9(b)").
[2] Wells Fargo does not contest that Plaintiffs alleged the first element - underlying violation by the primary wrongdoer.

*Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985)). Establishing such knowledge does not require direct evidence in the form of an admission or a proverbial "smoking gun." Rather, for purposes of an aiding and abetting claim, "actual knowledge of another's wrongful conduct is nearly universally found based upon circumstantial evidence." *Cabot*, 2016 WL 8740484, at *4 (denying motion to dismiss claims of aiding and abetting fraud and breaches of fiduciary duty where plaintiff alleged defendant knew fraudster "was manipulating the Investor Reports to hide losses from Plaintiffs and the Class stemming from a multi-million-dollar embezzlement scheme") (citing *Amegy Bank Nat. Ass'n v. Deutsche Bank Alex. Brown*, 619 Fed. Appx. 923, 931 (11th Cir. 2015) ("It should not be a surprise that the jury was forced to rely on purely circumstantial evidence to conclude that [defendant] had actual knowledge of wrongful conduct. It is difficult to imagine what sort of evidence, other than an admission…would constitute direct evidence of…knowledge of wrongful conduct.")).[3]

Knowledge of a fraudulent scheme can be inferred from a variety of circumstantial evidence. *Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd*., 682 F. Supp. 3d 1112, 1137 (S.D. Fla. 2023) (denying motion to dismiss aiding and abetting claims where plaintiffs' "specific allegations as a whole" established "a strong inference of actual knowledge"); *Woods*, 765 F.2d at 1009 (a defendant's knowledge "must usually be inferred"). Knowledge may be inferred by the way an employee alters the financial institution's normal ways of doing business to benefit the fraudster. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) ("[I]f the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge

---

[3] *See also Chang*, 845 F.3d at 1097 ("Even if Chang has no explicit allegation that Padgett-Perdomo knew about Gordon's fraud, such a direct allegation was unnecessary because Chang's allegations support an inference that Padgett-Perdomo knew that Gordon was misappropriating money.")

necessary for aiding and abetting liability.").[4] Where allegations "go beyond [mere] 'red flags[,]' [those] allegations could support a plausible inference of actual knowledge by Wells Fargo of the Ponzi scheme which it then aided and abetted by permitting the fraud to continue through use of its accounts after it had actual knowledge of the scheme." *Perlman*, 559 Fed. Appx. at 996.  And where a bank has monitoring and reporting systems in place to detect improper activities, allegations that actual knowledge of the impropriety exists due to those systems is sufficiently plausible to withstand a motion to dismiss. *Gevaerts v. TD Bank, N.A.*, 56 F. Supp. 3d 1335, 1341-42 (S.D. Fla. 2014) (denying motion to dismiss where plaintiff alleged existence of systems to detect and report complained-of fraud).

The knowledge inquiry for an aiding and abetting claim is necessarily fact intensive. *Woods*, 765 F.2d at 1009 ("the surrounding circumstances and expectations of the parties [are] critical").  Therefore, "the exact[] level [of knowledge] necessary for liability remains flexible and must be decided on a case-by-case basis." *Perlman v. Bank of Am., N.A.*, 2011 WL 13108060, at *6 (S.D. Fla. Dec. 22, 2011), quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991).

### a.  *Plaintiffs alleged more than mere atypical banking transactions.*

"[A]lleging atypical transactions and transactions that lack a business justification can itself support an inference of knowledge on the part of the Bank." *Perlman*, 2011 WL 13108060, at *8, (citing *Woodward*, 522 F.2d at 97). Regardless, allegations that go beyond the mere existence of "red flags" or atypical transactions most certainly "support a plausible inference of actual knowledge by [a bank] of [a] Ponzi scheme" for purposes of aider and abettor liability. *Perlman*, 559 Fed. Appx. at 996 (11th Cir. 2014); *see also Pearson v. Deutsche Bank AG*, 2022 WL 951316,

---

[4] *See also Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1120 (C.D. Cal. 2003) (alleging bank's knowledge for aider and abettor liability where "Banks utilized atypical banking procedures to service [fraudster's] accounts, raising…inference…they knew of the Ponzi…and sought to accommodate it by altering" regular business practices).

at *8 (S.D. Fla. Mar. 30, 2022) (denying motion to dismiss claims for aiding and abetting against bank where "[p]laintiffs' allegations in this case go beyond merely failing to investigate red flags"); *Perlman*, 2011 WL 13108060, at *8 (denying motion to dismiss on basis that "allegations of atypical transactions are sufficient to create an inference of knowledge" where bank policies would have put bank on notice of customer's breach of fiduciary duties). [5]

Plaintiffs' Complaint alleged Wells Fargo had both direct and circumstantial knowledge of the Scheme from its inception. D.E. 3 ¶¶51-167. As explained in Section (I)(A)-(C) *supra*, the Complaint alleged Wells Fargo created an ILIT structure its outside counsel described as "unlike any ILIT…Wells Fargo agreed to serve as Trustee under," which structure was specifically designed to allow the Scheme Operators to evade the insurance companies' STOLI provisions. *Id.* ¶¶51-54. Wells Fargo structured the ILITs to hide the Scheme Operators' STOLI violations, including: (1) the assignment of the STOLIs to the Scheme Operators; (2) the Scheme Operators paying the STOLIs' premiums; and (3) payments made by Scheme Operators to the insured for procuring the STOLIs. *Id.* ¶¶52-53. Wells Fargo had direct knowledge that the Scheme Operators violated each of these provisions for each STOLI they obtained because Wells Fargo received the STOLI application paperwork, policies, and agreements between the Scheme Operators and insureds for each STOLI for which it served as Trustee. *Id.* ¶¶51-59. Moreover, Wells Fargo's design and use of an atypical ILIT structure to conceal the STOLI violations is also circumstantial evidence of its actual knowledge of the Scheme. *See Woodward*, 522 F.2d at 97.

Plaintiffs' Complaint also alleged Wells Fargo had actual knowledge that the Scheme operated as a Ponzi. § (I)(A)-(C) *supra*. Wells Fargo, as Trustee, had actual knowledge that the

---

[5] *See also Smith v. First Union Nat. Bank*, 2002 WL 31056104, at *5 (S.D. Fla. Aug. 23, 2002) (denying summary judgment because disputed fact remained as to whether bank employee had knowledge of fund's "wrongful purpose based on the series of 'atypical' banking transactions [and] her unexplained failure to report the suspicious activity").

Scheme Operators represented to the Class that their money would be used to pay the STOLI premiums through the purchase of the Notes and routinely received the Class' money for deposit in the Scheme Operators' accounts. D.E. 3 ¶¶5, 7, 9, 45-46, 60, 112, 155-57.  However, Wells Fargo knew the Scheme Operators did not use the Class' funds to pay the STOLI premiums because Wells Fargo as Trustee routinely received "grace notices" from insurance companies indicating non-payment of the STOLIs' premiums. *Id.* ¶75. And, the Scheme Operators told Wells Fargo the STOLI policies were "in default" for non-payment of the premiums and it had to resign as Trustee in order for the Scheme Operators to assign the STOLIs to the Lenders to avoid a "formal foreclosure action." *Id.* ¶¶62, 64-65. Wells Fargo's actual knowledge of this was demonstrated when it resigned as Trustee of the ILITs and helped facilitate the assignment of the STOLIs to the Lenders by actively assisting the Scheme Operators with the assignments when the insurance companies questioned them about possible STOLI violations. *Id.* ¶¶68-69.

Wells Fargo also had actual knowledge of the assignment of the STOLIs to the Lenders because it participated in it. *Id.* ¶¶70-73. Wells Fargo entered into the SAAs with the Scheme Operators and Lenders, representing to the Lenders there were no "liens" on the STOLIs, that the Lenders had "first priority lien on and security interest in" the STOLIs, and Wells Fargo had "no actual knowledge of any claim that any person" had an interest in the STOLIs. *Id.* ¶71.  These statements were all false because Wells Fargo knew the Class had a first priority lien interest in the STOLIs yet told the Lenders otherwise in order to facilitate the $40 million loan from the Lenders to the Scheme Operators using the STOLIs Wells Fargo knew collateralized the Class' Notes. *Id.* ¶¶71-75, 154-55.  Wells Fargo's actual knowledge is confirmed by its conduct – that is, entering into the SAAs with the Lenders and Scheme Operators. *See Pearson*, 2022 WL 951316, at *8

Finally, Wells Fargo had actual knowledge of the Scheme through the Scheme Operators' deposit accounts. Wells Fargo deviated from its KYC procedures to open the accounts resulting in "compliance violations" (*id.* ¶146), ignored inconsistencies in the account opening documents submitted by the Scheme Operators (*id.* ¶¶138, 140), and ignored thousands of red flag transactions including, but not limited to: (1) 5,100 round trip transfers from the PLCs' Wells Fargo accounts to a Centurion Company's U.S. Bank account and back, indicative of money laundering (*id.* ¶161(a)); 400 transfers of more than $50 million from new PLCs to old PLCs with payouts to Class members unrelated to the PLCs' business but consistent with Ponzi scheme activity (*id.* ¶¶161(d)-(e)); and transfers of funds among related accounts including more than $378 million in intercompany transfers between the PLCs and Centurion Companies accounts without any justification for such transfers (*id.* ¶161(f)). Wells Fargo's manipulation of its policies to allow the Scheme Operators to execute these transactions in violation of Wells Fargo's policies, without closing the Scheme Operators' deposit accounts, is compelling circumstantial evidence of its knowledge of the Scheme. *See Cabot*, 2016 WL 8740484, at *4.

Courts have frequently inferred actual knowledge in circumstances where the parties alleged far less than Plaintiffs have here. *Pearson*, 2022 WL 951316, at *2-4, *8 (denying motion to dismiss where plaintiff alleged defendant bank entered into various agreements with issuers of insufficiently-backed notes integral to the fraudulent scheme, allowed clients to circumvent anti-money laundering and 'Know Your Customer' rules, and ignored transactions that would have revealed the fraudulent scheme years earlier and classic Ponzi scheme activity).[6]

---

[6] *See also Perlman*, 2011 WL 13108060, at *7-8 (denying motion to dismiss where plaintiff alleged defendant bank effected frequent and voluminous transfers from entity to entity and into personal accounts, opened multiple prohibited "investment club" accounts, and where there was an absence of transactions consistent with the operation of a business); *Cabot*, 2016 WL 8740484, at *4 (denying motion to dismiss where plaintiff alleged defendants knew millions of dollars diverted into personal accounts were proceeds of the fraud, knew fraudster was manipulating investor reports, and knew fraudster was omitting information from balance sheets).

### b. Wells Fargo's policies and regulations put it on notice of the fraud.

Specific allegations that a bank had monitoring systems in place to detect fraudulent banking activities and was under an obligation to report them is sufficient to plausibly allege actual knowledge of the underlying misconduct. *Gevaerts*, 56 F. Supp. 3d at 1341-42 (denying motion to dismiss where plaintiff alleged existence of systems to detect and report complained-of fraud).[7] Here, as described more fully in Sections I(C) and II(B)(1)(a), Wells Fargo violated its own KYC policies and FFIEC BSA/AML rules by ignoring thousands of red flag transactions thereby plausibly establishing it had knowledge of the Scheme (in addition to its actual knowledge). D.E. 3 ¶¶138, 140-42, 151, 161. Specifically, with regard to its own policies, Wells Fargo did not require the Scheme Operators to complete required account opening paperwork, which Wells Fargo internally noted constituted "compliance violation[s]" (*id.* ¶¶146, 148) and ignored the Scheme Operators' inconsistent answers about the PLCs' beneficial owners, which were red flags necessitating closure of the deposit accounts under its own policies (*id.* ¶¶138, 140-42, 151).  Also, Wells Fargo's decision to  ignore thousands of red flag transactions it was obligated to report under FFIEC BSA/AML rules sufficiently establishes its actual knowledge of the underlying Scheme.[8] *See Gevaerts*, 56 F. Supp. 3d at 1341-42.

---

[7] *See also Pearson*, 2022 WL 951316, at *8 (denying motion to dismiss where "[f]acts surrounding [bank's] maintenance of anti-money laundering and monitoring systems…provide[d] circumstantial evidence of actual knowledge" of fraud); *Perlman*, 2011 WL 13108060, at *7-9 (denying motion to dismiss in light of factual allegations that bank employed precautions to preclude money laundering and to comply with BSA); *Bansal v. TD Ameritrade, Inc.*, 2024 WL 3009423, at *5-6 (S.D. Fla. June 7, 2024) (denying motion to dismiss where defendant "violated its own polices" and made "exceptions to its inbound wire procedures").

[8] The transactions Wells Fargo was required to monitor and report under FFIEC BSA/AML rules but ignored include: 5,100 round trip transfers from the PLCs' Wells Fargo accounts to a Centurion Company's U.S. Bank account indicative of money laundering (*id.* ¶161(a)); 400 transfers of more than $50 million from new PLCs to old PLCs with payouts to Class members unrelated to the PLCs' business but consistent with Ponzi scheme activity (*id.* ¶161(d)-(e)); transfers of funds among related accounts including more than $378 million in intercompany transfers processed between the PLCs and Centurion Companies' accounts despite no justification for such transfers (*id.* ¶161(f)); (4) payments from the PLCs' accounts for the STOLI premiums even though they were pledged to the Lenders (*id.* ¶¶161(m)-(n); (5) loans made for or paid on behalf of a third-party with no explanation (*id.* ¶161(t)); and (6) payments to or from the companies that have no stated purpose or were simply annotated as mistakes (*id.* ¶¶161(u)-(v)).

Courts have consistently concluded that similar (indeed, even lesser) allegations are sufficient to plead knowledge.  For example, *Gevaerts* involved a strikingly similar scheme.  There, investors wired funds to various corporate entities operated by the fraudsters, who would then in turn wire the funds to their trust accounts at the defendant bank. 56 F.Supp.3d at 1337. Those funds were purportedly invested to purchase certain life insurance policies.  *Id.*  However, those funds were then allegedly used to pay unrelated premium obligations with high rates of return.  *Id.*  The plaintiffs alleged that TD Bank allowed the fraudsters to overdraw the trust accounts, knowing that such conduct was in violation of relevant rules governing attorney trust accounts, and that TD Bank knew it was required to report such activities but failed to do so.  *Id.* at 1341.  Rejecting TD Bank's contention that the plaintiffs' allegations of knowledge equated to (essentially) routine banking transactions, the court explained:

> Plaintiffs' implicit contention is therefore that (i) because TD Bank had an obligation to report overdraws of attorney trust accounts to the New Jersey bar, (ii) TD Bank had systems in place to detect such overdraws for reporting purposes and (iii) due to such systems TD Bank had actual knowledge of the overdraws. The Court finds this contention to be plausible. Accordingly, the Court finds that Plaintiffs' allegations of actual knowledge satisfy the *Twombly* motion to dismiss standard.

*Id.* at 1341-42.

Similarly, *Perlman* also involved a Ponzi scheme facilitated by Bank of America ("BA") where the fraudsters used numerous entities to perpetrate their scheme. 2011 WL 13108060, at *1. The fraudsters opened personal checking accounts, multiple business accounts, and a number of investment club accounts at BA, with $2.2 million coming into the investment club accounts shortly after opening. *Id.* Plaintiffs alleged BA's knowledge of the fraud based on the facts that:

- BA employs certain precautions and due diligence as part of its own efforts to preclude money laundering and comply with the Bank Secrecy Act, indicating a likelihood that such checks were performed with respect to the fraudsters;

- these checks would yield information about: (1) the principals' troublesome history; (2) the entities incoherent business models and uniform addresses; (3) the fraudsters acting as fiduciaries without the necessary licenses; and (4) Wachovia previously closed the fraudsters' accounts due to suspicious activity; and

- this information, combined with other suspicious banking activity (*e.g.*, frequent and voluminous transfers from entity to entity and into the fraudsters' personal accounts, the absence of transactions consistent with the operation of the business, BA's willingness to open multiple investment club accounts despite its policy prohibiting them) established the fraudsters were breaching their fiduciary duties.

*Id.* at *8. The court denied BA's motion to dismiss, in part, concluding "[i]n light of these factual allegations, the Court cannot say…there is no factual support for the Receiver's ultimate allegation that the Bank had knowledge of the underlying Ponzi scheme and associated violations." *Id.* Plaintiffs here allege the same circumstantial facts as in *Gevaerts* and *Perlman*, ***plus*** Wells Fargo's actual knowledge of the Scheme.

### 2. Plaintiffs Alleged Wells Fargo Provided Substantial Assistance to the Scheme.

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so…enabling the breach to occur." *Gevaerts*, 56 F. Supp. 3d at 1342. "Because 'banks…have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating…those funds are being mishandled,' a bank's inaction–that is, its failure to stop the theft of such trust funds–can constitute substantial assistance." *Chang*, 845 F.3d at 1098. A bank substantially assists a fraud when it provides services that allow it to occur and fail to take actions that would stop it. *See Gevaerts*, 56 F. Supp. 3d at 1342 (denying motion to dismiss where plaintiff alleged bank provided substantial assistance by "disregard[ing] overtly suspicious activity, fail[ing] to report overdraws…and providing letters that 'vouched' for [the perpetrator] during the course of [the] alleged fraud"); *TD Ameritrade*, 2024 WL 3009423, at *6 (denying motion to dismiss where plaintiff alleged "ten different ways" that TD Ameritrade

"facilitated the operation of a commodity pooling scheme and of a Ponzi scheme in the accounts, pursuant to [the perpetrator's] instructions and transfer orders").[9]

Here, as noted in greater detail above in Sections I(A)-(C), Wells Fargo "affirmatively assist[ed], help[ed] conceal, [and] fail[ed] to act when required to do so." *See Gevaerts*, 56 F. Supp. 3d at 1342; *see also* D.E. 3 ¶¶50-162. Wells Fargo affirmatively assisted the Scheme Operators by designing the ILITs to evade the insurance companies' STOLI prohibitions. *Id.* ¶¶51-59.  The fact that these ILITs were, as its outside counsel described, "unlike any ILIT that…Wells Fargo has agreed to serve as Trustee under" evidences just how far Wells Fargo was willing to go to advance the Scheme – even at its inception. *Id.* ¶51. Wells Fargo designed the ILITs to allow the Scheme Operators to prevent the insurance companies from discovering they were paying: (1) the STOLIs' premiums, (2) the insured to purchase the STOLIs, and (3) the STOLIs' assigned beneficiaries. *Id.* Without Wells Fargo's assistance, the Scheme Operators would not have been able to sell collateralized Notes to the Class. *Id.*

Not only did Wells Fargo help create the medium through which the Scheme Operators defrauded the Class, it also prevented the Scheme from financial collapse. D.E. 3 ¶¶62-69. The Scheme Operators in 2012 told Wells Fargo the STOLI policies were "in default" and that it had to resign as Trustee in order to assign the STOLIs to Lenders to avoid a "formal foreclosure action." *Id.* ¶¶62, 64-65. As Trustee, Wells Fargo knew the Class paid the STOLI premiums and that the STOLIs collateralized the Notes, yet it took no action to stop what was an obvious Ponzi scheme. *Id.* ¶65. Instead, Wells Fargo helped the Scheme Operators further the Scheme by assigning the

---

[9] *Cabot*, 2016 WL 8740484, at *5 (denying motion to dismiss where plaintiff alleged "despite [defendant's] alleged actual knowledge, [defendant] 'not only kept quiet about the embezzlement, he helped [the perpetrators] continue and conceal the embezzlement from Plaintiffs…by helping …create false and fraudulent Investor Reports," and defendant "assisted in creating the false… Investor Reports through accounting…designed to conceal the embezzled funds").

Class's STOLIs to the Lenders. *Id.* ¶65. Wells Fargo used an expedited resignation process and resigned as Trustee to facilitate the assignment of the STOLIs, even going as far as to backdate the resignation forms nearly a year. *Id.* ¶67. When the resignation and assignment forms were submitted to the insurance companies, they were rejected for potential STOLI violations until Wells Fargo, at the request of the Scheme Operators, intervened and convinced the insurance companies to process the assignments. *Id.* ¶¶67-69.

Without Wells Fargo's assistance, the Scheme Operators would have been unable to borrow $40 million from the Lenders using the Class's STOLIs. *Id.* ¶¶70-73. Wells Fargo in the SAAs represented to the Lenders they had a "first priority lien on and security interests in" the STOLIs (*id.* ¶71) and that it had "no actual knowledge of any claim to, or security interest in the [STOLIs]" by any other entity (*id.* ¶72). This was false. Wells Fargo actually knew the Class had a claim to, and a security interest in, the STOLIs because they collateralized the Notes. *Id.* Because of Wells Fargo's misrepresentations in the SAAs, Centurion SPV I and II were able to borrow $40 million using the Class' STOLIs as collateral, continuing the Scheme, allowing the Scheme Operators to raise hundreds of millions of dollars more from the sale of Notes to the Class. *Id.* ¶¶154-55.

Wells Fargo also "failed to act when required to do so" as the depository bank. *See Gevaerts*, 56 F. Supp. 3d at 1342. Wells Fargo ignored its policies and FFIEC BSA/AML rules requiring closure of the Scheme Operators' deposit accounts, including compliance violations of its KYC policies and ignoring: (1) more than 5,100 red flag transactions of money laundering activity; (2) 400 red flag transfers of over $500 million from new PLC accounts to old PLC accounts indicative of Ponzi scheme activity; (3) $378 million in related account fund transfers between the PLCs and Centurion accounts without any business justification; (4) loans to third

parties without any justification; and (5) payments to or from companies with no stated purpose. *Id.* ¶¶161 (a), (d)-(f), (m)-(n), (t), (u)-(v); *see also* fn. 8.

Wells Fargo's Motion contrasts selected allegations in the Complaint with the facts in *Pearson* to create the false impression that Plaintiffs' allegations show nothing more than "inaction." D.E. 25 at 14. Rather, *Pearson* illustrates why Plaintiffs made sufficient allegations of substantial assistance. In *Pearson*, the plaintiffs alleged Deutsche Bank ("DB") "provided advice and assistance to the Individual Wrongdoers and others that allowed them to conceal their fraud and continue their scheme." 2022 WL 951316, *3. There, the court concluded "the substantial assistance element for the aiding and abetting claim is met for the same reasons the actual knowledge element is met." *Id.* at *8; *see also Gevaerts,* 56 F. Supp. 3d at 1343 ("Plaintiffs' allegations [of substantial assistance] must be considered in light of the alleged actual knowledge of TD Bank."). That is, the *Pearson* plaintiffs provided "sufficient detail as to how [DB], through its employees, affirmatively assisted the Individual Wrongdoers by instructing them on how to circumvent the Know Your Customer monitoring systems." *Pearson*, 2022 WL 951316, at *8.

Here, Wells Fargo directly helped the Scheme Operators implement the Scheme by creating the ILITs to disguise the STOLI violations from the life insurance companies, deceived the life insurance companies into approving the assignments of the STOLIs to the Lenders, made a series of misrepresentations to the Lenders to allow the Scheme Operators to borrow more than $40 million using the STOLIs as collateral, and ignored its own policies, red flags, and FFIEC BSA/AML rules, allowing the Scheme Operators to use the deposit accounts in violation of them. *See Gevaerts*, 56 F. Supp. 3d at 1342; *TD Ameritrade*, 2024 WL 3009423, at *6.[10]

---

[10] Wells Fargo relies on cases where, unlike here, the plaintiffs alleged only that "the transactions were atypical and therefore [the bank] should have known of the Ponzi scheme." *Lawrence v. Bank of Am., N.A.*, 455 Fed. Appx. 904, 907 (11th Cir. 2012); *see also Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014) ("facts alleged…at

## C.    **COUNT III STATES A CLAIM FOR UNJUST ENRICHMENT.**

Plaintiffs' unjust enrichment claim states a valid cause of action[11] against Wells Fargo. As shown below, Wells Fargo's arguments to the contrary have no merit whatsoever.

### 1.    **Plaintiffs Conferred a Direct Benefit on Wells Fargo.**

Wells Fargo first argues Plaintiffs' unjust enrichment claim fails because "there is no allegation that Wells Fargo received a direct benefit *from Plaintiffs* that could form the basis for an unjust enrichment claim." D.E. 25 at 16.  First, Plaintiffs have alleged they directly conferred a benefit on Wells Fargo.[12] D.E. 3 ¶¶186, 202.  Second, Plaintiffs' unjust enrichment claim does not require the benefit to directly pass from the Class to Wells Fargo to satisfy the direct conferral requirement.  *See Williams v. Wells Fargo Bank, N.A.,* 2011 WL 4368980, at *8 (S.D. Fla. Sept. 19, 2011). As Judge Altonaga held in *Williams*:

> In other words, just because the benefit conferred by Plaintiffs on Defendants did not pass directly from Plaintiffs to Defendants—but instead passed through a third party—does not preclude an unjust-

most show that State Street 'should have known'"); *Isaiah v. JPMorgan Chase Bank, N.A.*, 2017 WL 5514370, at *4 (S.D. Fla. Nov. 15, 2017) (allegations demonstrated only "knowledge of the symptoms of the…scheme, not…actual knowledge of" it); *Meridian Tr. Co. v. Batista*, 2018 WL 4693533, at *4 (S.D. Fla. Sept. 26, 2018) ("courts…have rejected these types of 'should have known' arguments"); *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. Appx. 988, 993–94 (11th Cir. 2014) ("At most [plaintiff's allegations] list facts that could arouse suspicions…").  Here, Wells Fargo had actual knowledge of the Scheme and actively participated in it.  Wells Fargo's cases for the proposition that a bank's failure to adhere to policies and regulations does not establish actual knowledge are similarly inapposite because none featured allegations, like Plaintiffs have made here, that the bank had a monitoring obligation and nevertheless actively assisted the fraudsters.  *See Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*, 2015 WL 12862724, at *4 (S.D. Fla. Aug. 20, 2015) ("the allegations…support the conclusion that Chase knew of the transfers themselves, but not necessarily that…the transfers were part of a fraudulent scheme").

[11] A claim for unjust enrichment has three elements: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained the benefit; and (3) the circumstances are such that it would be inequitable for the defendant[] to retain it without paying the value thereof." *Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1323 (M.D. Fla. 2013).

[12] Plaintiffs alleged Wells Fargo "earned income from fees and from its possession of deposits" held in the PLCs' accounts. D.E. 3 ¶¶186, 202.  Plaintiffs also alleged the PLCs only source of funds came from the Class' purchase of Notes. *Id.* ¶41. Because the PLCs had no legitimate source of funds other than from the Class, the fees Wells Fargo took from the PLCs' accounts were paid by the Class. *See Williams*, 2011 WL 4901346, at *5 ("Wells Fargo…received…commissions…taken directly from the insurance premiums paid by Plaintiffs….even if there was no direct contact between Wells Fargo…and Plaintiffs, by paying the allegedly excessive premiums, Plaintiffs directly conferred a benefit on Wells Fargo Bank"). Regardless,"[w]hether Defendant did or did not receive a direct benefit from [Plaintiffs] is a question of fact that cannot be resolved at the motion to dismiss stage..." *Stermer v. SCK Solutions, LLC*, 2009 WL 1849955, at *6 (S.D. Fla. June 26, 2009).

> enrichment claim.  Indeed to hold otherwise would be to undermine the equitable purpose of unjust enrichment claims. *See* 11 FLA. JUR 2d Contracts § 288 ("[I]f someone does enrich himself unjustly to the detriment of another, that person should be required to make restitution of all the benefits received, retained, or appropriated when it appears that to require it would be just and equitable.").  It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the "benefit" passed through an intermediary before being conferred on a defendant.

*Id.* at *9. The Class' funds deposited into the PLCs paid Wells Fargo's fees – conferring a direct benefit on Wells Fargo even though those funds passed through a third-party intermediary account.

### 2.   Wells Fargo's Adequate Consideration Defense is Misplaced.

Wells Fargo also argues Plaintiffs' unjust enrichment claim fails because the "allegations establish that Wells Fargo in fact provided contracted-for services for which the fees at issue were paid." D.E. 25 at 17.  Wells Fargo's argument is misplaced. Wells Fargo and the Class were never in contractual privity – a critical distinction. Wells Fargo cites *Wiand v. Wells Fargo, N.A.*, 86 F. Supp. 3d 1316, 1332 (M.D. Fla. 2015), but the plaintiff there was a court-appointed receiver for entities in contractual privity with Wells Fargo and the "account services' fees and interest payments made by the [receivership] entities were the product of arms-length transaction between the parties."  As such, "there is no evidence that any benefits [were] conferred on the Bank over and above those bargained for in the agreements." *Id.*[13]  Unlike the cases cited by Wells Fargo, the Class is not asserting claims on behalf of the PLCs. The Class was never in direct privity with Wells Fargo nor did the Class receive any benefit in exchange for the banking services provided to the PLCs, whose "bank accounts were used to carry out the Ponzi scheme."  D.E. 3 ¶201.

### III.   <u>CONCLUSION</u>

Accordingly, Plaintiffs' respectfully request that Wells Fargo's Motion be denied.

---

[13] Wells Fargo cites *Biondi v. Branch Banking & Trust Co.*, 2018 WL 6566027, *1 (S.D. Fla. Aug. 28, 2018), but plaintiffs and the bank in that case were also in direct contractual privity.

Respectfully submitted,

Dated: September 9, 2024.

BUCKNER + MILES
2020 Salzedo Street, Ste. 302
Coral Gables, Florida 33134
Tel.: (305) 964-8003
Fax: (786) 523-0585

/s/Seth Miles
**Seth Miles, Esq.**
Fla. Bar No. 385530
seth@bucknermiles.com
**David M. Buckner, Esq.**
Fla. Bar No. 60550
Email: david@bucknermiles.com
**Brett E. von Borke, Esq.**
Fla. Bar No. 0044802
Email: vonborke@bucknermiles.com

SILVER LAW GROUP
11780 W. Sample Road
Coral Springs, FL 33065
Tel.: (954) 755-4799
Fax: (954) 755-4684

**Scott L. Silver, Esq.**
Fla. bar No. 095631
Email: ssilver@silverlaw.com
**Ryan A. Schwamm, Esq.**
Fla. Bar No. 1019116
Email: rschwamm@silverlaw.com
**Peter M. Spett, Esq., Of Counsel**
Fla. Bar No. 0088840
Email: pspett@silverlaw.com

SALLAH ASTARITA & COX, LLC
One Boca Place
2255 Glades Rd., Ste. 300E
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020

**James D. Sallah, Esq.**
Fla. Bar No. 0092584
Email: jds@sallahlaw.com
**Joshua A Katz, Esq.**
Fla. Bar No. 0848301
Email: jak@sallahlaw.com

*Counsel for Plaintiffs and the Class*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on

September 9, 2024, on all counsel or parties of record on the Service List below.

/s/ Seth Miles
Seth Miles, Esq., FBN 385530
seth@bucknermiles.com

## <u>SERVICE LIST</u>

Nellie E. Hestin, Esq.
Mark W. Kinghorn, Esq.
Jarrod D. Shaw, Esq.
McGuire Woods, LLP
260 Forbes Avenue, Suite 1800
Tower Two-Sixty
Pittsburgh, Pennsylvania 15222
nhestin@mcguirewoods.com
mkinghorn@mcguirewoods.com
jshaw@mcguirewoods.com

William O. L. Hutchinson
Zachary L. McCamey
McGuire Woods, LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
whutchinson@mcguirewoods.com
zmccamey@mcguirewoods.com

Emily Yandle Rottmann, Esq.
McGuireWoods LLP
50 N. Laura Street, Suite 3300
Jacksonville, Florida 32202
erottmann@mcguirewoods.com

*Counsel for Wells Fargo Bank, N.A.*