**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI AND WEST PALM BEACH DIVISIONS**

**CASE NOS.: 1:24-cv-22142-DPG; 9:24-cv-80722-DPG[1]**

FANNY B. MILLSTEIN and
MARTIN KLEINBART,

        Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

        Defendant.

_____

DANIEL J. STERMER, as Receiver for
NATIONAL SENIOR INSURANCE, INC.
d/b/a SEEMAN HOTLZ, et al.,

        Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

        Defendant.

_____

**REPORT AND RECOMMENDATIONS ON MOTIONS**
**TO DISMISS RELATED LAWSUITS**

_____

[1]     The Undersigned is filing this Report and Recommendations on CM/ECF in *both* cases.

1

In the first paragraph of his classic historic novel "A Tale of Two Cities," Charles Dickens describes life in the at-issue years in starkly different ways. It was "the best of times," but it was also "the worst of times." It was "the age of wisdom," yet it was also "the age of foolishness." He classified the times as being "the season of Light," even though they were also "the season of Darkness." And he explained that life before and during the French Revolution was "the spring of hope," while also being "the winter of despair."

Similar to Dickens' iconic first paragraph of dueling depictions of the same thing, Wells Fargo Bank, N.A. ("Defendant," "Wells Fargo," or "the Bank"), the defendant in the two related lawsuits listed above, is simultaneously portrayed in dramatically diverse ways. There is no doubt that the parties describe Wells Fargo with a clear-cut contrast in perceptions.

Plaintiffs (a state court-appointed Receiver and two retirees who lost their investments in a Ponzi scheme) in the two related lawsuits contend that Wells Fargo aided and abetted both a Ponzi scheme fraud and breaches of fiduciary duty – and did so with knowledge of the fraudsters' misconduct. The Receiver also alleges that the bank was negligent; the two retirees, who are seeking to pursue a class action, separately contend (in their unjust enrichment count) that Wells Fargo must disgorge its gains from its purported misconduct.

2

Wells Fargo, however, insists that it was not a bad actor. It contends that it was involved in mere routine banking transactions and was not aware of the fraud. It brands the "with knowledge" allegations as conclusory, speculative, fact-free, and appropriate to be ignored. At *most*, Wells Fargo argues, it might have been in a "should-have-known" scenario -- which is insufficient to establish an aiding and abetting claim. And it argues that the allegations in the two lawsuits are woefully inadequate and should therefore lead to an order dismissing the lawsuits with prejudice.

In grappling with the two motions to dismiss filed by Wells Fargo in the two related lawsuits, the Undersigned is confronted with allegations and arguments generating competing visions of who Wells Fargo is (or was, in the years in question).

The Receiver, Daniel J. Stermer ("Stermer"), filed a Complaint in Palm Beach state court, alleging that Wells Fargo Bank enabled the Ponzi scheme to "reach catastrophic levels." [ECF No. 1-2, p. 9, ¶ 18]. And his response to Wells Fargo's motion to dismiss contends that the Bank "continued to knowingly assist the rogue insiders of the Ponzi scheme by transferring and remitting hundreds of millions of dollars through the bank, from one account to another, both inside and outside the bank, for purposes it knew were not legitimate or in line with the business purposes for which those accounts were opened." [ECF No. 35, p. 4].

But Wells Fargo says the Receiver's lawsuit is an improper attempt to hold it responsible for the acts of the purported Ponzi schemers, and it argues that the Receiver

"targets" it merely because it provided "routine banking services" to the Receivership Entities.

Meanwhile, Fanny Milstein and Martin Kleinbart (collectively, "the Retirees") filed a putative class action lawsuit against Wells Fargo and alleged (in their First Amended Complaint ("FAC") [ECF No. 3, p. 3, ¶ 5]) that the Bank "chose to substantially assist and profit from" an "ongoing and ever-expanding fraud." But, Wells Fargo argues, the Retirees do not allege in their FAC that the Bank or its employees "operated or actually knew about the scheme, much less benefitted from it." [ECF No. 25, p. 1]. On the other hand, the Retirees' Response to the Bank's dismissal motion says that their FAC "alleges Wells Fargo not only knew of the Scheme, but **played an active role** in its operation." [ECF No. 30, p. 1 (emphasis supplied)].

In fact, the FAC alleges that Wells Fargo "substantially assisted in [] the fraudulent representations and material omissions of facts crafted by the Scheme Operators to Plaintiffs and the Class." [ECF No. 3, ¶ 7]. Similarly, the FAC further alleges that Wells Fargo "knew of and substantially assisted in the frequent transfers of those [investment] funds for improper purposes[,] which included . . . the pilfering of those funds by the Scheme Operators." *Id*. at ¶ 8.

So Wells Fargo's bold contention (in its dismissal motion) that the FAC does not allege that it or its employees "actually knew about the scheme" ignores clear-cut allegations in the FAC. It may well be that those allegations in the FAC will later be

**proven** incorrect or that the Retirees will be unable to adequately establish them factually. But that is a far cry from challenging the FAC as not *alleging* actual knowledge of the scheme.

Although Plaintiffs in both lawsuits have asserted other claims besides aiding and abetting theories, the primary issues argued at the hearing[2] and discussed in the memoranda are: (1) have Plaintiffs adequately alleged Wells Fargo's purported aiding and abetting with knowledge of the fraud at issue and through substantial assistance; or (2) are their allegations insufficient and reveal a strategic plan (by Plaintiffs) to pursue claims against a financially viable (but not liable) defendant like Wells Fargo simply because it has the assets to fund a significant recovery?

The Court is also being required to evaluate the Receiver's standing to pursue claims on behalf of certain entities. This part of the assignment leads to an examination of whether the Receiver's Complaint adequately alleges the involvement of an innocent control person (at the entities committing the fraud) who had the authority to prevent or stop the fraud. Without that, the Receiver would be (with one exception, explained later) improperly pursuing a claim on behalf of the very entities which committed the fraud.

For the reasons outlined in greater detail below, the Undersigned **respectfully recommends** that the Court **grant in part and deny in part** the motion to dismiss the

---

[2]     The Undersigned held an in-person hearing on both motions to dismiss on December 4, 2024. [ECF No. 43].

Receiver's Complaint (without prejudice and with leave to amend) and that the Court **deny** the motion to dismiss the Retirees' FAC.

## I.      PROCEDURAL BACKGROUND

<u>Receiver's Lawsuit</u>

On July 12, 2021, the State of Florida, Office of Financial Regulation ("OFR"), filed a Complaint for Temporary and Permanent Injunction, Appointment of Receiver, Restitution, Civil Penalties, and Other Statutory and Equitable Relief (the "OFR Complaint") against thirty corporate defendants, two individual defendants, and three relief defendants in the Fifteenth Judicial Circuit Court of Palm Beach County, Florida, seeking to restrain acts and practices of those defendants in violation of various provisions of Chapter 517, Florida Statutes, including sections 517.301, 517.12 and 517.07, and "halt the securities fraud scheme and common enterprise operated and controlled by Marshal Seeman ('Seeman') and Seeman's deceased business partner, Eric Charles Holtz ('Holtz')."[3]

The OFR Complaint alleges that Seeman and Holtz were assisted in the scheme and enterprise (referred to therein as the "SH Enterprise") by Brian Schwartz,[4] who acted as the SH Enterprise's untitled chief financial officer.

---

[3]      Holtz committed suicide on June 11, 2021.

[4]      Schwartz committed suicide on April 12, 2023.

The OFR Complaint further alleges that as part of the SH Enterprise, Seeman, Holtz, and Schwartz ("SH&S") created and operated a myriad of corporate entities; that the SH Enterprise raised more than $400,000,000 since 2009 through the sale of unregistered securities in the form of purportedly secured note purchase agreements and promissory notes, which were purportedly secured by viaticated life settlement policies and other insurance-related assets; that investors were misled regarding the SH Enterprise's profitability, the existence of sufficient life settlement policies and other assets securing their investments and the perfection of security interests in those assets -- and that the SH Enterprise was a "Ponzi-like scheme" in which new investor monies were commingled within the common enterprise and used to repay prior investors in the ongoing scheme, thereby providing the appearance of profitability.

On September 9, 2021, the OFR filed a Consent Motion for Appointment of Corporate Monitor, seeking the appointment of the Corporate Monitor for the property, assets, and businesses of the initial Consenting Corporate Defendants, as well as a temporary injunction against the Consenting Corporate Defendants, Seeman, and Schwartz. On September 14, 2021, the Court entered an Agreed Order Granting Plaintiff's Consent Motion for Appointment of Corporate Monitor and Related Injunctive Relief (the "September 14, 2021 Order"), thereby approving and appointing Stermer as the Corporate Monitor for the Consenting Corporate Defendants and their affiliates,

subsidiaries, successors, and assigns, until further order of the court (such proceeding, the "Corporate Monitorship").

The court expanded the scope of the Corporate Monitorship to include five (5) additional corporate entities as Consenting Corporate Defendants by way of an agreed order dated January 6, 2022 (together with the September 14, 2021 Order, the "Appointment Orders").

On March 23, 2023, the OFR and the Corporate Monitor filed their Joint Motion to Appoint Receiver (the "Joint Motion"), which, in pertinent part, provided for the appointment of Stermer as the Receiver of the Receivership Entities (formerly the Consenting Corporate Defendants). On May 12, 2023, the court entered the Receivership Order ("Order Appointing Receiver"), providing that Stermer serve as Receiver for the Receivership Entities and their respective affiliates, subsidiaries, successors, and assigns (individually, each a "Receivership Estate" and collectively, the "Receivership Estates"). Grace Holdings Financial, Inc. was subsequently added to the receivership by further court order in November 2023 and is one of the Receivership Entities in the Receivership Estate.

On May 9, 2024, Stermer filed a Complaint as Receiver for National Senior Insurance, Inc. d/b/a Seeman Holtz; Centurion ISG Services, LLC; Emerald Assets 2018, LLC; Integrity Assets 2016, LLC; Integrity Assets, LLC; Para Longevity 2014-5, LLC; Para Longevity 2015-3, LLC; Para Longevity 2015-5, LLC; Para Longevity 2016-3, LLC; Para

Longevity 2016-5, LLC; Para Longevity 2018-3, LLC; Para Longevity 2018-5, LLC; Para

Longevity 2019-3, LLC; Para Longevity 2019-5, LLC; Para Longevity VI, LLC; and SH

Global, LLC n/k/a Para Longevity V, LLC, (collectively, the "Receivership Entities") in

Case No. 50-2024-CA-004345-XXXA-MB, titled *Daniel J. Stermer, et al. v. Wells Fargo Bank,*

*N.A.,* in the Fifteenth Judicial Circuit Court of Palm Beach County, Florida (the "State

Court Action").

In the Complaint, the Receiver asserts claims against Wells Fargo for aiding and

abetting breach of fiduciary duties, aiding and abetting fraud, negligence, and unjust

enrichment [ECF No. 1-2, pp. 63–76, ¶¶ 221–54].

Stermer served Wells Fargo with his Complaint on May 14, 2024.

Based on diversity of citizenship jurisdiction, Wells Fargo removed the lawsuit to

this federal court on June 7, 2024. [ECF No. 1].

Wells Fargo filed a motion to dismiss, Stermer filed a Response, and Wells Fargo

filed a Reply [ECF Nos. 30; 35; 45].

United States District Judge Darrin P. Gayles referred all pre-trial matters to the

Undersigned. [ECF No. 48]. He also denied [ECF No. 47] Wells Fargo's motion to stay

discovery [ECF No. 31], finding that a complete stay was not warranted.

The Undersigned held a three-hour hearing on the motion to dismiss (and a related

motion to dismiss which Wells Fargo filed in the Retirees' putative class action lawsuit).

[ECF No. 52].

9

<u>Individual Investors'/Retirees' Lawsuit</u>

On June 4, 2024, Fanny B. Millstein ("Millstein") filed [ECF No. 1] her putative class action lawsuit against Wells Fargo. Two days later, she and Martin Kleinbart ("Kleinbart") filed their FAC [ECF No. 3] against Wells Fargo, also as a putative class action. Their FAC concerns the same purported Ponzi scheme at issue in the Receiver's lawsuit.

The FAC asserts claims for: aiding and abetting breach of fiduciary duty (Count I); aiding and abetting fraud (Count II); and unjust enrichment (Count III).

The FAC alleges that the scheme which Wells Fargo aided and abetted resulted in the loss of more than $300 million by more than 1,000 investor victims (*i.e.*, the purported class), most of whom were elderly and lost substantial life savings. *Id.* at ¶ 1. Kleinbart is 82 years old, Millstein is 79 years old, and they both describe themselves as victims of the fraud.

Wells Fargo filed a motion to dismiss, the Retirees filed a response and Wells Fargo filed a reply. [ECF Nos. 25; 30; 41].

Judge Gayles referred all pre-trial motions and matters to the Undersigned. [ECF No. 42]. Before doing so, however, Judge Gayles denied [ECF No. 29] Wells Fargo's motion to stay discovery [ECF No. 26] pending disposition of its motion to dismiss, concluding that a complete stay of discovery was not warranted.

## II.     <u>FACTUAL BACKGROUND (*i.e.*, The Primary Allegations)</u>

<u>Individual Investors'/Retirees' Lawsuit</u>

Seeman, Holtz and Schwartz, collectively described as the "Scheme Operators," engaged in their fraud through entities they controlled, including National Senior Insurance, Inc. d/b/a Seeman Holtz ("NSI"), the Para Longevity Companies ("PLCs"), and the Centurion Companies. They used Wells Fargo as their primary bank.

The basic framework of the alleged Scheme consisted of NSI and its agents soliciting and selling to Plaintiffs and the Class promissory notes ("Notes") that were offered by the PLCs and secured by collateral in the form of certain life insurance policies issued to third parties, commonly known throughout the insurance industry as "Stranger-Originated Life Insurance" ("STOLI") and "life settlements." The Scheme Operators promised investors in the Notes that the proceeds from the STOLI death benefits would be used to fund the interest payments due to those investors and eventually return their principal.

However, according to the Retirees, Wells Fargo knew that, instead of properly using new investor money to fund premiums for new STOLI policies, the Scheme Operators took a substantial portion of those newly invested funds to pay existing investors, and further looted significant sums through improper, exorbitant, or fictitious fees and expenses. [ECF No. 3, ¶ 5]. Wells Fargo also knew (and observed that) many of the same STOLIs that were represented to the Retirees and the Class to serve as collateral

for their Notes were instead fraudulently pledged as security or transferred to other lenders through the Centurion Companies. But rather than reporting or taking any action to stop this ongoing and ever-expanding fraud, Wells Fargo instead chose to substantially assist and profit from it.

The Retirees allege that Wells Fargo knew that the Scheme Operators, by and through the PLCs they controlled, communicated to the Retirees and the Class that the underlying STOLIs for the Notes were held by a collateral agent to protect those life settlement assets. *Id*. at ¶ 7. This, according to the Retirees, evidences Wells Fargo's misconduct because, in reality, as Wells Fargo knew, no collateral agent held those assets -- and investors in the Notes were misled regarding the profitability of the PLCs that issued the Notes, the existence of sufficient STOLIs and other assets securing their investments, and the perfection of security interests in those assets.

Furthermore, the Retirees accused Wells Fargo of knowing about, and substantially assisting in, the frequent transfers of those funds for improper purposes, which included round-trip, in-and-out transactions of new investor money to pay existing investors, as well as the theft of those funds by the Scheme Operators.

Furthermore, according to the Millstein lawsuit, Wells Fargo *must* **have known** that: (a) the Notes were not properly registered as securities; (b) the Notes were not qualified for exemption from registration under the applicable state securities statutes;

and (c) the NSI or its agents who recommended and sold the Notes were not properly licensed to do so. *Id*. at ¶ 9.

The Retirees allege that the PLCs and other Receivership Entities had: (a) their assets stolen; (b) the STOLIs they purchased pledged (and ultimately foreclosed on by third parties); and (c) their bank accounts pilfered by the Scheme Operators. *Id*.

Stermer further discovered that from 2011 until 2021, Wells Fargo provided substantial assistance and services in furtherance of the Scheme, including, inter alia, as the trustee ("Trustee") of irrevocable life insurance trusts ("ILITs") that owned the STOLI policies, as securities intermediary ("Securities Intermediary") for STOLIs, as well as the bank that opened and maintained dozens of bank accounts for the PLCs and other entities affiliated with the Scheme ("Depository Bank"). *Id*. at ¶ 13.

The Retirees contend that Wells Fargo played several roles -- Trustee, Securities Intermediary, Depository Bank, and credit card issuer[5] -- and used those positions to monitor the PLCs activities and to learn the PLCs were being used to perpetrate the scheme.

---

[5]     The Retirees point out [ECF No. 3, p. 11, n. 5] that Wells Fargo issued a credit card to one of the PLCs, Integrity Longevity Investment, LLC, which was used by Seeman for extensive personal use, including charges for thousands of dollars in gambling debts to FanDuel, despite being a company which should have purchased life insurance policies. Moreover, the Wells Fargo credit card balances were often paid by other PLCs or NSI.

According to the Retirees, Wells Fargo's goal was to maximize: (1) assets held; (2) account-and-transfer-related revenue; and (3) compensation. *Id*. at ¶ 14.

Concerning its Trustee role, as early as 2009, Wells Fargo served as the Trustee for the ILITs that owned certain life settlement policies funded by the Centurion Companies in order to build a lucrative banking relationship with them.

When the Centurion Companies proposed the ILITs' structure to Wells Fargo, Wells Fargo's outside counsel remarked that, "[i]n short, the ILIT that has been proposed is unlike any ILIT that I believe Wells Fargo has agreed to serve as Trustee under . . . . It is rife with discretion and fiduciary provisions akin to the type of document a personal trust trustee would agree to serve under." As Wells Fargo's outside counsel explained about the Centurion Companies' proposed ILIT structure, "[t]he Trust Agreement would require a fair amount of editing to make it consistent with the type of Trust Agreement under which we typically see Wells Fargo serve in premium finance transactions."

The reason the ILITs' structure was so unusual was that the STOLIs being purchased by the Centurion Companies were ostensibly held for its investors and not the named insureds. The STOLI investment scheme proposed by the Centurion Companies to Wells Fargo is, according to the Retirees' lawsuit, strictly prohibited by most insurance companies. To prevent this, the insurance companies require their life settlement policies to contain provisions that explicitly *prohibit* a STOLI relationship between the insured and beneficiary.

14

As alleged in the Retirees' FAC, insurance companies "strongly oppose[] arrangements designed to obtain life insurance for the benefit of a third party that lacks an insurable interest in the insured." To prevent STOLIs from occurring, insurance companies prohibit an applicant from applying for a life settlement policy in certain circumstances.

The FAC contends that Wells Fargo agreed to serve as the Trustee over the ILITs and assist the Centurion Companies in implementing the Scheme. The ILIT structure proposed by the Centurion Companies was "unlike any ILIT" for which Wells Fargo had agreed to serve as Trustee because it was designed by the Scheme Operators to prevent the insurance companies from discovering that the Centurion Companies were making third-party investments in STOLIs in violation of the insurance companies' STOLI provisions. *Id.* at ¶ 54.

Based upon information and belief, the Retirees' FAC contends that the life settlement policies held in the ILITs for which Wells Fargo served as Trustee contained STOLI provisions similar to those exemplars noted above. Because Wells Fargo served as the Trustee, it would have received the life settlement applications and policies, including all of their terms and conditions, and would have been aware of the STOLI provisions through its role as Trustee. And Wells Fargo would have *also* known that the Centurion Companies were directly violating the STOLI provisions contained in the life settlement policies through its work as the ILITs' Trustee.

Despite knowing that the Centurion Companies were violating the insurance companies' STOLI policies through their purchase of the STOLIs, the Retirees allege that Wells Fargo actively participated in the Scheme and assisted the Scheme Operators.

The FAC provides an example of how Wells Fargo knew, from its role as Securities Intermediary, that the Centurion Companies' business practices were not normal. Specifically, Paul Fritz, Assistant Vice President of Wells Fargo's Corporate Trust Services, Longevity Group, emailed the Centurion Companies that their repeated failure to pay policy premiums led to Wells Fargo's receiving "consistent grace notices" that are:

> causing a strain at times to keep up with so many policies week to week. **This is not normal for accounts we administer** as most times policies are kept out of grace and grace notices are not frequent occurrences. Can you provide me with the expectations on your side in keeping policies in active status. Is the expectation that you will pay the minimal amount and pay grace amounts very near the end of the grace period? **That appears to be the history for this account.**

*Id*. at ¶ 75 (emphasis in original).

Rather than investigate the clear and ongoing red flags and determine how the Centurion Companies could fund the policy premiums when Wells Fargo knew it was not receiving income from death benefits from the life insurance policies, Wells Fargo simply stated: "I would like to confirm though if this is going to be continued procedure on your side or not." Wells Fargo continued to serve as Securities Intermediary despite these known red flags." *Id*. at ¶ 76.

16

The Retirees' FAC also alleges that Wells Fargo had a long-term business relationship with the Scheme Operators and the entities they controlled – and relaxed its "Know Your Customer" policies when dealing with them.

For example, the FAC notes, Wells Fargo's relationship managers pre-filled account application forms on Seeman's behalf and forwarded them to Seeman for his execution, instead of making Seeman prepare the forms himself and explain: the purpose of the account; the nature of the business of the company opening the account; the expected transactions; and the sources of revenue. *Id*. at ¶ 17.

Furthermore, the Retirees contend that Seeman repeatedly and routinely provided inconsistent answers regarding the beneficial owners of the PLCs. Seeman provided incomplete and cryptic answers regarding the nature of the PLCs' businesses. Seeman never provided answers regarding the sources of revenues of the PLCs. *Id*. at ¶ 138.

During the hearing, the Retirees emphasized what their counsel described as "backdating documents" by Wells Fargo. Given the importance of this allegation, the Undersigned will excerpt the relevant paragraphs:

> 62.     In April 2012, the Centurion Companies recognized the Scheme was going to collapse and decided that the only way to prevent that collapse was to assign the STOLIs to other lenders as collateral for loans to shore up the Scheme. First, the Centurion Companies wrote Wells Fargo and provided it with "executed copies of the Loan Purchase Agreements [it] has entered into with Life Share Financial, LLC and Madison One Associates, LLC in respect of the premium finance loans made by Life Share Financial, LLC to each of the [ILITs] and secured against the life insurance policies [held by the ILITs]." As the letter explained, "I have appointed Centurion Insurance Services Group, LLC to act as my company's servicing agent in

respect [to] the above referenced life insurance policies . . . ." With the new loan purchase agreements in place with the new lending companies, the Centurion Companies wrote Wells Fargo in July 2012 asking it to resign as Trustee of the ILITs and appoint new trustees for them. Specifically, the Centurion Companies informed Wells Fargo that they needed Wells Fargo to resign immediately because the "life settlement policies held by the [ILITs] are to form part of a larger portfolio which is the subject of an imminent transaction and the absence of executed change forms on these three policies presents a disproportionately larger issue for us."

63.     Wells Fargo's outside counsel, who copied Wells Fargo's senior banking leadership on her response, summed up the problem best with what the Centurion Companies were asking for:

> We are confused as to how Centurion has the authority to include these policies in a portfolio that is being sold. Wells Fargo is not aware of any default having been declared with respect to the loans, nor is it aware of the policies having been foreclosed upon as part of the default or any other event that would give rise to Centurion's having the authority to unilaterally direct the trustee, on behalf of the trusts, to transfer these policies. As such, Wells Fargo is not in a position to take instruction from Centurion with respect to the execution change form transferring the policies out of the trusts. The direction would need to come from the protector of each trust, countersigned by the Lender. Given the lack of direction from the protectors with respect to the transfer of these policies, Wells Fargo is not in a position to execute these change forms.

64.     In response to Wells Fargo's outside counsel's email, the Centurion Companies responded, again copying Wells Fargo's senior banking leadership, and explained:

> Centurion is within a group of associated companies that includes the Lender. The loans are currently in default. As an alternative to formal foreclosure action, the Lender is prepared to acquire the Policies. To that end the Lender will require the Change Forms to be executed as quickly as possible. For a number of reasons, it is very important that the Cohen and Walters Policies are assigned as quickly as possible without the potential delays at the carrier level that can occur when there is a change of trustee.

18

65.     Like it had when it ignored outside counsel's advice about the structure of the ILITs, Wells Fargo's senior banking leadership again ignored outside counsel's advice about the Trustee resignation forms and pushed forward with the resignation papers in order to limit its liability by resigning as Trustee over the ILITs and to secure the more lucrative fees as the Securities Intermediary. At this critical juncture, Wells Fargo, as the Trustee for the ILITs that held the STOLIs and whose premiums were funded by the Class members, knew that the STOLIs were "in default" and facing a "formal foreclosure action." Despite being the Trustee of those ILITs and knowing that the premiums were being paid by the Class members who had priority lien rights, Wells Fargo took no action to stop what was now an obvious Ponzi scheme but instead doubled down and helped the Centurion Companies and Scheme Operators further the Scheme by assigning the STOLIs owned by the Class members to Telios and DZ Bank.

66.     In June 2013, the Centurion Companies wrote Wells Fargo's senior executives omitting Wells Fargo's outside counsel and requested that Wells Fargo, as Trustee of the ILITs, execute the resignation forms and make them "effective as of August 10, 2012 [since] they are not being notarized. Moreover, this would seem to be in the bank's interest from a liability perspective." The Centurion Companies went on to explain, "[t]he only date-sensitive aspect is to that whoever executes on behalf of the bank must have been authorized to do so as of August 10, 2012." Finally, the Centurion Companies explained that this was advantageous to Wells Fargo because the Centurion Companies agreed to indemnify Wells Fargo as soon as the documents had been executed by the bank. Privately, the Centurion Companies' executives acknowledged how broad the release Wells Fargo wanted [was] in exchange for the Trustee resignation forms by commenting that "the release of Wells under section 10 is very comprehensive . . . ."

67.     In an effort to limit its liability and to secure the more lucrative Securities Intermediary fees, Wells Fargo did exactly what the Centurion Companies demanded. Specifically, a Wells Fargo Vice President informed the Centurion Companies that Wells Fargo "will not object to the documents being made effective as of August 10, 2012." That is, Wells Fargo was **willing to backdate** the Trustee resignation forms by nearly a year, obtaining even more liability protection. And, in exchange for a broader liability release for its role as Trustee of the ILITs from the Centurion

Companies, Wells Fargo's senior management informed the Centurion Companies that in order to expedite this process as requested, "Wells is willing to move forward without the more involved resignation/appointment process (where all interested parties sign-off)." In late June 2013, Wells Fargo **backdated the ILIT Trustee resignation forms** and other requested documents to August 10, 2012, and provided them to the Centurion Companies, which allowed the Centurion Companies to begin to assign the Class members' STOLIs to Telios and DZ Bank, setting them up for their eventual seizure by those lenders to the detriment of the Class members.

68.     However, on July 3, 2013, [TransAmericaOccidental Life Insurance Company ("TransAmerica")] informed Wells Fargo that it was "unable to process" the change of Beneficiary Designation, Transfer of Ownership, and Release of Assignment for the Yakovakis Policy for a number of reasons. One of those reasons related to a possible STOLI violation. Specifically, TransAmerica wanted "additional clarification with regards to the assignment release. The Release of Assignment we received was dated June 10, 2010, when the above policy had been in force for only two months, however, the release did not get submitted to us until now." Of course, the reason Wells Fargo did not submit the Release of Assignment in 2010 was because it would have revealed to TransAmerica that the funds used to purchase the Yakovakis Policy and make its premium payments came from a third-party life settlement company, Life Share Financial, LLC, in direct violation of the Yakovakis Policy's STOLI provisions.[6] Had Wells Fargo submitted the Release of Assignment back in 2010, it would have revealed that this was a stranger-originated life insurance policy and it would have threatened the viability of the Scheme because it would have allowed TransAmerica to unwind or cancel the STOLI sale.

*Id*. at ¶¶ 62–68 (emphasis supplied; footnote added).

---

[6]     According to the FAC, TransAmerica's response is additional evidence there were STOLI provisions in the Yakovakis Policy, otherwise this would not have been an issue for TransAmerica in processing the forms provided by Wells Fargo and the Centurion Companies. [ECF No. 3, p. 20, n.8].

Concerning Wells Fargo's role as Securities Intermediary, the Retirees' FAC asserts active misconduct by Wells Fargo (not mere passive knowledge). Paragraphs 71 through 73 raise the allegations:

71.    Wells Fargo's duties and obligations as the Securities Intermediary were set forth in the Securities Account Control and Custodian Agreements ("Securities Account Agreements") it entered into with DZ Bank, Teleios, and certain of the Centurion Companies.[7] Both Securities Account Agreements represented that there were no "liens" or "security interests" in the life settlement policies and that Teleios and DZ Bank were granted a "first priority lien on and security interests in" all of the life settlement policies. However, as Wells Fargo was aware through its work as Trustee over the ILITs, the Class members had a first priority lien in the life settlement policies that the Centurion Companies were now giving a first priority lien to DZ Bank and Teleios. In fact, every life settlement policy that Wells Fargo had served as the Trustee of was transferred to DZ Bank and Teleios and identified in the Securities Account Agreements. Wells Fargo **knew this representation was false but went along with it anyway to ensure the Scheme continued instead of collapsing.**

72.    Wells Fargo's deception, however, did not end there. Wells Fargo **falsely represented** in the Securities Account Agreements that, "the Securities Intermediary on the date hereof has no actual knowledge of any claim to, or security interest in the Pledged Accounts or in any 'financial asset'. . . credited hereto and does not have actual knowledge of any claim that any person other than the Agent has been given 'control' of a Pledged Account or any such financial asset." However, contrary to Wells Fargo's assertion to Teleios and DZ Bank, **it <u>did</u> have actual knowledge** that the Class members had a claim to, and a security interest in, the life settlement policies that were now being pledged and assigned to Teleios and DZ Bank.

---

[7]    The FAC explains that DZ Bank AG Deutsche Zentral-Gennossenschaftsbank and Teleios LS Holdings V DE LLC were investors. It alleges that Wells Fargo assisted the Centurion Companies in assigning STOLIs to other investors -- *i.e.*, DZ Bank and Teleios. *Id*. at ¶ 61.

73.     Wells Fargo was not only willing to deceive Teleios and DZ Bank in order to help the Centurion Companies further the Scheme, it also **took an active role** in the Scheme under the Securities Intermediary Agreements. Specifically, Wells Fargo contractually agreed to make the premium payments for the life settlement policies on behalf of the Centurion Companies thereby further **concealing the STOLI violations** and preventing the insurance companies from knowing that the premium payments came from a life settlement funding company, which would have alerted the insurance companies to the STOLI violations and resulted in the cancellation of the life settlement policies. And, **knowing** that its conduct was **unlawful**, Wells Fargo sought to inoculate itself under the Securities Intermediary Agreements by limiting its liability to fraud, willful misconduct, and gross negligence. Wells Fargo's assistance was necessary and critical in perpetrating and sustaining the Scheme.

*Id*. at ¶¶ 71–73 (emphasis and footnote added).

The FAC also alleged that Wells Fargo aided the scheme in its role as depository bank. The Retirees' opposition memorandum summarizes these types of allegations:

The Scheme Operators maintained accounts at Wells Fargo that enabled the Scheme. Between 2011-2018, Wells Fargo opened 58 accounts for them and the Receivership Entities. Wells Fargo knowingly violated its own Know Your Customer ("KYC") policies by sending pre-filled applications, opening accounts without required paperwork, and providing blank forms for signatures. Wells Fargo acknowledged these compliance violations, stating, "I need the attached documents signed and returned . . . to avoid a compliance violation."

The few times Wells Fargo required Seeman to complete new account opening documents, he provided inconsistent information about the PLCs' beneficial owners and business nature, which were red flags Wells Fargo ignored. By overlooking these, Wells Fargo enabled thousands of questionable transactions involving the PLCs' accounts, including transfers to the Centurion Companies. As Trustee, Securities Intermediary, and depository bank, Wells Fargo knew there were no legitimate contracts or goods/services to justify these transfers. Failing to follow due diligence procedures and KYC regulations, Wells Fargo created inaccurate client

profiles with knowledge of the entities' true profiles, facilitating the Scheme.

Wells Fargo knowingly ignored obvious Ponzi-like activity in the Scheme Operators' accounts, allowing the use of new investor funds to pay older investors. For instance, on January 31, 2019, Para Longevity 2018-5 deposited $100,000 from Class member 1 into a Wells Fargo account. The next day, this amount was transferred to Para Longevity 2012-5's account. And, on February 11, 2019, Para Longevity 2012-5's Wells Fargo account cleared a check payable to Class member 2 for $100,024. This classic Ponzi scheme activity, using new investor funds to pay off old investors, was routine in the PLCs' Wells Fargo accounts, despite their stated purpose of purchasing STOLIs and paying their premiums.

Wells Fargo ignored other red flag activity that violated the FFIEC BSA/AML rules requiring closure of the Scheme Operators' deposit accounts. Violations included but were not limited to: (1) 5,100 round trip transfers from the PLCs' Wells Fargo accounts to a Centurion Company's U.S. Bank account suggesting money laundering; (2) $50 million in transfers from new PLCs' to old PLCs' accounts, with payouts to Class members unrelated to business operations, but consistent with Ponzi scheme activity; (3) over $378 million in unjustified intercompany transfers between the PLCs' and Centurion Companies' accounts; (4) using PLCs' accounts to pay STOLI premiums for STOLIs already pledged to the Lenders; (5) securing the Class' Notes with STOLIs known to be pledged to the Lenders ; (6) loans made for or paid on behalf of a third party with no reasonable explanation including $1.2 million in payments from multiple PLCs' Wells Fargo accounts to Pelican Capital Management for debts owed by the Centurion Companies ; and (7) payments to and from the company that have no stated purpose, do not reference goods or services, or identify only a contract or invoice number, including more than 120 transfers among the PLCs' Wells Fargo accounts annotated "mistake."

[ECF No. 30, pp. 4–6] (internal citations omitted).

The allegations concerning Count III's Unjust Enrichment claim are found in the

following three paragraphs:

201.    Wells Fargo provided banking services to the PLCs through various bank accounts. Those bank accounts were used to carry out the Ponzi scheme.

202.    The funds held in the PLCs' bank accounts conferred benefits upon Wells Fargo in the form of deposits from which Wells Fargo generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees. Wells Fargo knowingly and voluntarily accepted, and retained, the deposits and those benefits.

203.    Because Wells Fargo aided and abetted the fraud and breaches of fiduciary duties by the Scheme Operators and the entities they controlled, it would be inequitable for Wells Fargo to retain the benefits it generated from PLCs' bank accounts, which otherwise would contained those funds that are due and owing to Plaintiffs and the members of the Class.

[ECF No. 3, ¶¶ 201–03].

<u>The Receiver's Lawsuit</u>

For the most part, the gist of the allegations asserted by the Receiver largely mirror the Retirees' allegations. The claim is based on the same alleged Ponzi scheme, with the same players. This Report and Recommendations need not parrot, summarize, or restate in a different language the critical Ponzi scheme allegations already mentioned above concerning the Retirees' lawsuit.

However, there are two major distinctions.

First, with one exception, the lawsuit was brought on behalf of the entities created to perpetrate the alleged fraud -- a circumstance which, as we shall soon see in the analysis section, dooms the Receiver's standing to bring the lawsuit (at least based on the current allegations).

24

Second, the Complaint repeatedly alleges that Wells Fargo "knew, or **should have known"** of certain supposed red flags. *See* [ECF No. 1-2, ¶¶ 7, 8, 9, 11, 12, 108, 113, 126, 208, 215, 227, 235, 237, 238. (emphasis supplied)]. For purposes of stating an aiding and abetting claim, a plaintiff who alleges a "should have known" standard fails to state a viable claim because those allegations do not reach the requisite level of *actual* knowledge.

The Receiver's allegations for his negligence count are found in paragraphs 246 through 248:

246.   Wells Fargo owed [ ] Plaintiffs the duty of ordinary and reasonable care applicable to banks and financial institutions because of the opening, operation, maintenance and management of the accounts.

247.   Instead of using the Para Longevity Companies' and non-Receivership Para Longevity Companies' funds for their intended investment purpose, Seeman and Holtz ran a Ponzi scheme with those funds.

248.   Wells Fargo breached its duty of care to the Para Longevity Companies and non-Receivership Para Longevity Companies by:

a.   failing to know its customer through account opening documents and due diligence;

b.   failing to implement adequate account monitoring programs and guidelines;

c.   allowing, facilitating, and executing the commingling of monies across the Para Longevity Companies' and non-Receivership Para Longevity Companies' accounts;

d.   failing to inform any of the investors, Hodge, or other control persons of Seeman and Holtz's misconduct;

e.    failing to report Seeman's and Holtz's misconduct to law enforcement and/or regulatory agencies;

f.    failing to freeze or close the Para Longevity Companies' and non-Receivership Para Longevity Companies' accounts upon discovering Seeman and Holtz's misconduct;

g.    allowing and facilitating Seeman and Holtz's theft from the Para Longevity Companies' and non-Receivership Para Longevity Companies' bank accounts; and

h.    aiding and abetting Seeman and Holtz's breaches of fiduciary duty and conversion of assets.

*Id*. at ¶¶ 246–48.

## III.    APPLICABLE LEGAL STANDARDS AND ANALYSIS

### Adequacy of Complaints/Motions to Dismiss

A complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule does not require detailed factual allegations, but it demands more than an unadorned, conclusory accusation of harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Iqbal*, 556 U.S. at 678 (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual

enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).

"To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). *See also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324–25 (11th Cir. 2012). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1937 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678, 129 S. Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 679, 129 S. Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibili*ty and plausibility of entitlement to relief.'" Id*. at 678, 129 S. Ct. 1937 *(*quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id.* at 679, 129 S. Ct. 1937 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd sub nom. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).[8]

Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief. *Id.*

In *Twombly*, the Supreme Court addressed the well-pleaded, nonconclusory factual allegations of parallel behavior to determine whether they gave rise to a "plausible" suggestion of conspiracy. 550 U.S. at 565–66, 127 S. Ct. 1955. Although the Court acknowledged that the conduct alleged was consistent with an unlawful agreement, the Court nevertheless concluded that the claims were not plausible because the conduct was more likely explained by other lawful behavior. *Id.* at 567, 127 S. Ct. 1955. Therefore, where the allegations of parallel conduct underlying the legal conclusions of a complaint are more likely explained by other lawful behavior, the complaint must be dismissed.

Phrased differently, "'courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask to court to infer.'" *Rusty 11 Corp. v. Bank of Am., N.A.,*

---

[8]    In *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1243 (M.D. Fla. 2013), the Court cited the "judicial experience and common sense" approach from *Iqbal v. Hasty* even though *Iqbal* reversed it under a different case name.

No. 22-cv-22541-BER, 2024 WL 1619697, at *2 (S.D. Fla. Apr. 15, 2024) (quoting *Am. Dental*

*Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal*, 556 U.S. at 682)).

Therefore, "where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of 'entitlement to

relief.'" *Id*. at *3 (quoting *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)).

At the motion to dismiss stage, the complaint is construed in the light most

favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L.

Ed. 2d 59 (1984). Although it is axiomatic that the Court must accept as true all of the

allegations contained in the complaint, this tenet is "inapplicable to legal conclusions."

*Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework

of a complaint, they must be supported by factual allegations." *Id*. at 679, 129 S. Ct. 1937.

<u>Standing</u>

Because Wells Fargo has challenged the Receiver's standing to bring claims on

behalf of the non-NSI entities[9] seeking damages incurred by investors, this ruling needs

to discuss fundamental standing principles, as applied to a scenario where a Receiver is

---

[9]    NSI is National Senior Insurance, Inc., d/b/a Seeman Holtz. Wells Fargo's lack-of-standing argument concerns the fourteen non-NSI entities, which it says "were all controlled or managed by the Perpetrators." [ECF No. 30, p. 4]. Wells Fargo notes that NSI is the "only Receivership Entity alleged to have conducted legitimate business activities at any point." *Id*. at 6, n.2. The Bank made clear that it is **not** seeking to dismiss the Receiver's claims brought on behalf of NSI on standing grounds. [ECF No. 45, p. 1, n.2].

pursuing claims. Wells Fargo contends that the Receiver "does not represent the alleged investors and does not have standing to bring tort claims on behalf of entities created solely to perpetrate the alleged fraud, as those entities suffered no damages as a matter of law." [ECF No. 30, p. 6].

As succinctly explained in *Isiah v JPMorgan Chase Bank*, "[i]t is axiomatic that a receiver obtains only the rights of action and remedies that were possessed by the person or corporation in receivership." 960 F.3d 1296, 1306 (11th Cir. 2020) (citing *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 550 (Fla. 2d DCA 2003)). "Although a receivership is typically created to protect the rights of creditors, the receiver is not the class representative for creditors and cannot pursue claims owned directly by the creditors." *Id.* (citing *Freeman*, 865 So. 2d at 550). "Rather, he is limited to bringing only those actions previously owned by the party in receivership." *Id.*

When a fraud is perpetrated by a corporation's own insiders, "unless the corporation in receivership has at least one honest member of the board of directors or an innocent stockholder, the fraud and intentional torts of the insiders cannot be separated from those of the corporation itself and the corporation cannot be said to be an entity separate and distinct from the individual tortfeasors. *Id*. at 1306 (citing *Freeman*, 865 So. 2d at 551). Therefore, "the corporation – and the receiver who stands in the shoes of the corporation – lacks standing to pursue such tort claims because the corporation, 'whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to

30

have suffered injury from the scheme it perpetrated.'" *Id.* (quoting *O'Hallaran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1203 (11th Cir. 2003)).

According to the *Isiah* analysis, *Freemen* "distinguished 'between an honest corporation with rogue employees, which *can* pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a Ponzi scheme, which **cannot** pursue such claims.'" *Id.* at 1307 (quoting *Freeman*, 865 So. 2d at 552) (emphasis added).

The *Isiah* Court held that the receiver's complaint was "indistinguishable" from *Freeman* because it depicted "the Receivership Entities as the robotic tools of the Ponzi schemers, alleging that the Ponzi schemers 'asserted complete control over the Receivership Entities in operating the Ponzi Scheme and improperly diverting funds from the bank accounts of the Receivership entities.'" *Id.*

Applying those conclusions and legal principles, *Isiah* affirmed the district court and held that the receiver could not bring aiding and abetting claims for the following reasons: (1) the complaint did not allege that the Receivership Entities engaged in any legitimate activities or had "at least one honest member of the board of directors or an innocent stockholder" such that the fraudulent acts of its principals, the Ponzi schemers, should not be imputed to the Entities themselves; (2) the Ponzi schemers' torts cannot properly be separated from the Receivership Entities, and the Receivership Entities cannot be said to have suffered any injury from the Ponzi scheme that the Entities

themselves perpetrated; (3) any claims for aiding and abetting the torts of the Receivership Entities' corporate insiders belong to the investors who suffered losses from this Ponzi scheme, not the Receivership Entities; (4) the Receivership Entities cannot assert tort claims against third parties for aiding and abetting the Ponzi scheme; and (5) the receivers stands in the shoes of the Receivership Entities and he therefore also lacks standing to bring the aiding and abetting claims.

The *Isaiah* Court also noted that the receiver's ability to pursue the claims was not barred by the *in pari delicto* doctrine, but, rather, "by the fact that the Receivership Entities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme, and so the Receivership Entities were not injured by that scheme." *Id.* at 1308.

The Eleventh Circuit followed its *Isaiah* rule in *Wiand v. ATC Brokers, Ltd.,* where it held that "tort and fraudulent transfer claims must be treated differently for standing purposes: fraudulent transfers (which are not at issue in either of the two lawsuits here) are 'cleansed through receivership' as a matter of course, but common-law torts by third parties are not." 96 F.4th 1303, 1310 (11th Cir. 2024) (quoting *Isaiah*, 960 F. 3d at 1306). Therefore, *Wiand* emphasized that, "receivers who assert common-law torts claims must meet a **heightened standard** to establish their **standing**." *Id*. (emphasis supplied).

The "crux" of the standing inquiry is whether the receivership estate was "separate and distinct" from the Ponzi scheme. *Id*. To establish that requirement, the "receiver must allege the presence of innocent decision-makers within the corporation to whom

fraudulent conduct could be reported." *Id*. at 1310–11 (relying on *Isaiah*, 960 F.3d at 1307). Significantly, the *Wiand* Court emphasized that the complaint did not allege that any of the entity's "controlling individuals were innocent." Instead, the Court pointed out, the complaint relied "on the innocence of six shareholders who owned less than 10 percent" of the common stock "and the innocence of the shareholders of the nonvoting preferred stock." *Id*. at 1311. The Court was not convinced, and held that "six duped minority shareholders, and nonvoting investors, do not amount to an **innocent controlling decision-maker**." *Id*. (emphasis added).

Tellingly, the *Wiand* Court rejected the argument that a plaintiff need only allege the existence of a single innocent and honest shareholder to defeat the conclusion that the entity was a sham corporation without standing to assert a tort injury. Although "the allegation of a single innocent shareholder is *necessary*, [it is] not s*ufficient* to establish that the corporation was separate and distinct from the Ponzi perpetrators." *Id*. (emphasis in original). The Court held that a receiver pursuing tort claims still lacks standing when the now-receivership estate "was controlled exclusively by persons engaging in its fraudulent scheme." *Id*. (quoting *Isaiah,* 960 F. 3d at 1307) (emphasis added by the *Wiand* Court). Consequently, the assertion that six innocent shareholders existed was "not dispositive" because the complaint "failed to allege that those shareholders exercised any **decision-making power**." *Id.* (emphasis supplied).

The Receiver's Complaint fails to establish the Receiver's standing to pursue common-law tort claims on behalf of the fourteen non-NSI Entities.

First, for all practical purposes, the Complaint alleges that the Non-NSI Entities were conduits created, controlled and used by the Ponzi schemers (*i.e.*, Seeman and Holtz) to perpetrate the alleged Ponzi scheme. The Complaint alleges that Seeman and Holtz "created the Para Longevity Companies and non-Receivership Para Longevity Companies to solicit funds from investors," [ECF No. 1-2, ¶ 51], but, instead of using the funds for legitimate purposes, the funds "were used to pay back investors in earlier Para Longevity Companies and non-Receivership Para Longevity Companies." *Id*. at ¶ 12. The Non-NSI Entities "**comingled and transferred investor money between the Wells Fargo bank accounts without** any legitimate purpose or financial arrangement," *Id*. at ¶ 11 (emphasis added), and the proceeds from the Non-NSI Entities' note sales "**diverted** to the Centurion Companies . . . lacked any written loan or repayment agreements, and were not repaid." *Id*. at ¶ 89 (emphasis added).

The Undersigned agrees with Wells Fargo's position that the Complaint does not adequately allege that the non-NSI Entities were "separate and distinct" from the Ponzi scheme, which is a core requirement when a receiver, like Stermer, is pursuing common-law tort claims.

Moreover, Stermer's effort to rely on Alan Hodge, an in-house attorney and so-called chief of compliance for the Receivership Entities, as an "innocent decision-making

insider" and "innocent control person," fails. [ECF No. 35, pp. 7–9]. Although the Receiver advanced these arguments in his opposition memorandum and at the hearing, the *Complaint* itself does not allege that Hodge was "innocent." Furthermore, the Complaint also fails to allege that Hodge was an officer, director, or stockholder.[10]

Although the Complaint alleges the *investors* as "innocent," [ECF No. 1-2, ¶ 228], it does not expressly allege a similar description for Hodge. Instead, the Receiver's Complaint indirectly implies that Hodge was innocent by saying "he would have stopped" the fraudulent conduct "had [he] known about the fraudulent mismanagement of the Para Longevity Companies' and non-Receivership Para Longevity Companies' assets, the pilfering of their accounts and intentional fraud . . . ." *Id*. at ¶ 82.

Furthermore, the other ground on which the Complaint appears to rely on to meet the requirement that Hodge was innocent is insufficient – the allegation that Seeman "once described Hodge as "the most conservative lawyer I've ever met," which is not the legal analog of being "innocent." *Id*. at ¶ 74.

In addition, the Complaint does not adequately allege that Hodge was a director or shareholder who was *also* a decision-maker. Rather, the Complaint alleges that "Hodge's primary role was to establish tax efficient structures and security intermediary relationships for the Centurion Companies and ensur[e] general legal compliance in the

---

[10]    At the hearing, the Receiver's counsel noted that the entities involved are LLCs, so there would be members and managers, not directors on the Board of Directors. But the Complaint does not allege that Hodge was a member or manager, either.

execution and performance of contracts of the Receivership Entities." *Id*. at ¶ 73. While the Receiver alleges that "Hodge worked closely with Schwartz and believed that Schwartz was using his prudent business judgment in managing the financial affairs and obligations of the Centurion Companies," there is no such allegation concerning any actions Hodge performed **for the Non-NSI Entities.** *Id*. at ¶ 76.

There is no allegation that Hodge made a single decision for the Non-NSI Entities or acted on their behalf. In fact, the OFR Consent Motion states that Seeman and Schwartz —not Hodge— "control the [Receivership Entities]." [ECF No. 30-1, ¶ 5] And the OFR Complaint lists the Receivership Entities controlled by the Perpetrators —not Hodge. [ECF No. 30-2, ¶¶ 26–41]. Thus, the Complaint fails to allege that Hodge exercised control over the Non-NSI Entities, enabling him to "thwart the wrongdoing."

Paragraph 82 of the Receiver's Complaint [ECF No. 1-2] alleges that Hodge "had the authority and ability to take the necessary steps to stop the Para Longevity Scheme, protect the Para Longevity Companies' and non-Receivership Para Longevity Companies' assets, and/or to alert the proper regulatory authorities." But it does not expressly allege that Hodge was an innocent decision-maker with control. At the hearing, the Receiver's attorney argued that Hodge had the "*role* of a control person" (emphasis added), but he conceded that the term does not appear in the Complaint. [ECF No. 55, p. 32]. He also conceded that the Complaint similarly does not allege that Hodge was a decision-maker.

But the Court need not consider Plaintiff's new allegation about Hodge having the role of control person (raised orally at the hearing) because the Complaint "must stand on its own" and "[i]f [the Receiver] wishes to make additional allegations, [he] must include them in an amended complaint – not in response to a motion to dismiss." *Schuh v. Am. Express Bank, FSB*, No. 17-24345, 2018 WL 3751467, at *4 (S.D. Fla. May 3, 2018) (also noting that "a legal memorandum in response to a motion to dismiss cannot cure a defective complaint" and concluding that the new allegations in the plaintiff's response memorandum "may not be considered in the disposition of [the] [d]efendant's motion to dismiss"). *See also Watts v. City of Port St. Lucie, Fla.*, No. 2:15-cv-14192, 2015 WL 7736532, at *14 (S.D. Fla. Nov. 30, 2015) (noting that the necessary allegations "are missing from the Complaint" and rejecting Plaintiff's "explanation" of "her position in more detail" in her memorandum because it needed to be in the complaint). *Cf. Huls v. Llabona*, 437 F. App'x 830, 832 n.5 (11th Cir. 2011) ("Because Huls raised this argument for the first time in his response to Llabona's motion to dismiss, **instead of seeking leave to file an amended complaint**, pursuant to Fed. R. Civ. P. 15(a), it was not properly raised below." (emphasis added)). *Cf. Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (stating that "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment").

The Receiver's attorney further contended at the hearing that a control person who is not also an officer, director or shareholder could be a sufficient decision-maker to

generate the requisite standing. He additionally advanced the theory that being the chief compliance officer, without also being an officer, director, or shareholder, would constitute being in the entity's "management" (and could therefore be adequate to create standing for the Receiver to pursue common-law tort claims.). [ECF No. 55, p. 36].

The Undersigned is not convinced. *Isaiah* follows *Freeman's* holding that unless there is an innocent **director** or **stockholder,** the insiders' fraud is imputed to the corporation. 960 F.3d at 1306 (citing *Freeman*, 865 So. 2d at 551). Innocence itself is insufficient. The innocent insider must be a director or stockholder. *See Wiand*, 96 F.4th at 1311 (emphasizing that "a receiver lacks standing if he fails to allege that the Ponzi corporation 'had at least one honest member of the board of directors or an innocent stockholder'" and noting that six innocent shareholders were not a "dispositive" fact because the receiver "failed to allege that those shareholders exercised any decision-making power" (internal citations omitted)).

Furthermore, although the *Wiand* Court observed that "the receiver must allege the presence of innocent *decision-makers within the corporation*," the Court still took its cue from *Perlman* and *Isaiah*, which both held that there must be an innocent **director or shareholder**. *Wiand*, 96 F.4th at 1310; *Perlman v. PNC Bank*, 38 F.4th 899, 901 (11th Cir. 2022). Hodge, as in-house counsel, was **neither** of these.

Moreover, *Wiand* acknowledged that "the allegation of a single innocent **shareholder** is necessary but not sufficient" for standing, and "the receiver still lacks

standing when the now-receivership estate 'was controlled exclusively by persons engaging in its fraudulent scheme.'" *Wiand,* 96 F. 4th at 1311 (emphasis added). *See also Perlman,* 38 F.4th at 904–05 (holding that the Florida Deceptive and Unfair Trade Practices Act does not impact the requirement – which it called *Isaiah's* "mandate" -- that the receiver "must allege the presence of at least one **innocent director or shareholder** because, without such an allegation, the tortious acts cannot be separated from the Receivership Entities and the Receivership Entities cannot be said to have suffered an injury" (emphasis supplied)).

Because the Receiver's *Complaint*[11] does not adequately allege the *Isaiah*

requirements, he lacks standing[12] and Judge Gayles should **grant** the motion to dismiss

---

[11]     At the hearing, the Receiver's counsel acknowledged that "the words 'decision-maker' or 'control person' as a formal term in the allegation is not there [in the Complaint] but the import of his authority is.  The ability is what matters." [ECF No. 55, p. 99, Case No. 24-cv-80722]. But the additional gloss added by counsel at the hearing cannot be injected into the existing Complaint and considered for purposes of the dismissal motion. *Howard v. Harris*, No. 4:22CV97-AW-MAF, 2022 WL 22877473, at *1 (N.D. Fla. Aug. 24, 2022) (citing *Pankey v. Aetna Life Ins. Co.*, No. 616cv1011-ORL37GJK, 2017 WL 9362906, at *2 (M.D. Fla. Feb. 24, 2017), *report and recommendation adopted*, No. 616cv1011-ORL37GJK, 2017 WL 1089330 (M.D. Fla. Mar. 23, 2017) (noting that "[c]ourts within the circuit have held that a litigant cannot supplement his or her pleadings in a response to a motion to dismiss"); *Irwin v. Miami-Dade Cnty. Pub. Sch.*, No. 06-23029-CIV, 2009 WL 465066, at *6 (S.D. Fla. Feb. 24, 2009), *aff'd*, 398 F. App'x 503 (11th Cir. 2010); *Bruhl v. Price Waterhousecoopers Int'l*, No. 03-23044-CIV-MARRA, 2007 WL 997362, at *4 (S.D. Fla. Mar. 27, 2007) (stating that "[the] [p]laintiffs cannot supplant the allegations of the [second amended complaint] with new arguments set forth in their response to a motion to dismiss"); *Walker v. City of Orlando*, No. 607CV651ORL19DAB, 2007 WL 1839431, at *5 (M.D. Fla. June 26, 2007) (denying motion to strike which argued that the plaintiff's responses to motions to dismiss attempted "to introduce new allegations not contained in the complaint" and explaining the court would limit "its consideration to the allegations of the complaint").

     If written arguments filed with the Court in response to a motion to dismiss cannot be considered when they assert supposed new facts not found in the Complaint, then surely *oral* rhetoric from counsel at a hearing cannot be used as support either. The Receiver's counsel has not called our attention to any case law authority (binding or otherwise) which would permit that procedurally unavailable effort.

[12]     Assuming for the sake of discussion that the Receiver did in fact adequately allege that Hodge was an innocent director or innocent shareholder (which he did not), he would *still* lack standing because the now-receivership estate "was *controlled* exclusively by persons engaging in its fraudulent scheme." *Wiand*, 96 F.4th at 1311 (finding that the receiver lacked standing even when there were six innocent shareholders because none of those individuals "exercised any decision-making power" (emphasis in original)); *see also Freeman*, 865 So. 2d at 551 (noting that the corporation "was controlled exclusively by persons engaging in its fraudulent scheme and benefitting from it," which meant it "was

all common-law tort claims the Receiver brought on behalf of the non-NSI entities. But the dismissal should be **with_out_ prejudice**, however, **with leave to amend**. *See generally Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988 (11th Cir. 2014) (agreeing that a receiver's complaint against a bank for aiding and abetting a Ponzi scheme failed to state a claim but vacating and remanding because the trial court improperly denied leave for the filing of a proposed amended complaint).[13]

<u>Aiding and Abetting Liability</u>

Because the elements of aiding and abetting are the same for each of the claims, they are considered together. *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) ("Given that all of Plaintiffs' claims are predicated on the theory of aiding and abetting, we need only consider whether Plaintiffs adequately alleged the elements of such a claim.").

---

entirely the robot or the evil zombie of the corporate insiders"). The Perpetrators are the only individuals expressly alleged to have had any control of (or authority in) the Non-NSI Entities.

[13]     Of course, the practical reality may well be that the Receiver might not, consistent with his obligations under Federal Rule of Civil Procedure 11, be able to allege that Hodge was in fact a director or shareholder of any of the non-NSI entities. Likewise, he might not be able to allege in good faith that Hodge (or another purported "innocent" director or shareholder) was in fact a decision-maker. Under those circumstances, the Undersigned would not expect the Receiver to file an amended complaint on behalf of the non-NSI entities because his lack of standing would remain an impediment.

"Florida, like other jurisdictions, recognizes that as a general matter, a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship' . . . [and] generally do[es] not owe non-customers a duty to protect them from fraud." *Herrera v. TD Bank, N.A.*, 682 F. Supp. 3d 1271, 1275 (S.D. Fla. 2023) (quoting *Chang v. JPMorgan Chase Bank*, 845 F.3d 1087, 1094 (11th Cir. 2017)); *Rusty115 Corp. v. Bank of Am., N.A.*, No. 22-CV-22541, 2023 WL 6064518, (S.D. Fla. Sept. 18, 2023) ("[B]anks ordinarily do not owe a fiduciary duty to their own customers, and so it follows that a bank would not owe a fiduciary duty to a third-party who chooses to deposit money into a customer's account." (internal citation omitted)).

Indeed, "a bank . . . has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds." *O'Halloran*, 350 F.3d at 1205.

Furthermore, courts recognize that "case law finding banks liable to third party non-customers necessarily sets a high standard for liability to be found. *Gevaerts v. TD Bank, N.A.*, 56 F. Supp. 3d 1335, 1343 (S.D. Fla. 2014) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006)).

Given these overall perspectives, it is no surprise to the Undersigned that the law imposes significant hurdles on plaintiffs seeking to pursue aiding and abetting claims against banks where fraudsters deposited their proceeds. To state an aiding and abetting claim, Plaintiffs must allege "'(1) an underlying violation on the part of the primary

wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor.'" *Tuckman v. Wells Fargo Bank, N.A.*, No. 19-62843, 2020 WL 13413838, at *5 (S.D. Fla. Mar. 25, 2020) (quoting *Lawrence,* 455 F. App'x at 906).

"While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Todd Benjamin Int'l, Ltd.*, 682 F. Supp. 3d 1112, 1136-37 (S.D. Fla. 2023) (quoting *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012), *aff'd sub nom. Lamm v. State St. Bank & Tr.*, 749 F.3d 938 (11th Cir. 2014)). "Conclusory statements that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known that something was amiss.'" *Id.* at 950 (quoting *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11–60670–CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012)).

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Chang*, 845 F.3d at 1098 (quoting *Lerner*, 459 F.3d at 295). "Because 'banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled,' a bank's inaction — that is, its failure to stop the theft of such trust funds — can constitute substantial assistance." *Id*. "[T]o

43

establish that a bank substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud "is the crucial element." *Chang*, 845 F.3d at 1098 (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006)).

Concerning this second requirement of actual knowledge, a plaintiff must "sufficiently establish — or allow the fair inference — that the defendant had actual knowledge of the underlying tort." *Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-CIV-21771, 2017 WL 5514370, at *3 (S.D. Fla. Nov. 15, 2017) (citing *Lamm*, 749 F.3d at 950).[14]

While knowledge may be shown by circumstantial evidence, "in actions involving the liability of a bank for aiding and abetting its customer's Ponzi scheme, the second element, knowledge, will only be satisfied if the bank had 'actual knowledge of the fraudulent activities.'" *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) (quoting *Lawrence*, 455 F. App'x at 907); *reversed in part and vacated in part* on other grounds;[15] *see Isaiah*, 2017 WL 5514370, at *3. "[E]vidence establishing negligence, *i.e.*, that a bank 'should have known,' will not suffice." *Wiand*, 938 F. Supp. 2d at 1244 (quoting *Aetna Cas. And Sur. Co. v. Leahey Const. Co*, 219 F.3d 519, 536 (6th Cir. 2000)).

---

[14]   Because *Isaiah* focused on the plaintiff's lack of standing, the Eleventh Circuit opinion had no reason to evaluate the sufficiency of the substantive allegations concerning knowledge.

[15]   The Eleventh Circuit's analysis concerned standing on whether the district court erred when it denied a request for leave to amend. It did not analyze the knowledge requirement.

Therefore, framed by these standards, "[a]lleging that a bank disregarded 'red flags' such as '*atypical* activities' on a customer's account is insufficient to establish knowledge." *Lamm*, 749 F.3d at 950 (citing *Ct. Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, No. 05-60080CIV, 2008 WL 926513, at *1 (S.D. Fla. Mar. 31, 2008) (emphasis supplied); *Rosner v. Bank of China*, No. 06 CV 13562, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008)); *see also Lawrence*, 455 F. App'x at 907 ("Florida law does not require banking institutions to investigate transactions."). *See generally, FW Distrib., LLC v. JP Morgan Chase Bank, N.A.*, No. 24-cv-21385, 2024 WL 4665255 (S.D. Fla. Nov. 4, 2024) (summarizing case law and granting the defendant bank's motion to dismiss without prejudice three aiding and abetting claims).

Factual allegations which merely demonstrate that a bank "should have known" about fraudulent conduct by non-account holders are inadequate to meet the actual knowledge requirement. *See Platinum Estates*, 2012 WL 76079, at *3 ("Conclusory statements that a defendant actually knew is [sic] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant should have known that something was amiss.") (quoting *Groom v. Bank of Am.*, No. 8:08–cv–2567–JDW–EAJ, 2012 WL 50250, at *2–3 (M.D. Fla. Jan. 9, 2012) (additional level of quotation and citation omitted)).

Similarly, allegations that a bank ignored obvious red flags or "failed to adhere to an appropriate standard of care or to follow relevant policies, procedures, or regulations"

are insufficient to show the actual knowledge necessary for Plaintiff's aiding and abetting claims. *Isaiah*, 2017 WL 5514370, at *3 (citing *Groom*, 2012 WL 50250, at *1); *see Perlman*, 559 F. App'x at 993 ("Florida does not require banking institutions that conduct routine banking services to investigate transactions involving its demand deposit accounts; therefore, merely alleging that a bank should have known of a Ponzi scheme based solely on a series of purportedly atypical transactions is not sufficient to survive *Twombly*."). *See generally FW Distrib.*, 2024 WL 4665255, at *8–10 (concluding that an allegation that the bank was "well positioned to observe the fraud" did not meet the actual knowledge element).[16]

Concerning the third factor of substantial assistance, "[a] defendant does not provide substantial assistance unless his action, or inaction, was a 'substantial factor in causing the [underlying violation].'" *Pearson v. Deutsche Bank AG*, Case No. 21-cv-22437,

---

[16]     The *FW Distributing* Court rejected the plaintiff's efforts to argue that the banks there had a duty to investigate and take appropriate action upon any discovery of suspicious activity under the Bank Secrecy Act because that duty is owed to the United States, not private bank consumers. 2024 WL 4665255, at *8 n.2. The Court relied upon the following legal authority: *Suzmar, LLC. v. First Nat'l Bank S. Miami*, 388 So. 3d 852, 855 (Fla. 3d DCA 2023) ("[T]he KYC requirements contained in the federal Bank Secrecy Act, 31 U.S.C. § 5311, do not create a duty [the bank] owed to the [plaintiff] because bank consumers do not have a private right of action to enforce these rules." (citing *TBTG, LLC v. Fid. Brokerage Servs. LLC*, Case No: 8:16-cv-83-T-36TBM, 2016 WL 9383325, at *4 (M.D. Fla. Oct. 17, 2016) (noting that "the Bank Secrecy Act and its implementing Regulations do not create a private right of action"); *SFS Check, LLC v. First Bank of Del.*, 990 F. Supp. 2d 762, 775 (E.D. Mich. 2013), *aff'd*, 774 F.3d 351 (6th Cir. 2014) (explaining "[a]s the BSA does not create a private right of action, it also 'does not provide a basis for imposing a duty of care owed by [the bank] to [the] [p]laintiff.'"))).

2023 WL 2610271, at *26 (S.D. Fla. Mar. 23, 2023) (quoting *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 348 (Bankr. S.D. Fla. 2013)).

Accordingly, courts have determined that allegations of "**passive conduct** by a bank which is being used as an unknowing conduit to further a scheme" will be insufficient to establish substantial assistance. *FW Distrib.*, 2024 WL 4665255 at *10  (citing *Mettrocity Holdings, LLC v. Bank of Am., N.A.*, Case No. 22-CV-80980-BER, 2023 WL 6064516, at *8 (S.D. Fla. Sept. 18, 2023) (emphasis supplied)).

Moreover, "mere inaction 'constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" *Chang,* 845 F.3d at 1098 (quoting *Lerner*, 459 F.3d at 295); *see Groom*, 2012 WL 50250, at *4 ("an allegation of the 'failure to act, absent a duty to act, is not substantial assistance'" (quoting *Hines v. FiServ, Inc.*, No. 8:08–cv–2569–T–30AEP, 2010 WL 1249838, at *4 (M.D. Fla. Mar. 25, 2010))).

In addition, a failure to allege that a bank intentionally assisted in covering up a fraud scheme (or encouraged a plaintiff to invest in the fraudulent venture) and the mere provision of "ministerial services that [a bank] would provide to any customer" do not generate a sufficient factual basis for substantial assistance. *FW Distrib.*, 2024 WL 4665255 at *11 (citing *Groom*, 2012 WL 50250, at *4, for the conclusion there that "Plaintiffs' assertion that the Defendant banks 'made it possible for Pearlman and his cohorts to deposit vast sums of money' is likewise insufficient because this is, "at most, a conclusory allegation that the banks **permitted a customer to engage in suspicious transactions**,

which *fails* to establish substantial assistance" (emphasis supplied) (internal citations omitted)).

Similarly, mere inaction by a bank constitutes substantial assistance only if the bank owes a fiduciary duty directly to the Plaintiff. Therefore, a bank's failure to close accounts upon the discovery of suspicious activity will not support an inference of substantial assistance when there are no alleged facts to support the theory that the banks owed a fiduciary duty to Plaintiff or that the accounts in question were trust accounts. *Id.* at *12 ("without a fiduciary obligation" on the part of the Defendant banks, "Plaintiff is unable to rely on Defendants' inaction to show substantial assistance" (citing *Sherman v. Gursky Ragan, P.A.*, 388 So. 3d 1034, 1036 (Fla. 3d DCA 2024) (citing *Chang*, 845 F.3d at 1098) ("Mere inaction [in an aiding and abetting claim] constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."))).

### *The Receiver's Complaint*

As previously discussed, when a claim for aiding and abetting is asserted against a bank, "knowledge of the underlying fraud is the crucial element." *Rosenfeld Gallery, LLC v. Truist Bank*, 719 F. Supp. 3d 1270, 1277 (S.D. Fla. Feb. 28, 2024) (quoting *Rusty115 Corp.*, 2023 WL 6064518, at *6). Simply alleging atypical transactions is insufficient to plead the actual knowledge element of aiding and abetting. *Otto Candies, LLC v. Citigroup, Inc.*, No. 1:16-cv-20725, 2023 WL 6418135, at *7 (S.D. Fla. Aug. 25, 2023) (agreeing with bank's argument that pleadings merely suggesting that bank disregarded red flags or atypical

transactions were inadequate to allege actual knowledge); *Lawrence*, 455 F. App'x at 907 (allegations of "numerous deposits, withdrawals, and wire transfers involving large amounts of money" were "insufficient under Florida law to trigger liability" requiring actual knowledge).

The Receiver's Complaint repeatedly alleges that Wells Fargo "knew **or *should have known***" about the transactions involved in the Ponzi scheme because of the supposedly suspicious nature of the financial transactions. [ECF No. 1-2, ¶¶ 113, 126, 194, 208, 211 (emphasis added)]. This is problematic for the Receiver's Complaint.

As the *Rusty115 Corp.* Court unequivocally held, "[w]here the facts in the complaint only **suggest** that the defendant '*should have* known that something was amiss;" [ ] they are insufficient to support the knowledge requirement of an aiding and abetting claim." 2023 WL 6064518, at *7 (emphasis added)(quoting *Platinum Estates, Inc.*, 2012 WL 760791, at *3). Here, the Receiver did more than simply "suggest" that Wells Fargo should have known of the fraudulent scheme. Instead, he often alleged *overtly* that the bank "should have known" about the scheme.

Nonetheless, this dooms his current aiding and abetting claims, as the "should have known" allegations are inadequate under Florida law to state aiding and abetting claims for common-law torts. *See, e.g.*, *FW Distrib.*, 2024 WL 4665255, at *7 ("evidence establishing negligence, *i.e.*, that a bank 'should have known,' will not suffice"). *See also Perlman*, 559 F. App'x at 993 ("Florida does not require banking institutions that conduct

routine banking services to investigate transactions involving its demand deposit accounts; therefore, merely alleging that a bank **should have known** of a Ponzi scheme based solely on a series of purportedly atypical transactions is **not sufficient** to survive *Twombly*.") (emphasis added).

The Receiver's reliance [ECF No. 35, pp. 14, 17] on *Gevaerts* is inapposite and not persuasive, as the *FW Distributing* Court held (in a case where the plaintiff there pursued a claim against a bank under an aiding and abetting theory):

> In *Gevaerts*, "the *crux* of [the p]laintiffs' pertinent allegations" were that the bank had actual knowledge of the underlying fraud given the bank's agreement with the New Jersey Bar to report overdrafts of attorney trust accounts. 56 F. Supp. 3d at 1341 (emphasis added). Since an attorney's overdrawing of an attorney trust account was itself strong evidence of a mishandling of client funds, the Court concluded it was reasonable to infer actual knowledge of fraud based on the defendant's failure to report the wrongful conduct as required under the agreement with the New Jersey Bar. Unlike here, the defendant in *Gevaerts* had a clear obligation as a fiduciary to the plaintiff (as well as a specific agreement with the state bar) to investigate and report the activity in question, and its failure to do so directly contributed to the continuation of the wrongful activity.

2024 WL 46652555, at *10.   No such fiduciary duty or obligation on Wells Fargo has been alleged here.

To be sure, the Receiver's Complaint also includes allegations that Wells Fargo did in fact know about certain transactions (as opposed to asserting a should-have-known allegation). According to the Receiver's theory, Wells Fargo's knowledge of atypical transactions generated the requisite evidence of actual knowledge. But the allegations

often concern typical and routine transactions (notwithstanding the dollar volume involved).

For example, the Receiver emphasizes that Wells Fargo knowingly assisted in the unlawful activities because it "assisted in at least 5,100 transfers [and] assisted in the transfers of over $50,000,000 through over 400 transfers," "processed wire transfers," "processed more than $378,000,000 in intercompany transfers," and "processed round dollar transactions." [ECF Nos. 35, p. 3; 1-2, ¶ 138].

But this Circuit has held that such transactions are routine banking activity that do not give rise to actual knowledge required for aiding and abetting. *See, e.g., Lawrence,* 455 F. App'x at 907 (allegations of "numerous deposits, withdrawals, and wire transfers involving large amounts of money" were insufficient for the inference of actual knowledge); *see also Perlman,* 559 F. App'x at 993 (allegations of "numerous transfers amongst the accounts," "thousands of deposits of even dollar amounts, [and] large cash deposits and withdrawals" did not raise a plausible inference of actual knowledge).

Wells Fargo's motion to dismiss the aiding and abetting counts of the Receiver's Complaint asserted by the Non-NSI Plaintiffs under Federal Rule of Civil Procedure 12(b)(6) should be **granted**, albeit **without prejudice** and **with leave to amend**.[17]

---

[17]     Wells Fargo's motion to dismiss the Receiver's Complaint does not challenge the Receiver's obligation (as the plaintiff) to sufficiently allege *substantial assistance* for the aiding and abetting claims. It does raise that challenge to the *Retirees'* FAC, though.

*The Retirees' FAC*

The Retirees' FAC does not confront the same difficulty as the Receiver's Complaint, as it does not repeatedly and expressly allege that Wells Fargo "should have known" about the Ponzi scheme. Nevertheless, Wells Fargo is still seeking to dismiss the FAC on the same defense challenge (*i.e.*, the aiding and abetting counts do not sufficiently allege the bank's actual knowledge of the misconduct) and a related challenge – the FAC supposedly does not adequately allege substantial assistance.

Although the FAC alleges actual knowledge by Wells Fargo, the Bank contends that the allegations are legally insufficient because they are conclusory and lack enough specific facts about how it knew or should have known. It contends that the only specific facts alleged in the FAC are "sparse and bare." [ECF No. 25, p. 8]. According to Wells Fargo's dismissal motion, the Retirees' FAC "resort[s] to relying on allegedly atypical transactions, and supposed deviations from banking policies and regulations, to establish knowledge." *Id*. at 9.

At bottom, Wells Fargo argues that the FAC's allegations, at most, "aver that Wells Fargo knew or should have been aware of the **transactions** themselves, but *not* that Wells Fargo knew the transactions were part of a Ponzi scheme." *Id*. at 12 (italics emphasis by Wells Fargo; bold emphasis by the Undersigned). According to the dismissal motion, "there are no allegations that the policies and procedures followed by Wells Fargo with respect to the accounts at issue alerted it to the existence of a Ponzi scheme." *Id*. (citing

*Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95–96 (2d Cir. 2012), which it summarized as "plaintiff failed to allege a monitoring obligation [which] would have alerted defendant to the alleged fraud"). Wells Fargo argues that even if its required monitoring was adequately identified, the FAC still does not allege that the monitoring led the bank to acquire actual knowledge **of the scheme**.

In response to this defense theme, the Retirees argue that the dismissal motion ignores the critical allegation that Wells Fargo was actually **involved in** the scheme. [ECF No. 30]. The Response highlights how the FAC alleges that the Bank "knowingly assisted the perpetrators by designing irrevocable life insurance trusts to circumvent prohibitions on [STOLIs], which served as the backbone of the scheme. *Id.* at 2 (citing ECF No. 3, ¶¶ 50–69). Furthermore, the Response argues, when the scheme was about to financially collapse, Wells Fargo "actively helped the perpetrators deceive lenders into providing over $40 million in loans, allowing the fraud to continue for another decade. *Id.* (citing [ECF No. 3, ¶¶ 60–76]). And, the Retirees contend, Wells Fargo permitted the use of its accounts in ways that blatantly violated its own policy and federal anti-money laundering laws. *Id.* (citing [ECF No. 3, ¶¶ 77–162]).

The Retirees explain that Wells Fargo aided the scheme in three different ways, through three different roles: as trustee of ILITs, as Securities Intermediary, and as the Depository Bank.

Before discussing the precise allegations which the Retirees contend are sufficient to allege actual knowledge (and even active participation in the scheme), the Undersigned will first flag legal principles which they rely upon in their Opposition:

"A defendant has knowledge of an underlying fraud if it has a general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank,* 303 So. 3d 999, 1003 (Fla. 4th DCA 2020) (reversing dismissal of aiding and abetting claims against bank) (citing *Woods v. Barnett Bank of Ft. Lauderdale,* 765 F.2d 1004, 1009 (11th Cir. 1985)).

\*\*\*

"Establishing such knowledge does not require direct evidence in the form of an admission or a proverbial 'smoking gun.' Rather, for purposes of an aiding and abetting claim, 'actual knowledge of another's wrongful conduct is nearly universally found based upon circumstantial evidence.'" (quoting *Cabot E. Broward 2 LLC v. Cabot,* No. 16-61218, 2016 WL 8740484 (Dec. 2, 2016), at \*4 (explaining that "actual knowledge of another's wrongful conduct is nearly universally found based on circumstantial evidence," and denying motion to dismiss claims of aiding and abetting fraud and breaches of fiduciary duty where plaintiff alleged defendant knew fraudster "was manipulating the Investor Reports to hide losses from Plaintiffs and the Class stemming from a multi-million-dollar embezzlement scheme")) (citing *Amegy Bank Nat. Ass'n v. Deutsche Bank Alex. Brown,* 619 F. App'x 923, 931 (11th Cir. 2015) ("It should not be a surprise that the jury was forced to rely on purely circumstantial evidence to conclude that [defendant] had actual knowledge of wrongful conduct. It is difficult to imagine what sort of evidence, other than an admission . . . would constitute direct evidence of . . .knowledge of wrongful conduct.")).

\*\*\*

Knowledge of a fraudulent scheme can be inferred from a variety of circumstantial evidence. *Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.,* 682 F. Supp. 3d 1112, 1137 (S.D. Fla. 2023) (denying motion to dismiss aiding and abetting claims where plaintiffs' "specific allegations as a whole" established "a strong inference of actual knowledge"); *Woods,* 765 F.2d at 1009 (a defendant's knowledge "must usually be inferred").

\*\*\*

Knowledge may be inferred by the way an employee alters the financial institution's normal ways of doing business to benefit the fraudster. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir. 1975) ("[I]f the

54

> method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.").
>
> ***
>
> Where allegations "go beyond [mere] 'red flags[,]'[those] allegations could support plausible inference of actual knowledge by Wells Fargo of the Ponzi scheme which it then aided and abetted by permitting the fraud to continue through use of its accounts after it had actual knowledge of the scheme." *Perlman*, 559 F. App'x at 996.
>
> ***
>
> The knowledge inquiry for an aiding and abetting claim is necessarily fact intensive. *Woods*, 765 F.2d at 1009 ("the surrounding circumstances and expectations of the parties [are] critical"). Therefore, "the exact[] level [of knowledge] necessary for liability remains flexible and must be decided on a case-by-case basis." *Perlman v. Bank of Am., N.A.*, No. 11-803331, 2011 WL 13108060, at *6 (S.D. Fla. Dec. 22, 2011), (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)).

[ECF No. 30, pp. 8–10].

To be sure, some of the FAC allegations about aiding and abetting fall short of stating a claim that Wells Fargo had actual knowledge of the Ponzi scheme. Nevertheless, there are other allegations which are less conclusory, more detailed and focused – and do meet the Rule 12(b)(6) standard for alleging aiding and abetting claims against the Bank.

The Undersigned has determined that it would be more logical to pinpoint those portions of the FAC which *do* in fact allege knowledge (or permit an inference of knowledge of the unlawful Ponzi scheme) and sometimes allege active participation in the scheme. Using this approach, the Undersigned concludes that the following allegations (which we construe as factually correct at this point) demonstrate knowledge

by Wells Fargo (and go beyond conclusory allegations that the Bank merely ignored red flags):

First, the FAC alleges that Wells Fargo created an ILIT structure which its outside counsel described as "unlike any ILIT . . . Wells Fargo agreed to serve as Trustee under" – and which was specifically designed to allow the Scheme Operators to evade the insurance companies' STOLI rules. [ECF No. 3, ¶¶ 51–54]. It is difficult to see how a transaction could be deemed "routine" when outside counsel expressly described the structure as unlike any previous one. Moreover, the Retirees argue that Wells Fargo's design and use of an atypical ILIT structure to conceal the STOLI violations are "also circumstantial evidence of its actual knowledge of the Scheme." [ECF No. 30, p. 10].[18]

Second, the FAC alleges that Wells Fargo structured the ILITs to hide the Scheme Operators' STOLI violations, including: (1) the assignment of the STOLIs to the Scheme

---

[18]    The Retirees cite *Woodward* to support this contention. That case involved a claim against a bank as an aider and abettor under the federal securities laws. The *Woodward* Court adopted a fact-based approach when assessing the other requirement of substantial assistance:

> In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.

522 F.2d at 97.

Operators; (2) the Scheme Operators paying the STOLI's premiums; and (3) payments made by Scheme Operators to the insured for procuring the STOLIS. [ECF No. 3, ¶¶ 52–53].

Third, Wells Fargo knew the Scheme Operators did not use the Class' funds to pay the STOLI premiums because Wells Fargo as Trustee routinely received "grace notices" from insurance companies indicating non-payment of the STOLIs' premiums. *Id*. at ¶ 75.

Fourth, Wells Fargo represented to the Lenders there were no "liens" on the STOLIs, that the Lenders had "first priority lien on and security interest in" the STOLIs, and Wells Fargo had "no actual knowledge of any claim that any person" had an interest in the STOLIs. *Id*. at ¶ 71. These statements were all **false** because Wells Fargo knew the Class had a first priority lien interest in the STOLIs yet told the Lenders otherwise in order to facilitate the $40 million loan from the Lenders to the Scheme Operators using the STOLIs Wells Fargo knew collateralized the Class' Notes. *Id.* at ¶¶ 71–75, 154–55.

Fifth, Wells Fargo resigned as Trustee to facilitate the STOLI assignments and allowed the Scheme Operators to **backdate the resignation forms** by nearly a year. *Id.* at ¶ 67. Wells Fargo proceeded without the usual resignation process requiring all parties' approval. *Id.* These actions enabled the Scheme Operators to assign the STOLIs to the Lenders, but the insurance companies initially rejected the assignments due to potential STOLI violations. *Id*. at ¶¶ 68–69. When approval was denied, the Scheme Operators

requested Wells Fargo's intervention, after which the insurance companies accepted the STOLI assignments without further issue. *Id*. at ¶ 69.

[At the hearing [ECF No. 47], the Bank's counsel argued the resignations concerned its role as trustee but the FAC did not allege which trust it was for. He also argued that there is insufficient context about whether the resignation could have been effective a year earlier. And he contended that the change in effective date does not necessarily lead to the conclusion that Wells Fargo knew of a Ponzi scheme. He further noted that the resignation occurred in 2013, with a 2012 effective date – but that the FAC has "not even alleged that the Ponzi scheme was being perpetrated at that point." "They don't allege that the scheme, itself, started until 2015."].

Sixth, the Scheme Operators maintained accounts at Wells Fargo that enabled the Scheme. *Id.* at ¶ 135. Between 2011–2018, Wells Fargo opened 58 accounts for them and the Receivership Entities. *Id*. Wells Fargo knowingly violated its own KYC policies by sending pre-filled applications, opening accounts without required paperwork, and providing blank forms for signatures. *Id*. at ¶¶ 146, 148. Wells Fargo acknowledged these compliance violations, with one bank employee writing "I need the attached documents signed and returned . . . **to avoid a compliance violation."** *Id*. at ¶ 146 (emphasis added).

Seventh, Wells Fargo created inaccurate client profiles, with knowledge of the entities' true profiles, facilitating the Scheme. *Id*. at ¶ 152.

The Undersigned agrees with the Retirees that their FAC alleges more than atypical transactions and more than merely overlooking red flags. Instead, for purposes of analyzing a motion to dismiss, the FAC plausibly alleges that Wells Fargo had actual knowledge of the wrongdoing. *Cf. Pearson*, 2023 WL 2610271 (denying bank's summary judgment motion because of record evidence of knowledge and substantial assistance). *See generally Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311 (M.D. Fla. 2013); *Bansal v. TD Ameritrade, Inc.*, No. 23-81539, 2024 WL 3009423, at *8 (S.D. Fla. June 7, 2024) (expressly acknowledging that "the law is abundantly clear that 'red flags' and 'atypical activities' are not enough to constitute actual knowledge;" denying motion to dismiss two counts for aiding and abetting fraud and breach of fiduciary duty; and noting that the merits could be "readdressed" at the summary judgment stage).

Having determined that the FAC meets the knowledge element for the aiding and abetting counts, the Undersigned shifts the focus to discussing whether the FAC adequately alleges the substantial assistance prong of the aiding and abetting requirements.

"[W]here the amount of subsistence is minor in comparison to the massive scope of an overall fraudulent scheme, there is no substantial assistance." *Pearson*, 2023 WL 2610271, at *26 (relying on *In re Palm Beach Fin. Partners, LP*, 517 B.R. at 348). "To determine whether a defendant provided substantial assistance, courts examine a variety of factors including 'the nature of the act encouraged, the amount of assistance given by

the defendant, his presence or absence at the time of the tort, [and] his relation to the other and his state of mind.'" *Id.* (quoting *In re Temporomandibular Joint Implants*, 113 F.3d 1484, 1495 (8th Cir. 1997)) (alteration in original).

The above-outlined seven categories of factors contain allegations sufficient to allege that Wells Fargo substantially assisted the Schemers. The FAC alleges that Wells Fargo did more than simply have actual knowledge of the scheme; it alleges that the Bank **helped** the Scheme Operators further the scheme in several ways. By way of clearcut example, it used an expedited resignation process and resigned as Trustee to facilitate the assignment of the STOLIs, even going as far as to **backdate** the resignation forms nearly a year. [ECF No. 3, ¶ 67]. When the resignation and assignment forms were submitted to the insurance companies, they were rejected for potential STOLI violations until Wells Fargo, at the request of the Scheme Operators, intervened and convinced the insurance companies to process the assignments. *Id.* at ¶¶ 67–69.

To provide another substantial scenario, without Wells Fargo's assistance, the Scheme Operators would have been unable to borrow $40 million from the Lenders using the Class's STOLIs. *Id.* at ¶¶ 70–73. Wells Fargo, in the Securities Account Agreements ("SAAs"), represented to the Lenders they had a "first priority lien on and security interests in" the STOLIs (*id.* at ¶ 71) and that it had "no actual knowledge of any claim to, or security interest in the [STOLIs]" by any other entity (*id.* at ¶ 72). According to the

FAC, this was *false*. The FAC alleges that Wells Fargo actually knew the Class had a claim to, and a security interest in, the STOLIs because they collateralized the Notes. *Id*.

Because of Wells Fargo's misrepresentations in the SAAs, Centurion SPV I and II were able to borrow $40 million using the Class's STOLIs as collateral, continuing the Scheme, allowing the Scheme Operators to raise hundreds of millions of dollars more from the sale of Notes to the Class. *Id.* at ¶¶ 154–55.

The FAC has asserted enough allegations above and beyond mere failure to act based on red flags to dodge a motion to dismiss challenging the actual knowledge and substantial assistance requirements. *See, e.g., Cabot*, 2016 WL 8740484, at *5 (denying motion to dismiss where plaintiff alleged that "despite [the defendant's] alleged actual knowledge, [the defendant] 'not only kept quiet about the embezzlement, he helped [the perpetrators] continue and conceal the embezzlement from [the] [p]laintiffs . . . by helping . . . create false and fraudulent Investor Reports," and the defendant "assisted in creating the false . . . Investor Reports through accounting . . . designed to conceal the embezzled funds").

The FAC allegations highlighted in this Report support the notion that a factfinder could reasonably conclude that Wells Fargo substantially assisted the Ponzi scheme. For example, there could conceivably be innocuous reasons[19] for a bank to backdate

---

[19]    Wells Fargo did not proffer any legitimate reason for backdating the documents by changing the effective date. At the hearing, the Retirees' attorney focused on this circumstance: "Backdating documents[,] despite counsel's yeoman's efforts to try and

documents, but, at this preliminary stage, the allegation must be deemed correct (and the allegation can be used to support an inference of both knowledge and substantial assistance).[20]

Therefore, the Undersigned respectfully recommends that Judge Gayles **deny** Wells Fargo's motion to dismiss the Retirees' aiding and abetting claims in the FAC. *See, e.g., Pearson,* 2023 WL 2610271, at *26–27 (explaining that "the nature of the act encouraged is a Ponzi scheme," distinguishing the case from those where a bank performed only a ministerial function and noting that "inaction in stopping [certain] custody account trading activity was essential to the continuation of the Ponzi scheme").

---

defend that as normal banking activity, there is no circumstance under which backdating documents is a routine banking activity, but particularly here when I put it in the context of what they were actually trying to do." [ECF No. 55, p. 54]. Even if the Undersigned were unwilling to say that backdating can *never* be permissible and limited my view to deeming backdating to be presumptively improper, Wells Fargo did not rebut that presumption by providing a specific ground to deem the activity to be a *bona fide* one.

[20]    Wells Fargo relies on cases where, unlike here, the plaintiffs alleged only that "the transactions were atypical and therefore [the bank] should have known of the Ponzi scheme." *Lawrence,* 455 F. App'x 904; *see also Lamm,* 749 F.3d at 950 ("facts alleged . . . at most show that State Street 'should have known'"); *Isaiah,* 2017 WL 5514370, at *4 (allegations demonstrated only "knowledge of the symptoms of the . . . scheme, not . . . actual knowledge of" it); *Meridian Tr. Co. v. Batista,* No. 17-23051, 2018 WL 4693533, at *4 (S.D. Fla. Sept. 26, 2018) ("courts. . . have rejected these types of 'should have known' arguments"); *Perlman,* 559 F. App'x at 993–94 ("At most [plaintiff's allegations] list facts that could arouse suspicions. . . .").

<u>Negligence</u>

As noted, the Receiver's Complaint includes a negligence count. Wells Fargo's motion to dismiss argues that the Receiver's negligence count fails under the independent tort doctrine. The Receiver disagrees, noting, among other arguments, that the doctrine does not bar claims where the alleged conduct is independent from acts which breached the contract and does not itself constitute a breach of the at-issue contract.

The Receiver's negligence claim alleges that "Plaintiffs maintained fifteen (15) bank accounts at Wells Fargo through which at least $414,000,000 was moved through their accounts through deposits and withdrawals." [ECF No. 1-2, ¶ 245]. The Receiver further alleges that Wells Fargo owed a duty based on its "opening, operation, maintenance and management of the accounts," a duty which Wells Fargo then purportedly breached by failing to adequately monitor or manage the accounts. *Id*. at ¶¶ 246, 248; *see also id*. at ¶ 9.

In return for these "banking services," Wells Fargo received "interest, transfer fees, service fees, transaction fees and online banking fees." *Id*. at ¶¶ 251–52.

According to Wells Fargo's motion, these allegations set forth only the standard obligations and actions inherent in a banking relationship, where Wells Fargo owes contractual obligations to its account holders, and, in return, Wells Fargo receives benefits in the form of banking fees. Wells Fargo contends that the Receiver's Complaint fails to allege that Wells Fargo owed or breached any duties independent of contractual duties,

which means the negligence claim fails. *See Veritas Pers. Servs. v. ADP Totalsource*, No. 1:19-cv-22435, 2019 WL 11506033, at *5 (S.D. Fla. Oct. 21, 2019) ("A plaintiff may not pursue a tort theory of relief where a contract created the duty to act [and] performance is measured against the contractual obligations." (citing *Nat'l Fire Ins. Co. Hartford v. Johnson Controls Fire Prot. LP*, No. 19-14050, 2019 WL 3428552, at *13 (S.D. Fla. Apr. 18, 2019))).

The Receiver's Response notes that the independent tort doctrine is inapplicable when the allegedly tortious conduct at issue is independent from the acts which breached the contract. *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1311 (S.D. Fla. 2019). He states that the Complaint does not assert a count or claim for breach of contract, the contracts between the parties were not attached to the Complaint, and Wells Fargo has not provided any details about the contracts it purportedly relies on.

Therefore, the Receiver argues, the Court cannot determine "at this early stage of litigation whether the basis of the action for [negligence] is really a breach of [contract]." *Strickland v. Burch,* No. 3:13-CV-1383-J-32JBT, 2014 WL 3417611, at *3 (M.D. Fla. July 14, 2014) (rejecting Wells Fargo's attempt to dismiss plaintiff's conversion claim based on the independent tort doctrine); *Pearson v. Deutsche Bank AG*, No. 21-22437-CIV, 2023 WL 5905958, at *6-8 (S.D. Fla. Sept. 11, 2023), *appeal dismissed* (Mar. 22, 2024), *appeal dismissed*, No. 23-13327-JJ, 2024 WL 1512841 (11th Cir. Mar. 22, 2024) (analyzing contractual

language to reject defendant's argument that negligence claim was barred by an Agency Agreement).

According to the Receiver, these omissions mean that the Court should reject Wells Fargo's argument as speculative and find that it is requiring the Court to "make unfounded assumptions about the contents of the unidentified contracts which should not be considered on a motion to dismiss." [ECF No. 35, p. 16].

Moreover, the Receiver contends that a bank assumes a higher duty over and above its ordinary obligations if it has actual knowledge of fraud being perpetrated. *See Barnett Bank of W. Fla. v. Hooper*, 498 So. 2d 923, 925 (Fla. 1986) (rejecting that a bank has no duty of disclosure when it has "actual knowledge of fraud being perpetrated upon a customer . . . or where a bank has established a confidential or fiduciary relationship with a customer"). The Receiver also cites *Gevaerts*, 56 F. Supp. 3d at 1343–44, for the statement that the bank's "authority essentially restates the general proposition that a bank has no duty to actively monitor accounts for wrongdoing," but the cases cited by the bank "do not address a bank's duties in the context when a bank has actual knowledge of a fiduciary's misappropriation of funds."

The Receiver argues that "Wells Fargo owed a heightened duty, due to its actual knowledge of the underlying wrongdoing, from the multiple roles it played in perpetrating the Ponzi scheme." [ECF No. 35, p. 17]. Therefore, the Receiver's Response proffers that his Complaint sufficiently alleges that "Wells Fargo owed, and breached,

various common law and statutory duties that are owed to Plaintiffs regardless of what is set forth in the contracts between the parties (which is not before the Court)." *Id*.

In addition, the Receiver states that Florida law "recognizes that banks can be liable for negligence." *Ackner v. PNC Bank, Nat'l Ass'n*, No. 16-81648-CIV, 2017 WL 7726684, at *3 (S.D. Fla. Aug. 30, 2017) (collecting cases). This, the Receiver contends, is because "[b]anks owe a duty to customers," *Wiand*, 938 F. Supp. 2d at 1247, including "a duty to use ordinary care, presumptively in all its dealings." *Journeys Acad., Inc. v. PNC Bank*, No. 2:13-CV-285-FTM-38, 2013 WL 3772483, at *2 (M.D. Fla. July 16, 2013).[21]

However, as a matter of law, a bank does **not** owe a duty to non-customers regarding the opening and maintenance of its accounts. *Id*. (citing *Sroka v. Bank*, No. 2006–CA–001117, 2006 WL 2535656 (Fla. 4th DCA Aug. 31, 2006). Moreover, as the *Wiand* Court further explained after making its "banks owe a duty to customers" comment, "[o]n the other hand, banks generally do not owe non-customers a duty to protect them from fraud perpetrated by customers." *Wiand*, 938 F. Supp 2d at 1247 (citing *MLSMK Inv. Co. v. JP*

---

[21]     The Receiver's Response cited additional case law authority to support the point. *See also Gilson v. TD Bank, N.A.*, No. 10-20535-CIV, 2011 WL 294447, at *9 (S.D. Fla. Jan. 27, 2011) (denying motion for summary judgment because there was a genuine issue of material fact about whether the bank acted negligently and recklessly "with regard to opening the accounts"); *Nguyen v. Raymond James & Assocs., Inc.*, No. 8:20-CV-195-CEH-AAS, 2021 WL 6091094, at *7–8 (M.D. Fla. Dec. 23, 2021) (rejecting application of the independent tort doctrine because plaintiff's negligence claim did "not depend on the contract between Raymond James and its client" but rather hinged "on industry standards and practices, evidenced by FINRA rules, which set the obligations imposed by Raymond James in its capacity as a broker-dealer to clients").

*Morgan Chase & Co.*, 431 F. App'x 17, 20 (2d Cir. 2011); *Conder v. Union Planters Bank N.A.*, 384 F.3d 397, 400 (7th Cir. 2004); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002)). "Nevertheless," the *Wiand* Court noted, "courts have recognized a narrow exception to this rule "when a bank fails to act to safeguard trust funds on deposit in a fiduciary account after receiving 'clear evidence' of misappropriation." *Id.* (citing *MLSMK Inv.*, 431 F. App'x at 20 (citing *Lerner*, 459 F.3d at 295)).

This narrow exception has been deconstructed into three elements: (1) there is a fiduciary relationship between the customer and the non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has actual knowledge or notice that a diversion is to occur or is ongoing. *Id.* at 1247–48 (citing *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 232 (5th Cir. 2010)). To satisfy the second element, "the facts [must] support the 'sole inference' that the funds being deposited are held in a fiduciary capacity." *Id.* at 1248.

The Undersigned is not prepared to conclusively determine whether the independent tort doctrine bars the Receiver's claim because neither side has submitted the contract (or contracts) at issue. This scenario makes it impossible for the Undersigned to know with certainty whether the negligence claims are, in effect, merely restating a breach of contract theory. It may well be that the contracts encompass the challenged conduct, but that conclusion is speculative without a review of the contract.

However, the Receiver's negligence claim is, as framed, substantively inadequate because it does not contain sufficient allegations to create the narrow exception to the rule that banks generally do not owe non-customers a duty to protect them from fraud perpetrated by customers.

The Receiver argues that banks can be liable for negligence because they owe a duty to customers. [ECF No. 35, pp. 16–17]. But, as the cases cited by the Receiver recognize, a bank's duty to a customer "extends only to confirming that the agent, at the time of the transaction, has the authority to make the transaction." *In re Rollguard Sec. LLC*, 591 B.R. 895, 925 (S.D. Fla. 2018) (emphasis added) (citing *O'Halloran*, 350 F.3d at 1205). The Receiver does not allege that transactions in the Wells Fargo accounts were **unauthorized.** And the law is clear that a bank does not have a duty to monitor accounts or investigate transactions more generally. *See Biondi v. Branch Banking & Trust Co.*, No. 1:18-cv-22521, 2018 WL 6566027 (S.D. Fla. Aug. 28, 2018), at *4 (dismissing negligence claim against bank but without prejudice and with leave to amend "so that [the] [p]laintiffs can specify exactly what happened and why those facts, if proven[,] would establish a breach of duty").

The Undersigned **respectfully recommends** that Judge Gayles **dismiss** the Receiver's negligence count **without prejudice** and **with leave to amend**. If the Receiver files an amended complaint and includes a negligence claim, then he shall: (1) attach copies of all relevant contracts involving the Wells Fargo conduct he challenges; and (2)

make clear the specific facts he relies on to create the narrow exception (to the rule that banks do not owe non-customers a duty to protect them from fraud perpetrated by customers) explained in *Wiand*.

<u>Unjust Enrichment</u>

Wells Fargo contends that the unjust enrichment claims asserted in both lawsuits fail because there is an adequate legal remedy – *i.e.*, the damages sought in both lawsuits are covered by an express contract – and because the Plaintiffs in both cases failed to allege that no adequate remedy at law exists. In addition, Wells Fargo advances two more reasons why Plaintiffs' claims fail: (1) customary banking fees are not considered direct benefits; and (2) Wells Fargo received adequate consideration for providing banking services.

To state an unjust enrichment claim, Plaintiffs must plead facts showing that: (i) they conferred a direct benefit on Wells Fargo; (ii) Wells Fargo had knowledge of the benefit; (iii) Wells Fargo accepted or retained the benefit conferred; and (iv) the circumstances are such that it would be inequitable for Wells Fargo to retain the benefit without paying value for it. *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234, 1237 (11th Cir. 2013).

Wells Fargo emphasizes that there is no allegation that it received a direct benefit *from Plaintiffs*. This is fatal, it says, because "Florida law requires that the plaintiff 'directly confer' a benefit in order to state a claim for unjust enrichment[.]" *City of Miami v. Eli Lilly*

69

& Co., No. 21-22636, 2022 WL 198028, at *9 (S.D. Fla. Jan. 21, 2022) (quoting *Kopel v. Kopel*,

229 So. 3d 812, 818 (Fla. 2017)).

Wells Fargo argues that "a party is not directly benefited by the plaintiff when the

only benefit it received was for performing a service for a different party under a

different, albeit arguably related, contract." *Coffey v. WCW & Air, Inc.*, No. 3:17-cv-90, 2018

WL 4154256, at *9 (N.D. Fla. Aug. 30, 2018); *see also Virgilio v. Ryland Grp., Inc.*, 680 F.3d

1329, 1337 (11th Cir. 2012) (holding that a home purchaser could not sue the developer

for unjust enrichment on the theory that the 1.5% fee paid to the developer constituted a

direct benefit because it was the seller that passed on the fee to the developer under a

separate contract).

Wells Fargo highlights the fact that it earned money from fees and from possession

of its deposits but that it was the *third parties* (*i.e.*, the PLCs) – not Plaintiffs – who paid

these fees (as account holders).

But there is case law authority from this district, which the Undersigned finds

persuasive, which holds that the involvement of a third party (who passed on the benefit)

does not preclude an unjust enrichment claim. Specifically, in *Williams v. Wells Fargo Bank,*

*N.A.*, now-Chief District Judge Cecilia M. Altonaga held:

> In other words, just because the benefit conferred by [the] [p]laintiffs on
> [the] [d]efendants did not pass directly from [the] [p]laintiffs to [the]
> [d]efendants—but instead passed through a third party—does not preclude
> an unjust enrichment claim. Indeed to hold otherwise would be to
> undermine the equitable purpose of unjust enrichment claims. *See* 11 FLA.
> JUR 2d Contracts § 288 ("[I]f someone does enrich himself unjustly to the

70

> detriment of another, that person should be required to make restitution of all the benefits received, retained, or appropriated when it appears that to require it would be just and equitable."). It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the "benefit" passed through an intermediary before being conferred on a defendant.

No. 11-21233, 2011 WL 4368980, at *9 (S.D. Fla. Sept. 19, 2011).

Thus, under *Williams*,[22] the Retirees' unjust enrichment claim does not require the benefit to directly pass from the Class to Wells Fargo to satisfy the direct conferral requirement. The funds deposited into the PLCs paid Wells Fargo's fees, thereby conferring a direct benefit on the Bank even though those funds first passed through a third-party intermediary account.

For the reasons articulated in connection with the negligence count, the Undersigned is not prepared now to adopt the argument that the unjust enrichment claim fails because the Receiver has not alleged the lack of an adequate remedy at law under the parties' banking contracts. Florida courts and Courts in this district have held that "this doctrine does not apply to *all* claims for unjust enrichment . . . . It is only when an express contract is proven that an unjust enrichment claim must fail in this way." *Martinez*

---

[22]     Other courts, including those in our district, have followed the *Williams* approach. *See Bansal*, 2024 WL 3009423, at *14. *See also MerchACT, LLC v. Ronski*, No. 20-82043-CIV, 2022 WL 3682207, at *8 (S.D. Fla. Jan. 13, 2022) ("[C]ourts in this district have recognized that an unjust enrichment claim may go forward where a benefit is conferred through another, finding that direct contact is not the equivalent of conferring a direct benefit."); *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013); *Romano v. Motorola, Inc.*, No. 07–CIV–60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007).

*for Mut. Benefits Corp. v. Steinger*, No. 05-61471-CIV, 2006 WL 8432187, at *3 (S.D. Fla. July 5, 2006) (emphasis added) (citing *Williams v. Bear Stearns & Co.*, 725 So. 2d 397 (Fla. 5th DCA 1998)); *Mobil Oil Corp. v. Dade County Esoil Mgmt. Co.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997) ("Until an express contract is proven, a motion to dismiss a claim for . . . unjust enrichment [because an adequate legal remedy exists] is premature.").

Here, the specific contracts have not been established because they have not been submitted (and the Undersigned can only speculate as to their provisions).

Furthermore, courts regularly deny a motion to dismiss based on failure to allege the lack of adequate remedy as premature. *Id.* Wells Fargo also argues that a party cannot sue for unjust enrichment if there is an express contract governing the subject matter of the dispute. [ECF No. 30, p. 24]. Here, however, Plaintiffs' claims arise from Wells Fargo's role in the Ponzi scheme, **not from the parties' banking agreements**.

As explained above, Plaintiffs have alleged that Wells Fargo was not merely providing routine banking services – but, instead, was intimately involved in the viatical life insurance policies scheme, serving as Trustee, then Securities Intermediary, and banker for the funds which raised the hundreds of millions to fuel the Ponzi scheme. The alleged claims arise from Wells Fargo's acts and duties *beyond* the provision of banking services and the not-yet-submitted banking agreements which do not govern the subject matter of the dispute.

Finally, the Undersigned is not convinced by the adequate consideration argument because Wells Fargo and the Retirees (and the putative class members) were never in contractual privity. In addition, Wells Fargo has not adequately explained how knowingly participating in, and enabling, a Ponzi scheme, causing injury to Plaintiffs, can be considered adequate consideration. As the Receiver argues in his Response, Plaintiffs "never agreed, by contract or otherwise, to have their accounts pilfered by the rogue insiders with Wells Fargo's help." [ECF No. 35, p. 20].

## IV.   <u>CONCLUSION</u>

The Court is required to, for now, accept the allegations of the two Complaints as correct. But that means that the claims which are viable now (and those claims which might be viable later in an amended pleading) will likely be put to the test in a summary judgment motion challenge, where the allegations will not merely be accepted without the submission of competent supporting evidence. Summary judgment, of course, "is the time to 'put up or shut up[,]' rather than resting on bare allegations." *Wilson v. White*, No. CV512-130, 2014 WL 3925293, at *4 (S.D. Ga. Aug. 11, 2014).

As mentioned earlier in this Report and Recommendations, the Receiver may not be factually able to allege additional facts sufficient to generate standing for the non-NSI entities. Any decision about whether to file an amended complaint in an effort to meet the standing requirement will be made with the knowledge that the new allegations will likely at some point be subjected to the put-up-or-shut-up standard.

The Undersigned **respectfully recommends** that Judge Gayles **grant in part** and **deny in part** the two motions in the two related cases, as outlined above. The dismissals should be **without prejudice** and with **leave to amend**.

## V.    OBJECTIONS

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Darrin P. Gayles. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in this Report and Recommendations and shall bar the parties from attacking on appeal any factual or legal conclusions contained in this Report and Recommendations and to which they did not object, except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); CTA11 Rule 3-1.

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on January 15, 2025.

Jonathan Goodman
CHIEF UNITED STATES MAGISTRATE JUDGE

74

<u>Copies furnished to:</u>
The Honorable Darrin P. Gayles
All Counsel of Record